**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MLB PLAYERS INC., | **COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiff*, | |
| v. | Civil Action No. |
| DRAFTKINGS, INC., f/k/a DK CROWN HOLDINGS INC. and BET365 GROUP LIMITED, | |
| *Defendants*. | |

Plaintiff MLB Players Inc. ("MLBPI"), by its undersigned attorneys for its Complaint, alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1.       This action is brought by MLBPI against Defendant DraftKings, Inc., f/k/a DK Crown Holdings Inc. ("DraftKings") and bet365 Group Limited ("bet365") (collectively, "Defendants"), leading sports gambling companies, based on their knowing and deliberate misappropriation of the images and likenesses of hundreds of Major League Baseball ("MLB") players for their own commercial purposes on their sportsbook betting online and mobile platforms and their use of MLB players' names, images, and likenesses in associated advertising, without the consent of MLBPI.

2.       DraftKings, founded in 2012, began primarily as a provider of daily and weekly fantasy sports in the U.S. While traditional fantasy sports are premised on users building a team of professional athletes and earning points based on the players' real-world statistical performance over the course of a season, in daily and weekly fantasy sports, users can win contests on the same

1

day that they enter. Fantasy sports are generally considered to be games of skill that are not regulated as sports betting.

3.      Bet365 is an online gambling company based in the United Kingdom that has offered online sports betting outside of the U.S. since approximately 2001.

4.      When states within the U.S. became free to legalize sports betting following a 2018 U.S. Supreme Court ruling, both DraftKings and bet365 launched their sportsbook platforms in U.S. states that legalized sports betting, allowing their users to wager on the outcome of sports competitions as well as place specific bets on individual player performances (commonly referred to as "prop bets").

5.      Despite not being licensed by MLBPI to use MLB player images, DraftKings and bet365, upon information and belief, began featuring dozens of such images prominently throughout their online and mobile DraftKings Sportsbook and bet365 sportsbook betting platforms sometime in early 2024. Indeed, nearly every active MLB player's image is displayed on Defendants' websites and mobile apps. MLB player names, images, and likenesses are also featured prominently in advertising on both DraftKings Sportsbook and bet365's social media, including in posts encouraging customers to place bets on the featured player.

6.      Defendants' use of player images within their sportsbook platforms is not merely informational—it is promotional. Users could bet that the Phillies will beat the Marlins, or that Bryce Harper will hit more than two home runs in a given game, without seeing Harper's valuable image. Indeed, both DraftKings and bet365 offer the same types of bets in other sports without using player images. For example, despite the fact that the 2024-25 football season just began, neither platform features images of National Football League ("NFL") players. And there is no other purpose for using popular MLB player names and images in advertising other than to increase

the consumer appeal of the apps and draw users to make bets on the platforms, particularly given that the core information that bettors need in order to make informed decisions about placing sports bets is statistical data.

7.     Defendants' use of MLB player images on their sportsbook betting platforms and in use of player names and images in associated advertising, without a license for such use, is a flagrant violation of Pennsylvania's right of publicity statute, 42 PA. CONST. STAT. § 8316, and Pennsylvania common law. As such, MLBPI brings this action to recover compensatory and punitive damages, and to prevent Defendants' further willful misappropriation of those players' publicity rights.

## JURISDICTION AND VENUE

8.     This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interests and costs. Plaintiff MLBPI is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York. Defendant DraftKings is a corporation organized under the laws of the State of Nevada, with its principal place of business in Boston, Massachusetts. Defendant bet365 is a foreign corporation formed in the United Kingdom, with its principal place of business in Stoke-on-Trent, United Kingdom. Both DraftKings and bet365 are registered to do business as foreign business corporations in the State of Pennsylvania.

9.     Venue in this district is proper under 42 PA. CONST. STAT. § 5301(a)(2)(i) and 28 U.S.C. § 1391(b)(2). Pursuant to 42 PA. CONST. STAT. § 5301(a)(2)(i), a corporation's qualification as a foreign corporation under the laws of the State of Pennsylvania "constitute[s] a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal

3

jurisdiction" over the corporation. Under federal law, venue is appropriate in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2).

10.     This Court also has personal jurisdiction over DraftKings and bet365 because they regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and/or services provided to persons in this District, including through the infringing activities challenged in this action. Additionally, pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events or omissions giving rise to MLBPI's claims occurred in the Eastern District of Pennsylvania.

## PARTIES

11.     Plaintiff MLBPI is the corporate subsidiary of the Major League Baseball Players Association ("MLBPA"), which represents MLB players in collective bargaining with MLB and in other matters affecting the players' economic and privacy interests. MLBPI, as assignee of the right to use the names, images, and likenesses of three or more MLB players in a calendar year, negotiates and enters into group licensing agreements with companies throughout the world, to authorize when appropriate the use of the players' names, images, and likenesses in commercial products and sponsorships under specifically negotiated terms and conditions. MLBPI is the exclusive group licensing agent for all active MLB players, and it possesses the exclusive right to use, license and sublicense those players' names, images, and likenesses for any commercial marketing, promotional activity, or product in which the MLB players' group licensing rights are implicated.

12.     Defendant DraftKings is a publicly traded NASDAQ corporation (DKNG) organized under the laws of the state of Nevada with its principal place of business in Boston,

Massachusetts. DraftKings is a digital sports entertainment and gaming company, providing online sports betting, online casino, daily fantasy sports, and other consumer products. Among these products is the DraftKings Sportsbook platform, available online and in a mobile app, which allows consumers to place bets on virtually any professional sport or athlete in states where such sports betting is legal, including Pennsylvania.

13.     Defendant bet365 is a privately held foreign corporation organized in the United Kingdom, and is headquartered in Stoke-on-Trent, United Kingdom. Bet365 is a digital sports gambling company, offering online sports betting, fantasy sports, online casino, online poker, and online bingo, among other consumer products. Bet365's sportsbook betting, fantasy sports, and online casino products are offered through its bet365 mobile app and website, which allow consumers to place bets on virtually any professional sport or athlete in states where such betting is legal, including Pennsylvania.

## FACTUAL ALLEGATIONS

### A.     Sports Betting in the United States

14.     Gambling was legalized in Nevada in 1931, and sports betting in particular was legalized in 1949. For decades afterwards, Nevada's casinos were the only places in the United States where Americans could legally place sports bets.

15.     The process for placing a bet in person at retail sportsbooks, which are usually located inside casinos, has remained largely the same since 1949: a bettor goes to the sportsbook, reviews large boards or screens that list out the active bets, selects their bets, and provides their selected bets and payment to either a clerk, or, in more technologically savvy sportsbooks, to a self-serve kiosk. The boards listing the active bets display nothing but the bets themselves—there are no team logos, no photos of the athletes, and not even so much as an icon representing the sport

on which the bet is placed. What was true in 1949 remains true in 2024: a bettor did not need a picture of Richie Ashburn (or Bryce Harper) to place a bet.

16.     The Professional and Amateur Sports Protection Act ("PASPA") was passed in 1992, which outlawed sports gambling in all states except Nevada, and in 2006, the Unlawful Internet Gambling Enforcement Act was passed, which forbade companies from knowingly accepting payments in connection with online betting. Post-PASPA, legal sports betting flourished in Nevada, with the market almost doubling from $1.8 billion to $3.9 billion.

17.     Nevada continued to accelerate the growth of this market in 2010 when, eight years before all other states were allowed to legalize online sports betting, it introduced its first online sportsbook. The state saw a sharp increase in sports betting immediately afterwards, especially among younger adults. For example, a 2011 study by the Annenberg Public Policy Center at the University of Pennsylvania found that monthly usage of online gambling sites among college-aged men increased from 4.4% in 2008 to 16% in 2010.[1] Online sports betting removed all potential hurdles to placing bets. A bettor no longer had to go to a casino, wait in line, and fill out a form; rather, they could just press a button on their computer or smartphone and place a bet instantly. This accessibility, combined with widespread legalization of sports betting, would lead to the drastic growth of the sports betting industry after 2018.

**B.     The Legalization of Sports Betting and Rise of Online Sports Betting**

18.     In May 2018, the Supreme Court legalized sports betting in *Murphy v. National Collegiate Athletic Association*. The decision, which overturned PASPA, allowed states to legalize sports betting and resulted in the rapid geographic and economic expansion of the industry.

---

[1] Annenberg Public Policy Center, *The Unrecognized Risks of Gambling for Male High School Athletes* (Apr. 27, 2011), https://cdn.annenbergpublicpolicycenter.org/Downloads/Releases/ACI/High%20School%20Male%20Athletes%20Helped%20Drive%20Recent%20Poker%20Craze%20final.pdf.

19. Following the ruling, sports betting was legalized in 38 states and the District of Columbia, and continues to expand, with active legislation currently introduced in two additional states.[2] 30 of these 38 states, as well as the District of Columbia, offer online and mobile sportsbook betting, with active legislation aiming to legalize such betting currently introduced in three additional states.[3] Pennsylvania legalized online sports betting on May 31, 2019 and currently does not restrict any bet types.

20. The sports betting market is booming, and betting figures have increased year after year, both on a state and national level. Americans spent more than $220 billion on sports betting within five years of *Murphy* being decided,[4] and the American Gaming Association reported that 28.7 million American adults intended on placing a wager using an online sportsbook for this past Super Bowl alone.[5] The industry has also been immensely profitable for the state of Pennsylvania—in the first quarter of 2024, the state saw $212 million in gaming revenue.[6]

21. Online sportsbook betting platforms, such as the DraftKings Sportsbook and the bet365 apps and websites, offer bets on the outcomes of multiple sports, based on odds those companies set. They also offer prop bets, or bets based on individual athletes' performances (*e.g.*, how many home runs a baseball player will hit in a season) or occurrences within games (*e.g.*, how many total home runs will be hit by a team during a baseball game).

---

[2] American Gaming Association Sports Betting Map, https://www.americangaming.org/research/state-gaming-map/.

[3] *Id.*

[4] American Gaming Association, *Five Years Post-PASPA: Consumer Sports Betting Trends* (May 9, 2023), https://www.americangaming.org/resources/five-years-post-paspa-consumer-sports-betting-trends/.

[5] American Gaming Association, *Super Bowl LVIII Wagering Estimates* (Feb. 6, 2024), https://www.americangaming.org/resources/super-bowl-lviii-wagering-estimates/.

[6] American Gaming Association, *2024 Q1 Commercial Gaming Revenue Tracker*, https://www.americangaming.org/wp-content/uploads/2024/05/Q1-2024_CGRT.pdf.

22.     DraftKings initially focused on daily and weekly fantasy sports and expanded into online and retail sportsbook betting after the 2018 *Murphy* decision—an expansion that has been immensely profitable for the company. Bet365 has consistently offered both daily fantasy sports and sportsbook betting on its website and app since it entered the United States market in 2019.

23.     Both DraftKings and bet365 have reaped the benefits of the expanding online sportsbook betting marketplace. DraftKings launched its DraftKings Sportsbook platform in August 2018 in New Jersey and expanded into Pennsylvania in November 2019. According to publicly reported financial information, DraftKings generated over $3.6 billion in revenues in 2023, a 63.6% increase over the year before, a growth which it primarily attributes "to the strong performance of [its] Sportsbook and iGaming product offerings."[7] In 2023, bet365 saw a 18.9% rise in sports betting and gaming revenue to £3.39 billion (approximately $4.42 billion USD), as well as a 29% rise in new customers, increases that CEO Denise Coates attributed largely to the company's growing presence in the United States.[8] Bet365 launched its sportsbook platform in Pennsylvania in July 2024, and within 16 days of its soft launch, it saw almost $1.1 million in online gaming revenue.[9]

C.      **MLBPI's Group Licensing Structure**

24.     Professional baseball players spend their lives and careers developing the specialized skills necessary to succeed at the professional level. One of the most important rewards for the small number of players who play professional baseball is the establishment of a personal

---

[7] Annual Report of DraftKings, Inc. for Fiscal Year ended December 31, 2023 (Form 10-K) at 57 and 61 (Feb. 16, 2024).

[8] iGaming Business, "Bet365 Posts £61.2m loss despite revenue growth in 2022-23" (Jan. 8, 2024), https://igamingbusiness.com/finance/full-year-results/bet365-posts-loss-despite-revenue-growth-in-2022-23/.

[9] Play Pennsylvania, "Bet365 Impresses in First Two Weeks in PA Gaming Market," https://www.playpennsylvania.com/bet365-on-pace-over-2-million-monthly-igaming-revenue/#:~:text=Including%20the%20soft%20launch%20that,averaged%20%2467%2C701%20in%20daily%20revenue.

and professional identity. MLB players benefit from approved uses of their public personas by sponsoring and supporting causes and institutions that are meaningful to them, and also use their public personas and identities for commercial benefit and for the benefit of their union (the MLBPA) through means such as licensing and promotional agreements negotiated by MLBPI on their behalf.

25.     For professional athletes, the ability to control the commercial use of their names, images, and likenesses (commonly referred to as the "right of publicity") is a crucial return on their substantial career investment. It also enables athletes to avoid being associated with companies, commercial products, and industries that they do not wish to be perceived as supporting and endorsing.

26.     MLBPI is the exclusive group licensing agent for all active MLB players. Each active MLB player has assigned to MLBPA, and in turn to MLBPI, the exclusive, worldwide right to use, license, and sublicense, among other things, the players' names, images, and likenesses for purposes of any commercial marketing, promotional activity, product, or service in which three or more MLB players are identified over the course of a calendar year. Any use of the aforementioned protected attributes of three or more players in connection with commercial activities must be licensed through and authorized by MLBPI.

27.     In its role as licensing agent, MLBPI regularly negotiates group licensing agreements authorizing use of MLB players' rights in a range of commercial products and services. These agreements ensure that players are associated only with brands, products, and services that they choose to support; that the commercial value of their rights is neither tarnished nor diluted through misuse or overuse; and that the MLBPI and players receive fair compensation when the players' images are used to increase the consumer appeal of a brand, product, or service.

### D. Defendants' Unauthorized Uses of MLB Player Images on Their DraftKings Sportsbook and bet365 Platforms and in Related Advertising

28.   The DraftKings Sportsbook and bet365 apps and websites feature the image of almost every current MLB player. These images are specifically used in connection with the promotion of prop bets on both Defendants' platforms. For example, on both platforms, the home run prop bet page under the MLB tab features images of each player hitting in each game, alongside the players' team logos.

| *DraftKings Sportsbook mobile app* | *bet365 mobile app* |
|---|---|
|  |  |

For comparison, on both platforms, the Touchdown Scorer prop bet page under the NFL tab does not feature player images:

*DraftKings Sportsbook mobile app*        *bet365 mobile app*




29.    Additionally, on the DraftKings Sportsbook platform, MLB player images are featured on individual player pages accompanying the player's statistics and playing records.

*Player pages for Bryce Harper and Paul Skenes on DraftKings Sportsbook*




For comparison, on both platforms, NFL player images are not featured on individual player pages accompanying the player's statistics and playing records:

*DraftKings Sportsbook mobile app*



*bet365 mobile app*



30.    MLB player images are also used in a stylized manner in both team "rosters" and on the "featured players" tabs on various parts of the DraftKings Sportsbook app. These images are combined with the team logo, team colors, and MLB logo in order to create a visually appealing tile within the app. Generally, these tiles are created for the most popular players at the time— underscoring the point that the images are used for promotional rather than informational purposes. These featured players' images are intended to entice users of the platform to click on their tiles, which then takes the users to a page of prop bets pertaining to that player.

*Philadelphia Phillies Roster and Featured Players on DraftKings Sportsbook*




For comparison, NFL player images are not featured in both team "rosters" and on the "team odds" tabs on various parts of the DraftKings Sportsbook app.

*Philadelphia Eagles Stats and Team Odds on DraftKings Sportsbook*




31.     Similarly, the DraftKings Sportsbook website specifically advertises a "New!" feature to users that allows them to "[t]ap the player to access the player page!"

*DraftKings Sportsbook website*



32.     Clicking on the player's image takes users to a page of prop bets pertaining to such player. Use of player images in this manner serves no purpose other than to increase user interest, promote the prop bet, and entice the user to click into prop bet pages and place bets.

*Player prop bet page for the Pittsburgh Pirates'*
*Bryan Reynolds on DraftKings Sportsbook*



14

33.     Sportsbook betting is big business. The more customers that use and place bets on a sportsbook platform, the more money the sportsbook makes. Player images are not necessary for this business to function. The core information bettors require to make informed decisions—such as an athlete's name, past and current performance, and relevant statistics—can be fully conveyed through data alone. In fact, most serious bettors focus only on data in determining what bets to place, including quantitative factors such as performance metrics, matchups, and injury status, among others. These bettors do not consider a player's picture when making their bets, as an image cannot convey any relevant statistics about said player or their condition, and therefore does nothing to improve their understanding of the bet and does not impact their decision-making process in any way.

34.     Indeed, neither DraftKings Sportsbook nor the bet365 platforms feature player images of any kind for football, despite the fact that the 2024-25 NFL season recently began and the same types and breadth of bets are available on the platforms for football as they are for baseball, and despite the fact that the NFL is the most popular sport to bet on in America. Defendants are instead using MLB player images on their platforms for their own commercial advantage, as a means of associating their platforms more closely with these MLB players, to promote the use of their platforms and entice users to place bets when on the websites or apps.

35.     Both DraftKings and bet365 also use MLB player names and images in advertising for their respective sportsbook platforms for the same reason. DraftKings' social media posts feature action shots of MLB players mid-game, often in multi-slide posts that begin with what appears to be a piece of sports reporting yet concludes with an advertisement encouraging viewers of the ad to place a bet on the DraftKings Sportsbook platform. These posts, which are often made as joint posts with the primary DraftKings Instagram account in order to bring more visibility, are

shown to the 189,000 followers of the DraftKings Sportsbook platform and the 252,000 followers of the primary DraftKings platform, and often receive hundreds of likes and social media interactions.

*DraftKings Sportsbook Instagram post from July 13, 2024*



36.     Bet365 utilizes MLB player names and images in a very similar manner in advertising, making multi-slide posts that begin with a player image and end with an advertisement encouraging consumers to place a bet on the company's Sportsbook platform.

*bet365 Instagram post from August 1, 2024*




37.     Bet365 also frequently posts advertisements that feature an image of an MLB player captioned with teaser questions that could be associated with a prospective bet. For example, the bet365 sportsbook platform allows consumers to place bets on the winner of the Cy Young Award, and the caption on a September 3, 2024 Instagram post of an image of Atlanta Braves pitcher Chris Sale reads, "Cy Young?"



38.     This usage of player images on the platform and the use of player names and images in advertisements for the platform is intended to capitalize on those players' celebrity and/or notoriety and use it to promote and drive business into the DraftKings Sportsbook and bet365 platforms, despite the fact that MLBPI has not granted Defendants a license.

39.     Because Defendants have used well over three MLB players' images over the course of a single calendar year in a commercial context, DraftKings and bet365 were required to have obtained a license from MLBPI for such uses, but did not do so.

40.     DraftKings and bet365 knowingly appropriated the images and likenesses of three or more MLB players, and willfully disregarded MLBPI's rights in using these players' images and likenesses in their DraftKings Sportsbook and bet365 platforms, without MLBPI's consent or authorization. Further, DraftKings and bet365 at all relevant times knowingly appropriated the names, images, and likenesses of three or more MLB players, and willfully disregarded MLBPI's rights in using these players' names, images, and likenesses in advertising and promotions for their sportsbook platforms, without MLBPI's consent or authorization.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 PA. CONST. STAT. § 8316

41.     MLBPI incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

42.     Pennsylvania Statutes § 8316 provides for a cause of action by "[a]ny natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose without the written consent of such natural person," as well as a cause of action by "[a]ny other person, firm or corporation authorized in writing by such natural person to license the

commercial or advertising purposes of the person's name or likeness." 42 PA. CONST. STAT. § 8316(b).

43.    MLBPI has the right and license to use the group licensing rights described herein, including the right to grant sublicenses of those rights. MLBPI also has the right to prosecute claims and suits in its own name to protect those rights. As such, MLBPI has standing to bring claims for misappropriation of these MLB players' rights of publicity on MLBPI's behalf and on behalf of the MLB players who assigned their rights to MLBPI.

44.    MLB players' names, images, and likenesses have commercial value.

45.    Defendants knowingly and without consent used the images of three or more MLB players within their respective sportsbook betting platforms and knowingly used the names, images, and likenesses of three or more MLB players for the purposes of promoting and advertising their sportsbook platforms.

46.    Because MLBPI is the exclusive group licensing agent for current MLB players, Section 8316 required Defendants to obtain MLBPI's prior written consent before using the MLB players' names, images, and/or likenesses in the manner described above.

47.    Defendants' actions as alleged herein are outrageous, malicious, and in willful violation of MLBPI's rights.

48.    Defendants' violations of applicable and governing state law for its unauthorized use of MLB players' identities for commercial purposes entitles MLBPI to recover equitable and monetary relief in an amount to be proven at trial to remediate such violations on behalf of the MLB players who have assigned their group licensing rights to MLBPI. 42 PA. CONST. STAT. § 8316.

## SECOND CLAIM FOR RELIEF
**Violation of Common Law Misappropriation of Publicity**

49.     MLBPI incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

50.     Pennsylvania recognizes a common law right of publicity that provides individuals with a cause of action for the appropriation of their valuable likeness, without authorization, for commercial advantage.

51.     Defendants have used and appropriated the valuable likenesses of three or more MLB players within their respective sportsbook betting platforms and the names and likenesses of three or more MLB players in related advertising, for Defendants' commercial advantage, without authorization. This conduct has cost MLBPI the compensation it should have received for these uses, entitling it to compensatory damages.

52.     Defendants' conduct in misappropriating the names, images, and likenesses of these MLB players was outrageous and inexcusable, justifying punitive damages.

## THIRD CLAIM FOR RELIEF
**Violation of Common Law Misappropriation of Identity**

53.     MLBPI incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

54.     Pennsylvania recognizes a common law right of publicity that provides individuals with a cause of action for the invasion of privacy by misappropriation of their name and likeness.

55.     MLB players' names, images, and likenesses have commercial value. Defendants knowingly and intentionally violated the common law privacy rights of current MLB players, which were assigned to MLBPI for purposes of group licensing, by using those players' images

and likenesses within Defendants' sportsbook betting platforms and by using those players' names, images, and likenesses in advertising meant to draw customers to the platforms.

56.     Defendants' actions as alleged herein are outrageous, malicious, and in willful violation of MLBPI's rights. MLBPI is accordingly entitled to compensatory and punitive damages, as well as an accounting of all sales and profits related to the misappropriation of MLB player names, images, and likenesses, and disgorgement of all profits generated by virtue of the unauthorized uses.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**

57.     MLBPI incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

58.     By using three or more MLB players' names, images, and likenesses for their commercial advantage without authorization, Defendants have been unjustly enriched to the substantial detriment of the MLB players and MLBPI.

59.     Defendants have retained the benefits under such circumstances as to make it unjust and inequitable to retain them without paying MLBPI the value of the benefits they unjustly acquired.

60.     Accordingly, MLBPI seeks full restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, MLBPI prays for the following relief:

1.      Preliminarily and permanently enjoining Defendants from continuing to use MLB player images and likenesses in their sportsbook platforms;

2.     Preliminarily and permanently enjoining Defendants from continuing to use MLB player names, images, and likenesses in advertising and promotions for their sportsbook platforms;

3.     Actual damages under 42 PA. CONST. STAT. § 8316;

4.     Compensatory and punitive damages in an amount to be determined at trial;

5.     An accounting and disgorgement of all profits associated with the use of MLB player images and likenesses in their sportsbook platforms, and the use of MLB names, images, and likenesses in advertising and promotions for their sportsbook platforms;

6.     An award of reasonable attorneys' fees, costs, and disbursements; and

7.     Any other relief as this Court deems just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

MLBPI hereby demands a jury trial on all issues as to which a jury trial is available.


Dated:  September 16, 2024

By:_____*/s/ Jeffrey L. Kessler*_____

Jeffrey L. Kessler (*pro hac vice* forthcoming)
jkessler@winston.com
David L. Greenspan (*pro hac vice* forthcoming)
dgreenspan@winston.com
Robert S. Pannullo (*pro hac vice* forthcoming)
rpannullo@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4700

Diana H. Leiden (*pro hac vice* forthcoming)
dhleiden@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700

By:   */s/ Peter Leckman*

Peter Leckman (PA Id. 312076)
pleckman@langergrogan.com
Howard Langer (PA Id. 25403)
hlanger@langergrogan.com
Mary Catherine Roper (PA Id. 71107)
Mroper@langergrogan.com
Kevin Trainer (PA Id. 326064)
ktrainer@langergrogan.com
LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Counsel for Plaintiff MLB Players Inc.*