**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **MLB PLAYERS INC.**<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>**DRAFTKINGS, INC., f/k/a DK CROWN HOLDINGS INC. and BET365 GROUP LIMITED,**<br><br>　　　　　　Defendants. | **CIVIL ACTION**<br><br>**NO. 24-4884-KSM** |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT DRAFTKINGS INC.'S MOTION TO DISMISS</u>**

**Table of Contents**

                                                                                    **Page**

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

   I.   DK Sportsbook and Other Products.................................................................. 3

   II.   DraftKings' Social Media Posts...................................................................... 5

   III.  MLBPI's Claims ............................................................................................. 7

LEGAL STANDARD .................................................................................................. 8

ARGUMENT ............................................................................................................... 8

   I.   DraftKings' Use of Player Images Is Newsworthy and Is Not Subject to Right-of-Publicity Claims (Counts I, II, and III)........................................... 8

     A.   The Legal Framework............................................................................ 9

     B.   Player Headshots on DK Sportsbook Are Newsworthy ............................. 13

     C.   Player Images on DraftKings' Social Media Is Newsworthy....................... 15

   II.   DraftKings' Use of Players' Images Is Fully Protected under the First Amendment................................................................................................... 17

   III.  The Complaint Fails to Plead the Elements of Statutory and Common Law Right of Publicity Claims (Counts I, II, and III).................................................... 21

     A.   The Complaint Fails to Identify Any "Natural Persons" on Whose Behalf MLBPI Purports to Bring Claims (Counts I, II, and III) ...................................... 21

     B.   The Complaint Fails to Adequately Allege "Commercial Value" (Counts I and II)................................................................................... 22

     C.   The Complaint Fails to Adequately Allege That MLBPI Is Authorized to Bring a Claim (Count I) ................................................................................. 24

   IV.  MLBPI's Unjust Enrichment Claim (Count IV) Should Be Dismissed Because MLBPI Did Not Confer a Benefit on DraftKings.......................................... 25

CONCLUSION............................................................................................................ 25

## Table of Authorities

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................8

*Bank v. Cmty. Coll. of Phila.*,
No. CV 22-293 #, 2022 WL 2905243 (E.D. Pa. July 22, 2022)............................22

*Beauty Time, Inc. v. VU Skin Systems, Inc.*,
118 F.3d 140 (3d Cir. 1997)...............................................................................5

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................8

*Bissett v. Verizon Wireless*,
401 F. Supp. 3d 487 (M.D. Pa. 2019)...............................................................22

*Boring v. Google Inc.*,
362 F. App'x 273 (3d Cir. 2010) .......................................................................25

*Bosley v. Wildwett.com*,
310 F. Supp. 2d 914 (N.D. Ohio 2004)..............................................................10

*C.B.C. Distrib. & Mktg., Inc. v. MLB Advanced Media, L.P.*,
505 F.3d 818 (8th Cir. 2007) ..................................................................... *passim*

*Cardtoons, L.C. v. MLB Players Ass'n*,
95 F.3d 959 (10th Cir. 1996) .......................................................................18, 19

*CBS Interactive Inc. v. NFL Players Ass'n, Inc.*,
259 F.R.D. 398 (D. Minn. 2009).....................................................................18, 20

*Ciolli v. Iravani*,
625 F. Supp. 2d 276 (E.D. Pa. 2009) .................................................................5

*Connick v. Myers*,
461 U.S. 138 (1983)..........................................................................................17

*Country Classics at Morgan Hill Homeowners' Ass'n v. Country Classics at
Morgan Hill, LLC*,
780 F. Supp. 2d 367 (E.D. Pa. 2011) .................................................................8

*Daniels v. FanDuel Inc. and DraftKings Inc.*,
109 N.E.3d 390 (Ind. 2018) ....................................................................10, 14, 15

*Daniels v. FanDuel, Inc. and DraftKings Inc.*,
909 F.3d 876 (7th Cir. 2018) ..................................................................1, 11, 13

*Daniels v. FanDuel, Inc. and DraftKings, Inc.*,
No. 116CV01230TWPDKL, 2017 WL 4340329 (S.D. Ind. Sept. 29, 2017) ..........2, 14, 15, 19

*Dryer v. NFL*,
55 F. Supp. 3d 1181 (D. Minn. 2014), *aff'd*, 814 F.3d 938 (8th Cir. 2016) ..........................10

*Eagle v. Morgan*,
No. CIV.A. 11-4303, 2013 WL 943350 (E.D. Pa. Mar. 12, 2013) ............................21, 23, 24

*Edme v. Internet Brands, Inc.*,
968 F. Supp. 2d 519 (E.D.N.Y. 2013) ..................................................................10

*ETW Corp. v. Jireh Publ'g, Inc.*,
332 F.3d 915 (6th Cir. 2003) ..................................................................18

*Facenda v. N.F.L. Films, Inc.*,
542 F.3d 1007 (3d Cir. 2008) ..................................................................9

*Fair Wind Sailing, Inc. v. Dempster*,
764 F.3d 303 (3d Cir. 2014) ..................................................................8

*Fike v. Glob. Pharma Healthcare Priv., Ltd.*,
No. 5:23-CV-2981, 2024 WL 3460114 (E.D. Pa. July 18, 2024) ..........................22

*Flood v. Kuhn*,
407 U.S. 258 (1972) ..................................................................14

*Fogel v. Forbes, Inc.*,
500 F. Supp. 1081 (E.D. Pa. 1980) ..................................................................13

*Fuhrman v. Mawyer*,
No. 1:21-CV-02024, 2023 WL 5672314 (M.D. Pa. Sept. 1, 2023) ..........................4

*Gionfriddo v. MLB*,
94 Cal. App. 4th 400 (2001) .................................................. *passim*

*Grande v. Starbucks Corp.*,
No. CV 18-04036, 2020 WL 4937105 (E.D. Pa. Aug. 24, 2020) ....................................23, 24

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ..................................................................18

*Lewis v. Marriott Int'l, Inc.*,
527 F. Supp. 2d 422 (E.D. Pa. 2007) ..................................................................9

*Messenger v. Gruner Jahr Printing & Pub.*,
    208 F.3d 122 (2d Cir. 2000)..................................................................17

*Mills v. Ethicon, Inc.*,
    406 F. Supp. 3d 363 (D.N.J. 2019) ......................................................22

*Montana v. San Jose Mercury News, Inc.*,
    34 Cal. App. 4th 790 (1995) ..................................................................12

*Myskina v. Conde Nast Publ'ns, Inc.*,
    386 F. Supp. 2d 409 (S.D.N.Y. 2005)..................................................13

*Neff v. Time, Inc.*,
    406 F. Supp. 858 (W.D. Pa. 1976)........................................................10

*New Kids On The Block v. News America Pub., Inc.*,
    971 F.2d 302 (9th Cir. 1992) ..........................................................16, 17

*NFL v. Alley, Inc.*,
    624 F. Supp. 6 (S.D. Fla. 1983) ............................................................12

*Pellegrino v. Epic Games, Inc.*,
    451 F. Supp. 3d 373 (E.D. Pa. 2020) ....................................................25

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)..............................................................8, 22

*Pryor v. NCAA*,
    288 F.3d 548 (3d Cir. 2002)....................................................................5

*Somerson v. World Wrestling Ent., Inc.*,
    956 F. Supp. 2d 1360 (N.D. Ga. 2013) ............................................11, 18

*Taha v. Bucks Cnty.*,
    9 F. Supp. 3d 490 (E.D. Pa. 2014) ........................................................23

*Winters v. New York*,
    333 U.S. 507 (1948)................................................................................18

*Wurth Baer Supply Co. v. Strouse*,
    627 F. Supp. 3d 422 (M.D. Pa. 2022) ........................................9, 23, 24

*Zacchini v. Scripps-Howard Broad. Co.*,
    433 U.S. 562 (1977)................................................................................18

**Statutes**

42 Pa. Cons. Stat. § 5523(1) ..........................................................................5

42 Pa. Cons. Stat. § 8316 ................................................................................ *passim*

Cal. Civ. Code § 3344(d) ...................................................................................11, 17

Fla. Stat. § 540.08(4)(a) .........................................................................................12

Ind. Code § 32-36-1-1(c)(1)(B) .............................................................................15

## Other Authorities

Eugene Volokh, *Freedom of Speech and the Right of Publicity*,
    40 Hous. L. Rev. 903 (2003) ...........................................................................17

Fed. R. Civ. P. 8 .....................................................................................................22

Fed. R. Civ. P. 12(b)(6) ..........................................................................................11

Martin Spann & Bernd Skiera, *Sports forecasting: a comparison of the forecast
    accuracy of prediction markets, betting odds and tipsters*,
    28(1) J. OF FORECASTING 55 (2009) ..................................................................14

Restatement (Second) of Torts § 652C ...............................................................9, 21

## PRELIMINARY STATEMENT

For generations, sports fans have used public domain statistics to stay up to date on their

favorite teams and athletes, understand the game, engage with other sports fans, and place bets.

More traditionally, these statistics have been available in newspapers, magazines, through

television broadcasts, and at retail sportsbooks, and fans have discussed and debated the merits

of teams or individual players by calling into radio shows and talking at water coolers, bars, and

restaurants.  But today, fans increasingly consume sports statistics online, engage in spirited

discussions on social media, and place bets using online sportsbooks.

Defendant DraftKings—an industry leader in both online sports betting (through DK

Sportsbook) and daily fantasy sports ("DFS")—is one of the many places fans consume statistics

about sports.  DraftKings provides the same team and player statistics, news, and betting odds as

traditional media sources, and engages with and entertains fans on social media.

Plaintiff Major League Baseball Players Inc. ("MLBPI") recognizes the newsworthy

value of the statistics DraftKings provides fans and does not seriously challenge it.  Rather,

MLBPI complains that DraftKings' use of player images in connection with names and statistics

(on DK Sportsbook and social media) violates Pennsylvania's statutory and common law right of

publicity.  The Complaint runs headlong into every judicial decision that has addressed right-of-

publicity claims in this context:  whether on sports broadcasts or in news reporting, or in

connection with fantasy sports or other entertainment, (1) the use of publicly-available names,

statistics, and images of athletes falls within the newsworthiness exceptions to the right of

publicity carved out by state statutes and the common law, and (2) is protected by the First

Amendment.

The Complaint here fares no better than the one in *Daniels v. FanDuel, Inc. and*

*Draftkings, Inc.*, where the Seventh Circuit affirmed dismissal of right-of-publicity claims based

on DraftKings' use of player names, images, and statistics in connection with fantasy sports—virtually the same information MLBPI now claims violates Pennsylvania law in connection with DK Sportsbook and social media posts. On a certified question from the Seventh Circuit, the Indiana Supreme Court held that the use of player identities and information in connection with fantasy sports is no less protected from a right-of-publicity claim than use of the same identities and information in newspapers and on other websites.[1] DraftKings' virtually identical use in connection with online betting is no less newsworthy than in connection with fantasy sports, traditional sports broadcasts, and news reporting. Put simply, no court of which DraftKings is aware has ever imposed right-of-publicity liability on the use of publicly-available, newsworthy statistics that incorporate names and likenesses in the manner that MLBPI seeks to impose here. There is nothing different or unique under Pennsylvania law. The Complaint is deficient on its face, fails as a matter of law, and should be dismissed.

*First*, DraftKings' use of player images is newsworthy and does not give rise to right-of-publicity violations under Pennsylvania statutory or common law. Putting aside that the Complaint never explains why Pennsylvania law applies to the claims of every MLB player across the country, there can be no serious dispute that DraftKings' use of player images, names, statistics, and betting odds is newsworthy. In fact, the Complaint focuses on DraftKings' use of player images but does not challenge the corresponding use of names and statistics that equally identify the players (and that the Complaint acknowledges DraftKings has used in DK Sportsbook since 2018). Under established law, images (such as player headshots and action

---

[1]    The Southern District of Indiana, the Indiana Supreme Court, and the Seventh Circuit all found in favor of DraftKings on the question of newsworthiness. *See Daniels v. FanDuel, Inc. and DraftKings, Inc.*, No. 116CV01230TWPDKL, 2017 WL 4340329 (S.D. Ind. Sept. 29, 2017), *aff'd*, 909 F.3d 876 (7th Cir. 2018).

shots) that accompany newsworthy information cannot support right-of-publicity claims any more than names can.

*Second*, DraftKings' use of player images is protected by the First Amendment.  In balancing individuals' economic interests against the First Amendment guarantees of freedom of speech and the press, courts routinely conclude that disseminating information about professional sports outweighs players' economic interests in their rights of publicity.

*Third*, the Complaint fails to sufficiently plead the basic elements of statutory or common law right-of-publicity claims.  Among other things, the Complaint fails to (i) identify the specific individuals whose rights allegedly have been violated (instead, referring to "hundreds" of unidentified players); (ii) provide sufficient factual allegations that the as-yet-unidentified players have invested the requisite time, effort, and money to establish commercial value in their name or likeness; and (iii) plead that MLBPI has standing to bring a claim on behalf of the players (instead, alleging that a corporate parent has the authority).

*Fourth*, the tagalong unjust enrichment claim fails as a matter of law.  Third Circuit precedent is clear that an unjust enrichment claim requires a plaintiff to confer a benefit on the defendant, creating a quasi-contractual relationship between the parties.  MLBPI's unjust enrichment claim is based entirely on DraftKings' conduct, and the Complaint fails to allege that MLBPI conferred any benefit on DraftKings, as the law requires.

This Court should follow the legions of courts that have held that use of the same information about which MLBPI complains is protected and should dismiss the Complaint.

## FACTUAL BACKGROUND

### I.    DK Sportsbook and Other Products

DraftKings is a digital sports entertainment and gaming company that provides online DFS, sports betting, and sports-related news and commentary.  *See* Complaint ("Compl.") ¶ 12.

DraftKings' products include, among others, DraftKings Network, a news source and FAST (free ad-served television) channel that publishes and distributes, *e.g.*, "News, Betting Picks, Fantasy Advice, Shows, and Pop Culture [content]." Declaration of Jacob Hochberger ("Decl."), Ex. A.[2] On DK Sportsbook, users can place bets on, among other things, the outcomes of games, players' or teams' performances, the winners of divisions or conferences, and champions of various leagues. Compl. ¶¶ 4, 21. Among other things, DK Sportsbook provides player news (*e.g.*, injury status or recent highlights); player information (*e.g.*, team, position, jersey number, batting average (Avg.), home runs (HR), runs batted in (RBI), hits, doubles, and on-base percentage plus slugging percentage (OPS)); and player betting odds. *Id.* at 11. Headshot images accompany this information to further identify the players.[3] *Id.* This information is all available to the public, regardless of whether visitors to DK Sportsbook intend to place a bet.

The odds and information on DK Sportsbook and social media accounts is no different than information available from other sports news and media outlets. *See* Decl. Exs. B–E. For example, ESPN similarly includes single-game betting spreads and over/under totals on the BottomLine, its ticker running at the bottom of the screen throughout its 24-hour sports coverage, which features game scores, league standings, and player statistics. *See, e.g.*, *id.*, Ex. F. It also features betting odds on MLB preview articles, with a direct hyperlink to its own Sportsbook, ESPN Bet. These articles include content featuring copyrighted images and videos of MLB players. *See* Decl., Ex. G. Other news sources, such as Yahoo! Sports, CBS Sports,

---

[2]    The Court may take judicial notice of the publicly available DraftKings Network website. *See Fuhrman v. Mawyer*, No. 1:21-CV-02024, 2023 WL 5672314, at *7 (M.D. Pa. Sept. 1, 2023) (taking judicial notice of content from defendant's website).

[3]    DraftKings has licensed the copyrights for all the images that it uses. To the extent the Complaint survives this motion, DraftKings intends to move for summary judgment at the appropriate time on the ground of copyright preemption.

Fox Sports, and NBC Sports similarly list on their websites game schedules, and the default view includes betting spreads and over/unders, among other information. *See id.* Exs. B–E.[4]

## II.    DraftKings' Social Media Posts

In addition to DK Sportsbook, DraftKings uses its Instagram accounts, @draftkings_sportsbook and @draftkings, to post sports-related content. Compl. ¶ 35; *id.* at 16.[5] The Complaint identifies a single post from July 13, 2024, consisting of three slides (shown on the next page) that include images of Paul Skenes, a then-rookie pitcher for the Pittsburgh Pirates. The first slide poses the question: "Is Paul Skenes on the most dominant stretch in sports history?" which MLBPI concedes, as it must, is "a piece of sports reporting." *Id.* The second slide includes statistics about "Paul Skenes in the last 13 months," including that he was "[d]rafted first overall" by the Pirates, was "[n]amed an All Star as a rookie," had a 6-0 record, and had a 1.9 ERA in 11 starts, among other statistics.[6] The third slide includes betting odds information. *Id.* Notably, the Complaint crops out the middle slide (shown below) with Skenes' 13-month statistics—which is undoubtedly newsworthy—and includes only the slides on the left and right. *Id.* at 16.

---

[4]    The Court may take judicial notice of the presence of content on these websites for the same reason it can take judicial notice of the DraftKings Network. *See* n.2, *supra*.

[5]    DraftKings has been using player images in its DFS product and on social media for many years, and MLBPI's claims are barred by laches under either invasion of privacy's one-year statute of limitations, 42 Pa. Cons. Stat. § 5523(1), or property claims' two-year statute of limitations. *Beauty Time, Inc. v. VU Skin Systems, Inc.*, 118 F.3d 140, 143 (3d Cir. 1997). To the extent the Complaint survives this motion, DraftKings intends to move for summary judgment at the appropriate time on this defense.

[6]    The Court may consider the entirety of the DraftKings' social media pages—despite MLBPI's omission—because they are incorporated by reference in the Complaint. *Ciolli v. Iravani*, 625 F. Supp. 2d 276, 283–84 (E.D. Pa. 2009) ("The court may look to the allegations made in the complaint, the exhibits attached to the complaint, and any documents whose authenticity no party questions and whose contents are alleged in the complaint") (citing *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002)).





The Complaint also does not show the comments sections of the post, where users debated the very question DraftKings posed regarding whether Paul Skenes is "on the most dominant stretch in sports history," as well as general baseball topics:

- "Definitely not"

- "Yes 💯"

- "Imagine if he had a no hitter already, that would have been cool."

- "He has gotten pulled late game at least twice on no hitters recently.  Pirates won't let him get it smh [shaking my head]."

- "Baseball is all about stats imo [in my opinion].  Oh well.  That's the way things go now, pitch counts is on brand for a lot of things now a days [sic]."

- "Wayne Gretzky won 8 straight MVPs starting with his rookie year…."

- "Ummm ever heard of Tiger Woods?  This is a terrible take"

Decl., Ex. H.

### III.    MLBPI's Claims

The Complaint alleges that DraftKings uses MLB player images on DK Sportsbook (including on pages for prop bets, team rosters, and on the featured players tab) and on social media (along with player names) in violation of Pennsylvania's right of publicity statute, 42 Pa. Const. Stat. § 8316 (Count I), and Pennsylvania common law (Counts II and III), and that the uses constitute unjust enrichment (Count IV).

The Complaint fails, however, to allege several facts necessary to state a plausible claim. *First*, the Complaint does not identify by name a single player whose rights DraftKings purportedly violates. Rather, it merely alleges "upon information and belief" that DraftKings "began featuring dozens of [player] images prominently throughout" DK Sportsbook "sometime in early 2024," Compl. ¶ 5, and that DraftKings has misappropriated "the images and likenesses of hundreds of [MLB] players." *Id.* ¶ 1. With respect to DraftKings' social media posts, the Complaint merely alleges that DraftKings "feature[s] action shots of MLB players mid-game" but fails to identify by name any players whose images are used (save for the single example of Paul Skenes, discussed above). *Id.* ¶ 35.

*Second*, the Complaint alleges in conclusory terms that "MLB players' names, images, and likenesses have commercial value," without pleading any *facts* supporting how each—let alone any—player has developed commercial value in his name, image, or likeness. *Id.* ¶ 44.

*Third*, MLBPI purports to assert the rights of MLB players, but the Complaint does not allege that any MLB player has assigned his rights to MLBPI. Rather, it alleges that each active player has licensed to Major League Baseball Players Association ("MLBPA")—not a party to this case—the right to license and sublicense the players' names, images, and likenesses for purposes of commercial marketing and promotion. *Id.* ¶ 26. The Complaint alleges that MLBPI

is a corporate subsidiary of MLBPA, and draws the conclusion, unsupported by factual allegations, that the players' assignment to MLBPA, "in turn," confers rights on MLBPI.  *Id.*

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see Country Classics at Morgan Hill Homeowners' Ass'n v. Country Classics at Morgan Hill, LLC*, 780 F. Supp. 2d 367, 371 (E.D. Pa. 2011) ("bald assertions" and "legal conclusions" need not be accepted as true at the pleading stage).  A complaint must provide fair notice of the factual bases supporting its claims, and must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 312 (3d Cir. 2014) ("Pleading the 'mere elements' of a cause of action will not do") (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## ARGUMENT

I.    **DraftKings' Use of Player Images Is Newsworthy and Is Not Subject to Right-of-Publicity Claims (Counts I, II, and III)**

The right of publicity protects against the commercial use of a person's name, image, or likeness ("NIL") by another without their consent.  Courts across the country recognize that, consistent with First Amendment principles, the use of NIL in a newsworthy context—*e.g.*, in newspaper articles or television broadcasts—is not a right-of-publicity violation.  The challenged uses here on DK Sportsbook and DraftKings' social media accounts fit squarely within this well-established newsworthiness exception.  Sports news, statistics, and odds are newsworthy content,

as are social media posts, which present a forum for commentary and discussion about content the public is interested in. Accordingly, the Complaint fails as a matter of law to state statutory and common law right-of-publicity claims.

### A.      The Legal Framework

The Pennsylvania's Right-of-Publicity statute, passed in 2002, provides in relevant part:

> Any natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose without the written consent of such natural person or the written consent of any of the parties authorized in subsection (b) may bring an action to enjoin such unauthorized use and to recover damages for any loss or injury sustained by such use.

42 Pa. Cons. Stat. § 8316(a) (the "Statute") (Count I). The Statute expressly excepts from the definition of "commercial or advertising purpose" use that "is associated with a news report or news presentation having public interest." *Id.* § 8316(e)(2)(ii).

Common law causes of action for misappropriation of identity (Count II) and publicity (Count III) are based on the Restatement (Second) of Torts § 652C and track the statutory claim on the material elements. *See, e.g.*, *Wurth Baer Supply Co. v. Strouse*, 627 F. Supp. 3d 422, 442–444 (M.D. Pa. 2022) (relying on statutory analysis and dismissing common law right-of-publicity claim); *Lewis v. Marriott Int'l, Inc.*, 527 F. Supp. 2d 422, 428–429 (E.D. Pa. 2007) (applying analysis of statutory claims to common law misappropriation of publicity and invasion of privacy claims).[7] Under the common law, news reports regarding matters of public interest do

---

[7]    There is an open question as to whether the Statute has abrogated the common law. *Compare Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1013 n.2 (3d Cir. 2008) ("Pennsylvania's right-of-publicity statute subsumed the common-law tort of invasion of privacy"), *with Lewis*, 527 F. Supp. 2d at 429 (there is "no indicia in the text of section 8316 or its legislative history suggesting that it was intended as an exclusive remedy to replace the common-law cause of action of invasion of privacy by misappropriation of identity"). The Court need not resolve that question to conclude that the Complaint fails to adequately allege both statutory and common law claims.

not constitute an invasion of the right of privacy. *Neff v. Time, Inc.*, 406 F. Supp. 858, 861 (W.D. Pa. 1976) (the Restatement limits "unreasonable invasion[s] of [] privacy" only where a publication "is not of legitimate concern to the public").

Courts around the country uniformly recognize that the news exception under analogous statutes is broad and is not limited to traditional news reports or news presentations. Rather, it extends "to all matters [] customarily regarded as news and all matters giving information to the public for purposes of education, amusement or enlightenment, where the public may reasonably be expected to have a legitimate interest in what is published." *Dryer v. NFL*, 55 F. Supp. 3d 1181, 1198 (D. Minn. 2014), *aff'd*, 814 F.3d 938 (8th Cir. 2016). That is because a broad interpretation "would likely avoid a First Amendment issue in parsing acceptable forms of speech." *Daniels v. FanDuel Inc. and DraftKings Inc.*, 109 N.E.3d 390, 396 (Ind. 2018).

Indeed, the Indiana Supreme Court recently held on a certified question from the Seventh Circuit that, in connection with fantasy sports, DraftKings' use of the same type of images, statistics, and information that MLBPI now challenges was exempt from a right-of-publicity claim as newsworthy under Indiana's statute. *See id.*; *see also Edme v. Internet Brands, Inc.*, 968 F. Supp. 2d 519, 528 (E.D.N.Y. 2013) ("The concept of 'newsworthiness' is applied broadly, and includes 'not only descriptions of actual events, but also articles concerning political happenings, social trends or any subject of public interest.' . . . An item's newsworthiness 'depends solely on the content of the article—not the publisher's motive to increase circulation'") (internal citation omitted); *Bosley v. Wildwett.com*, 310 F. Supp. 2d 914, 923–24 (N.D. Ohio 2004) ("It makes no difference whether the article appears in a newspaper, a magazine, a newsreel, on television, in a motion picture, or in a book. The test of permissible use is . . . whether it is illustrative of a matter of legitimate public interest").

After the Indiana Supreme Court answered the certified question, the Seventh Circuit affirmed a Rule 12(b)(6) dismissal of the complaint.  *See Daniels v. FanDuel, Inc. and DraftKings Inc.*, 909 F.3d 876 (7th Cir. 2018).  Indeed, right-of-publicity claims are appropriately dismissed at the pleading stage on newsworthiness grounds.  *See, e.g.*, *Somerson v. World Wrestling Ent., Inc.*, 956 F. Supp. 2d 1360, 1367–68 (N.D. Ga. 2013) (finding "information on [defendant]'s websites as alleged in plaintiff's amended complaint is a matter of public interest" that fell under Georgia's newsworthiness exception).

Though courts have not specifically addressed the "news report" exception under the Pennsylvania Statute, analogous state statutes have been broadly interpreted, like the Indiana statute.  For example, California's statute, Cal. Civ. Code § 3344(d), is similar, and courts have held that uses of baseball players' names and images fall within that statute's exception for "any news, public affairs, or sports broadcast or account."  Cal. Civ. Code § 3344(d).

The California Court of Appeals considered this statutory provision in *Gionfriddo v. MLB*, 94 Cal. App. 4th 400 (2001), as applied to baseball players' right-of-publicity claims. Four MLB players alleged that MLB's use of their statistics, images, and audio and verbal descriptions of their play in websites, documentaries, and game-day programs violated their common law and statutory rights of publicity because the purpose of the use was "to increase interest in baseball, with the belief that this would increase attendance at games."  *Id.* at 413. The court affirmed summary judgment in favor of MLB on statutory grounds because information about baseball fell under California's statutory exception for use in connection with "any news, public affairs, or sports broadcast or account, or any political campaign."  *Id.* at 416. The court also held that the use fell under the First Amendment's protections for noncommercial speech, which outweighed plaintiffs' economic interests.  *Id.* at 414.

11

The court specifically found that "[t]he recitation and discussion of factual data concerning the athletic performance of these plaintiffs command a substantial public interest," *id.* at 412, and held that, "[i]n view of baseball's pervasive influence on our culture . . . the types of uses raised in the record before [the court] are among the 'public affairs' uses exempt" by the statute. *Id.* at 416. It recognized that 'public affairs' includes "subjects that do not relate to politics or public policy . . . that might [not] be covered on public television or public radio," but nonetheless "are of interest" to the public. *Id.* Thus, while not a news report or news presentation in the traditional sense, the public interest in the content of the game programs, video clips, and websites all qualified as "uses exempted from the consent requirement in the statute." *Id.* at 417; *see also Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (1995) (same for posters displaying images of Joe Montana and the San Francisco 49ers).

Like the Pennsylvania and California statutes, Florida's Right-of-Publicity statute, Fla. Stat. § 540.08(4)(a), contains an exception for "any bona fide news report or presentation having a current and legitimate public interest." Courts have similarly interpreted this statute broadly. In *NFL v. Alley, Inc.*, the NFL and Miami Dolphins players sued bars and restaurants that had intercepted satellite transmissions of blacked out local games and rebroadcast them on their premises. 624 F. Supp. 6 (S.D. Fla. 1983). The court held that the defendants' rebroadcast of the games was "a 'presentation having a current or legitimate public interest,'" *id.* at 10 (quoting Fla. Stat. § 540.08(4)(a)), and thus did not violate the statute, and further held that the use was not an advertising use that violated Florida's common law right of publicity. *Id.*

Although DraftKings disputes that each of the unnamed players' rights are governed by Pennsylvania law, usage of player images both on DK Sportsbook and on DraftKings' social

media accounts constitute "news report[s] or news presentation[s] having public interest" and are excepted from liability under the Statute and Pennsylvania common law.

**B.    Player Headshots on DK Sportsbook Are Newsworthy**

DraftKings uses headshots of MLB players on various pages in DK Sportsbook to accompany MLB players' information, news, and sportsbook odds.  Images connected to newsworthy facts enjoy the same protection from right-of-publicity claims as the facts themselves, which MLBPI here does not challenge.  *Fogel v. Forbes, Inc.*, 500 F. Supp. 1081, 1088 (E.D. Pa. 1980); *see also Daniels,* 909 F.3d at 877 (applying Indiana Supreme Court's holding that images, names, and statistics were all newsworthy); *Myskina v. Conde Nast Publ'ns, Inc.*, 386 F. Supp. 2d 409, 419 (S.D.N.Y. 2005) (image of top-ranked tennis professional to illustrate a magazine story was a newsworthy use and did not violate the New York statute).

Notably, MLBPI does not challenge the use of player names on DK Sportsbook, which the Statute treats the same as images.  *See* 42 Pa. Cons. Stat. § 8316(e) (defining "name or likeness" as "*[a]ny attribute* of a natural person that serves to identify that natural person to an ordinary, reasonable viewer or listener, including, but not limited to, *name*, signature, *photograph*, image, likeness, voice or a substantially similar imitation of *one or more thereof*") (emphasis added).  Thus, the only question is whether the information presented on DK Sportsbook is associated with a "news report or news presentation having public interest."

Courts have repeatedly confirmed that baseball is a matter of public interest.  *See C.B.C. Distrib. & Mktg., Inc. v. MLB Advanced Media, L.P.*, 505 F.3d 818, 823–824 (8th Cir. 2007) ("Major league baseball is followed by millions of people across this country on a daily basis . . . the recitation and discussion of factual data concerning the athletic performance of [players on MLB's website] command a substantial public interest'") (quoting *Gionfriddo*, 94 Cal. App. 4th

at 411); *Flood v. Kuhn*, 407 U.S. 258, 262 (1972) ("there are the many names . . . that have

sparked the diamond and its environs and that have provided tinder for [] reminiscence and

comparisons, and for conversation and anticipation in-season and off-season"); *Gionfriddo*, 94

Cal. App. 4th at 415 (noting "the public's enduring fascination with baseball's past").

As MLBPI concedes, sportsbooks and online gaming are growing in popularity, and

sportsbook odds are an increasingly-relied-upon form of nontraditional statistics that inform the

public's understanding of sports.  *See* Compl. ¶¶ 18–21.  Not only do odds provide information

helpful to placing bets, but fans, broadcasters, and pundits increasingly rely on bookmakers'

knowledge and historical data reflected in such odds to understand and compare the likelihoods

of future outcomes in baseball and other sports.  *See id.* ¶ 33; Martin Spann & Bernd Skiera,

*Sports forecasting: a comparison of the forecast accuracy of prediction markets, betting odds

and tipsters*, 28(1) J. OF FORECASTING 55 (2009) (finding that betting odds were more accurate

predictors than experts, betting models, and randomized samples).  As discussed above, ESPN

and many other news outlets include betting odds with their sports coverage alongside other

newsworthy content, such as team records and player statistics.  These metrics are informative,

provide context, help viewers understand a game and performance, and predict likely or unlikely

future outcomes.  *See Daniels*, 109 N.E.3d at 397 ("[t]he public fascination with these facts and

figures provides context and standards by which past, present, and future players are judged").

This all remains true of the information regardless of whether a fan intends to place a bet.

DraftKings' presentation of odds, names, images, and statistics about MLB players serves

this purpose.  For example, in *Daniels*, on a certified question from the Seventh Circuit, the

Indiana Supreme Court considered whether the use of college football players' names, *images*,

and statistics in DraftKings and FanDuel fantasy sports games fell under the Indiana statute's

exception for "material that has political or newsworthy value." 109 N.E.3d at 394 (quoting Ind. Code § 32-36-1-1(c)(1)(B)). There, users paid to enter DFS contests for cash prizes in which they were allocated a fixed salary amount to create a team, wherein each player's 'salary' was generated based on their real-life statistics. *Daniels*, 109 N.E.3d at 392. The court found that the challenged content was a protected use because newsworthiness encompasses "all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general." *Id.* at 396 (internal citation omitted). The presence of a paywall did not "strip[] [the content] of its newsworthy value" because the context did not change the "function of the underlying . . . publicly available information." *Id.*

DraftKings' use of player images, betting odds, and other information here serves the same public interest as its use of the challenged player images in *Daniels*. Statistics used in fantasy sports with accompanying images is no different than the use of statistics (including betting odds) with accompanying images on DK Sportsbook. Just as the use in *Daniels* was not transformed into a prohibited one simply because it was behind a paywall, the use in connection with DK Sportsbook is not transformed simply because users can place bets. DraftKings' use comfortably falls within the Statute's and common law's newsworthiness exception.

### C. Player Images on DraftKings' Social Media Is Newsworthy

MLBPI's sole factual support for its claim that DraftKings is unlawfully using player names and likenesses in advertising is a single Instagram post featuring Pittsburgh Pirates pitcher Paul Skenes. Compl. ¶ 35. This social media post is not an advertisement, and just like the information on DK Sportsbook, it is newsworthy both because of its content and because it serves as a forum for news commentators and individuals to discuss a topic of public interest.

The first slide of the cited post poses a question about the dominance of rookie pitcher Paul Skenes, which MLBPI concedes is "a piece of sports reporting." *Id.* The middle slide that

MLBPI omitted from the Complaint (*see* p. 6, *supra*) includes undoubtedly newsworthy statistical information about baseball.  And the third slide provides betting odds information reflecting the likelihood that Skenes would win National League Rookie of the Year.

The image of the Skenes Instagram post in the Complaint indicates that there were at least 29 user comments, including direct responses to the question posed on the first slide, discussions about baseball more broadly, and debate about Skenes' place among other elite athletes' runs of dominance.  *See* Decl., Ex. H.  The post is analogous to a sports radio host or opinion columnist discussing an athlete's potential for a season or their career:  pose a question, provide information, and present a perspective, prediction, or conclusion based on that information.  Contrary to MLBPI's allegation that the odds on the third slide are "an advertisement encouraging viewers of the ad to place a bet on the DraftKings Sportsbook platform," Compl. ¶ 35, they instead merely present readers with statistical information about Skenes' then-current likelihood of winning the National League Rookie of the Year:  "-700" means that if you bet $700 you could win $100.  The odds demonstrate the athlete's dominance being discussed in the prior two slides:  the high likelihood of Skenes winning Rookie of the Year and the low payout from a bet on that outcome is a piece of *statistical information*—even if considered a nontraditional one—supporting that perspective.

Courts have rejected misappropriation claims in similar contexts and under analogous state statutes.  For example, in *New Kids On The Block v. News America Pub., Inc.*, a music group sued two newspapers alleging that articles profiling the group's members, along with a 900-number poll (for which "the caller is charged a fee") soliciting voters as to their popularity, violated the group's right of publicity.  971 F.2d 302, 304, 309–310 (9th Cir. 1992).  The court ruled for the defendants because they published the poll—a means to engage with readers and

sell newspapers—"'in connection with [a] news, public affairs, or sports broadcast or account.'"
*Id.* at 309 (quoting Cal. Civ. Code § 3344(d)).  That the defendants charged a fee did not change the underlying character of the newsworthy information.

Similarly, in *Messenger v. Gruner Jahr Printing & Pub.*, the use of the plaintiff's images "in connection with a newsworthy" letter-to-the-editor column, which featured advice to the writer, did not violate New York's right-of-publicity statute.  The court explained: "Whether an item is newsworthy depends solely on the content of the article-not the publisher's motive to increase circulation."  208 F.3d 122, 124, 126 (2d Cir. 2000) (internal citation omitted).  Providing a space for user engagement—regardless of whether the entity is profiting off that engagement—constitutes newsworthy information that is exempt from a right-of-publicity claim.

The same principles apply here, where DraftKings posts, and users discuss the relative merits of, newsworthy content:  whether an MLB player's dominance is historic.  The content is newsworthy on its face, and DraftKings' use does not violate any rights of publicity or privacy.

## II.    DraftKings' Use of Players' Images Is Fully Protected under the First Amendment

The right of publicity takes a back seat to the First Amendment.  *See C.B.C.*, 505 F.3d at 823 (holding that right of publicity economic interests must give way to the "first amendment right to use information that is available to everyone"); *see also* Eugene Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 929–30 (2003) ("[r]ight of publicity law has long had to confront the First Amendment . . . and in many areas, such as [] news reporting . . . it has rightly yielded").  The economic interests protected by right of publicity laws must be sufficiently weighty to overcome the First Amendment protections for freedoms of speech and the press.  *See C.B.C.*, 505 F.3d at 824; *see also Connick v. Myers*, 461 U.S. 138, 145

(1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection").

In other cases involving speech about professional sports, courts have concluded, as a matter of law, that the economic interests served by state publicity-right laws were outweighed by First Amendment interests. *See, e.g.*, *C.B.C.*, 505 F.3d at 823–824 (fantasy baseball game); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 938 (6th Cir. 2003) ("the effect of limiting [Tiger] Woods's right of publicity [] is negligible and significantly outweighed by society's interest in freedom of artistic expression" in a painting); *Cardtoons, L.C. v. MLB Players Ass'n*, 95 F.3d 959, 969 (10th Cir. 1996) (parody baseball cards); *CBS Interactive Inc. v. NFL Players Ass'n, Inc.*, 259 F.R.D. 398, 419 (D. Minn. 2009) (fantasy football game).[8]

First Amendment principles apply regardless of whether the speech is classified as news or entertainment. *See Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501–502 (1952) (First Amendment protection is not lessened "by the fact that [media] are designed to entertain as well as to inform"); *Winters v. New York*, 333 U.S. 507, 510 (1948) ("[t]he line between the informing and the entertaining is too elusive for the protection of that basic right [a free press]"). Indeed, the United States Supreme Court has noted in the specific context of the right of publicity that "entertainment itself can be important news." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 574 (1977).

In the context of right-of-publicity claims, courts weigh the interests that right-of-publicity laws seek to protect against the constitutional considerations and protections in the First

---

[8] Like newsworthiness, courts resolve at the pleading stage whether the First Amendment outweighs right-of-publicity. *See, e.g.*, *Somerson*, 956 F. Supp. 2d at 1368 (granting motion to dismiss because information on defendant's website "as alleged in [the] complaint . . . [was] historical and fact based . . . and [thus] protected by the First Amendment").

Amendment. The key question is whether the governmental interest in allowing an individual to control the use of their name, image, or likeness is sufficiently weighty to permit a restriction on the First Amendment rights of speech and free expression. *See Cardtoons, L.C.*, 95 F.3d at 972–973 (in the context of parody baseball cards "elevating the right of publicity above the right to free expression would . . . not only allow MLBPA to censor criticism of its members, but would also have a chilling effect upon future celebrity parodies").

The Eight Circuit in *C.B.C.* holistically analyzed the First Amendment's application to the use of athletes' names and likenesses. C.B.C., an operator of internet fantasy baseball games (like in *Daniels*), sued MLB Advanced Media and MLBPA (the parent association of MLBPI in this case) for a declaration that its unlicensed use of players' names and statistics in its fantasy sports games did not violate players' rights of publicity under Missouri law because the use was protected by the First Amendment. *C.B.C.*, 505 F.3d at 820.

The court identified the right to earn a living, incentivizing productive activity, and consumer protection from false advertising as economic interests protected by the state right-of-publicity statute. *Id.* at 824. It also identified "protecting natural rights, rewarding celebrity labors, and avoiding emotional harm" as nonmonetary interests protected by the statute. *Id.* (citing *Cardtoons, L.C.*, 95 F.3d at 973). On the other hand, it identified discussing and publishing information in the public interest as the countervailing First Amendment consideration. *Id.* at 824–825 (citing *Gionfriddo*, 94 Cal. App. 4th at 411).

The court held, as a matter of law, that the First Amendment interests outweighed the right-of-publicity interests. First, it recognized the "recitation and discussion of factual data concerning the athletic performance of [MLB players] . . . is a form of expression due constitutional protection." *Id.* (citing *Gionfriddo*, 94 Cal. App. 4th at 411). Second, the use of

this information would not impact players' earning potential or mislead consumers. *Id.* at 824. Third, "the information used [] is all readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available to everyone." *Id.* at 823; *see also Gionfriddo*, 94 Cal. App. 4th at 415 ("the public interest favoring the free dissemination of information regarding baseball's history" overwhelms any mere "proprietary interest" in players' rights of publicity).

In *CBS Interactive*, decided two years later, the court took *C.B.C.* a step further, holding that the use of a "package of player information" in a fantasy football game, which included "names, player profiles, up-to-date statistics, injury reports, participant blogs, pictures, images, and biographical information," was protected by the First Amendment. *CBS Interactive*, 259 F.R.D. at 417. The Court expressly rejected the NFL Players Association's argument that the use was "for the undisputed purpose of marketing and promoting participation in fantasy football games, as well as to drive traffic to its website," and held that right-of-publicity interests "must give way to" the First Amendment. *Id.* at 418.

Here, too, the First Amendment considerations—the dissemination of, access to, and a forum for, discussion of information in the public interest (*e.g.*, statistics, news, odds, and images of MLB players)—outweigh the right-of-publicity interests for the same reasons they did in *C.B.C.* and *CBS Interactive*. The Complaint does not even allege any of the monetary or non-monetary interests that were cited by MLBPA in *C.B.C.*, nor does it allege that any such interests outweigh First Amendment protections. 505 F.3d at 824. Instead, MLBPI appears to allege that the lone right-of-publicity interest here is that players purportedly have been deprived of their individual shares of the broader licensing fee that would have come from DraftKings licensing the headshots. Compl. ¶ 51. But nothing about the use of the headshots on DK Sportsbook or

the images in the single Skenes Instagram post plausibly prevents players from earning a living, disincentivizes productive activity, confuses consumers, impacts natural rights or imparts any emotional harm on MLBPI. *C.B.C.*, 505 F.3d at 824. Accordingly, the First Amendment interests—providing information about baseball that is of public interest and providing a forum for the public to discuss that content—must prevail as a matter of law in the balancing analysis, and therefore the Complaint should be dismissed.

### III. The Complaint Fails to Plead the Elements of Statutory and Common Law Right of Publicity Claims (Counts I, II, and III)

To plead a claim under the Pennsylvania Statute, *see* p. 9, *supra*, a plaintiff must (1) identify the "natural person" whose name or likeness is being used without authorization; (2) that the natural person's name or likeness has "commercial value," as defined by the statute; and (3) that the defendant did so without the written consent of the natural person or a (b) authorized party. 42 Pa. Cons. Stat. § 8316(a). The same general elements apply to the common law publicity claim (Count II). *See Eagle v. Morgan*, No. CIV.A. 11-4303, 2013 WL 943350, at *8 (E.D. Pa. Mar. 12, 2013). The same is true for the misappropriation of identity claim (Count III), except "commercial value" is not an element. Restatement (Second) of Torts § 652C.

Counts I, II, and III should be dismissed for failure to plead these basic elements.

### A. The Complaint Fails to Identify Any "Natural Persons" on Whose Behalf MLBPI Purports to Bring Claims (Counts I, II, and III)

MLBPI vaguely refers throughout the Complaint to "hundreds" of MLB players, "all active MLB players," and "almost every current MLB player," but fails to identify a single "natural person" by name whose right of publicity has purportedly been violated. Compl. ¶¶ 1, 11, 26, 28. In a similarly conclusory manner, MLBPI alleges that "nearly every active MLB player's image is displayed on Defendants' websites and mobile apps," without specifically identifying whose image is being used or where. *Id.* ¶ 5. These allegations are insufficient under

basic Rule 8 pleading requirements.  MLBPI must provide adequate notice to DraftKings (and the Court) of the identity of the "natural person" or persons whose rights are being asserted and whose rights Defendant is supposedly violating.

Rule 8(a) requires a "showing," rather than a blanket assertion, of an entitlement to relief. *Phillips*, 515 F.3d at 232.  For example, a plaintiff alleging defamation must "identify specifically what allegedly defamatory statements were made, and to whom they were made," *Bank v. Cmty. Coll. of Phila.*, No. CV 22-293 #, 2022 WL 2905243, at *3 (E.D. Pa. July 22, 2022); plaintiffs alleging products liability must allege "what *specific* product is at issue," *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 387 (D.N.J. 2019) (emphasis in original); plaintiffs alleging breach of express warranty must allege the statements creating an express warranty, *Fike v. Glob. Pharma Healthcare Priv., Ltd.*, No. 5:23-CV-2981, 2024 WL 3460114, at *8 (E.D. Pa. July 18, 2024); and plaintiffs alleging breach of contract must identify the contract—and provisions therein—defendant allegedly breached, *Bissett v. Verizon Wireless*, 401 F. Supp. 3d 487, 500 (M.D. Pa. 2019).

The same principles apply here.  Neither DraftKings nor the Court are required to guess who "all active MLB players" are.  MLBPI cannot circumvent basic pleading requirements simply because it seeks to vindicate the alleged rights of "hundreds" of individuals.

## B.    The Complaint Fails to Adequately Allege "Commercial Value" (Counts I and II)

The Statute defines "commercial value" as a "[v]aluable interest in a natural person's name or likeness that is developed through the investment of time, effort and money." 42 Pa. Cons. Stat. § 8316(e).  "[P]laintiffs who invoke § 8316 have invested resources in the development of a personal brand, and are suing to redress the unauthorized exploitation of that

brand," but to do so, a plaintiff must allege facts demonstrating an investment of time, effort, and money. *Taha v. Bucks Cnty.*, 9 F. Supp. 3d 490, 493 (E.D. Pa. 2014).

The same pleading standard applies to the common law claims because courts look to the same facts for both analyses and reference the statutory dismissal when also dismissing common law claims. *See Eagle*, 2013 WL 943350, at *8 (using same facts to analyze § 8316 "commercial value" as common law "reputation, prestige, and commercial value"). Without an "explanation for how or why" a plaintiff's name or likeness "has the requisite 'value'—commercial or otherwise . . . [a plaintiff] has not stated a valid cause of action for misappropriation of name and likeness." *Wurth Baer Supply*, 627 F. Supp. 3d at 443.

The Complaint fails to properly allege this element because it simply regurgitates the conclusory legal standard that "MLB players' names, images, and likenesses have commercial value." Compl. ¶¶ 44, 55. It is implausible that every one of the hundreds of unnamed MLB players have developed commercial value in their name or likeness through investment of time, effort, and money. Simply playing a professional sport does not establish commercial value in one's name or likeness, and MLBPI must *allege facts* to establish that each player whose rights are purportedly being violated has commercial value in their name or likeness.

For example, in *Taha*, an arrestee whose mugshot and arrest information was published online alleged that the defendant had "profited by threatening the value of his brand . . . [and] ransomed his good name," but alleged "no facts demonstrating that he ha[d] invested time, effort and money to create 'valuable' interest in his name or likeness." 9 F. Supp. 3d at 493. Accordingly, the court dismissed his statutory claims.

Similarly, in *Grande v. Starbucks Corp.*, the plaintiff alleged that Starbucks employees had used his name and likeness, "Grande," without his consent at their stores to advertise the size

of the drinks offered.  No. CV 18-04036, 2020 WL 4937105, at *1 (E.D. Pa. Aug. 24, 2020).

The plaintiff attempted to plead commercial value in his name and likeness by alleging that he

saved his company from bankruptcy, was promoted, was featured in articles, potentially owned

patents, and gave to charity.  *Id.* at *3.  The court held that these allegations "sound[ed] more in

speculation than in plausibility" and that they did not demonstrate that "his *name* and *likeness*

ha[d] acquired value for purposes of his misappropriation claims."  *Id.* (emphasis in original).

Likewise, in *Wurth Baer Supply*, the defendant-counterclaimant alleged that his name and

likeness were misappropriated when used in promotional videos on the plaintiff's website.

627 F. Supp. 3d at 442.  But aside from alleging that he "suffered substantial damages" due to

the misappropriation, defendant did not "allege that his name ha[d] any special reputation or

prestige" nor did he "offer [any] explanation for how or why these damages occurred."  *Id.* at

443.  Without more specificity, the court dismissed his claims as conclusory.

MLBPI's allegation that the unidentified "MLB players' names, images, and likenesses

have commercial value," Compl. ¶ 44, is similarly conclusory and insufficient to state a claim.

### C.    The Complaint Fails to Adequately Allege That MLBPI Is Authorized to Bring a Claim (Count I)

Under the Statute, a "corporation authorized in writing by such natural person to license

the commercial or advertising purposes of the person's name or likeness" may bring a claim.  42

Pa. Cons. Stat. § 8316(b)(4).  The Complaint, however, merely alleges that each active player

has licensed to MLBPA (not a plaintiff in this case) the right to license and sublicense the

players' NIL for purposes of any commercial marketing, promotional activity, product, or

service.  Compl. ¶ 26.  Missing is an allegation that any natural person has licensed that right *to

MLBPI*.  The Complaint alleges only that MLBPI is a subsidiary of MLBPA, and then concludes,

without factual support, that the players' assignment to MLBPA, "in turn," confers rights on

MLBPI. *Id.* It is thus not clear from the face of the Complaint, even accepting all its allegations as true, that MLBPI is authorized under the Statute to bring a claim.[9]

## IV. MLBPI's Unjust Enrichment Claim (Count IV) Should Be Dismissed Because MLBPI Did Not Confer a Benefit on DraftKings

A claim for unjust enrichment under Pennsylvania law, must allege, among other elements, "facts sufficient to establish benefits conferred on defendant by plaintiff.'" *Pellegrino v. Epic Games, Inc.*, 451 F. Supp. 3d 373, 382 (E.D. Pa. 2020) (citation omitted). The nature of the claim contemplates a relationship of some sort between the parties, in which "the law [] implies a quasi-contract which requires the defendant to compensate the plaintiff for the value of the benefit conferred." *Boring v. Google Inc.*, 362 F. App'x 273, 281 (3d Cir. 2010). That benefit must be "directly conferred" by a plaintiff on a defendant. *Pellegrino*, 451 F. Supp. 3d at 382 (citation omitted). The focus, then, is on "[p]laintiff's actions" and unjust enrichment "does not apply simply because the defendant may have benefitted." *Id.*

Here, the Complaint alleges that DraftKings used "names, images, and likenesses [] without authorization" and "retained the benefits . . . without paying MLBPI." Compl. ¶¶ 58–59. MLBPI's unjust enrichment claim is based entirely on DraftKings' conduct, and the Complaint fails to allege that MLBPI conferred any benefit on DraftKings. *See Pellegrino*, 451 F. Supp. 3d at 382. In the absence of this essential element, there is "no basis for applying a quasi-contractual remedy," *id.*, and Count IV must be dismissed.

## CONCLUSION

For the foregoing reasons, MLBPI's Complaint should be dismissed.

---

[9]    Even assuming MLBPI is authorized, the authorization requires that three or more players' names or likenesses be used in a calendar year. Compl. ¶ 26. Because the Complaint does not identify any players by name whose images DraftKings has purportedly used, the Complaint fails to plead that the conditions of the authorization have been met.

Dated: November 18, 2024                Respectfully submitted,

                                        */s/ Megan K. Bannigan*
Barry L. Cohen (PA Id. 68864)           Megan K. Bannigan (*pro hac vice*)
Julie M. Latsko (PA Id. 315782)         David H. Bernstein (*pro hac vice*)
**ROYER COOPER COHEN BRAUNFELD**        Jared I. Kagan (*pro hac vice*)
Two Logan Square                        Jacob Hochberger (*pro hac vice*)
100 N. 18th St. Suite 710               **DEBEVOISE & PLIMPTON LLP**
Philadelphia, PA 19103                  66 Hudson Boulevard
Tel: (215) 839-1000                     New York, New York 10001
Fax: (484) 362-2630                     (212) 909-6000
bcohen@rccblaw.com                      mkbannigan@debevoise.com
jlatsko@rccblaw.com                     dhbernstein@debevoise.com
                                        jikagan@debevoise.com
                                        jhochberger@debevoise.com

**ATTORNEYS FOR DRAFTKINGS INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2024, a true and correct copy of the foregoing

document was served on all counsel of record via the Court's ECF system.


*/s/ Megan K. Bannigan*
Megan K. Bannigan (*pro hac vice*)
David H. Bernstein (*pro hac vice*)
Jared I. Kagan (*pro hac vice*)
Jacob Hochberger (*pro hac vice*)
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
mkbannigan@debevoise.com
dhbernstein@debevoise.com
jikagan@debevoise.com
jhochberger@debevoise.com