**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MLB PLAYERS INC.,** | CIVIL ACTION |
| *Plaintiff,* | No. 24-4884-KSM |
| v. | |
| **DRAFTKINGS, INC., f/k/a DK CROWN HOLDINGS INC. and BET365 GROUP LIMITED,** | |
| *Defendants.* | |

**PLAINTIFF MLB PLAYERS INC.'S**
**<u>OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................4

    A.    Sports Betting in the United States and the Rise of Online Sports Betting .............4

    B.    MLBPI's Group Licensing Structure ........................................................................5

    C.    Defendants' Unauthorized Uses of MLB Player Images on Their Sportsbooks
           and Related Advertising ...........................................................................................7

    D.    MLBPI's Claims Against Defendants ........................................................................8

LEGAL STANDARD ..............................................................................................................8

ARGUMENT ...........................................................................................................................9

I.    Defendants' Uses of MLB Player Images on Their Sportsbook Platforms and Names
    and Images on Their Social Media Advertising Are Not Exempted from Right of
    Publicity Claims Under Pennsylvania Law ............................................................................9

    A.    The Right of Publicity Under Pennsylvania Law ......................................................9

    B.    Defendants' Uses of MLB Player NIL Are Not Exempted Under the Statute .......12

          1.    Defendants' Out-of-Circuit Cases Analyzing Other States' Statutes Are
               Not Instructive ...........................................................................................12

          2.    Defendants' Uses Do Not Fall Within Pennsylvania's "News Report or
               News Presentation" Exception ....................................................................15

II.    The Court Should Reject Defendants' Argument That Their First Amendment
    Concerns Trump MLB Players' Weighty Right of Publicity Interests ...............................21

    A.    The Third Circuit's "Transformative Use" Balancing Test Governs This Case .....22

    B.    Whether Defendants' Interests in Using MLB Player NIL Without a License
           Trumps MLB Players' Right of Publicity Requires a Fact-Intensive Inquiry .......24

    C.    Defendants Ignore This Circuit's Precedent and Instead Rely Entirely on
           Distinguishable, Non-Binding Out-of-Circuit Cases ...............................................25

III.    MLBPI's Right of Publicity Claims Are Adequately Pled ...................................................28

    A.    MLBPI Has Standing to Bring Claims on Behalf of MLB Players .........................28

    B.    MLBPI Adequately Alleged That MLB Players' NILs Have "Commercial
           Value" .......................................................................................................................33

    C.    MLBPI's Common Law Claims Were Not Abrogated by Statute ...........................36

IV.    MLBPI's Unjust Enrichment Claim Should Not Be Dismissed ...........................................38

CONCLUSION ......................................................................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*151 Advisors, LLC v. Brumer*,
No. 21-3170, 2022 WL 18585882 (E.D. Pa. Sept. 21, 2022) ....................................................40

*Abdul-Jabbar v. Gen. Motors Corp.*,
85 F.3d 407 (9th Cir. 1996) ........................................................................................... 13, 14

*Acuña-Atalaya v. Newmont Mining Corp.*,
612 F. Supp. 3d 384 (D. Del. 2020) ..............................................................................6

*Ad World, Inc. v. Doylestown Tp.*,
672 F.2d 1136 (3d Cir. 1982) ........................................................................................21

*AFL Phila. LLC v. Krause*,
639 F. Supp. 2d 512 (E.D. Pa. 2009) ............................................................................37

*Allied World Ins. Co. v. Keating*,
No. 22-1996, 2023 WL 1463391 (3d Cir. Feb. 2, 2023) ..............................................38

*Am. Future Sys., Inc. v. Pa. State Univ.*,
752 F.2d 854 (3d Cir. 1984) ..........................................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................8

*Bank v. Cmty. Coll. of Phila.*,
No. 22-293, 2022 WL 2905243 (E.D. Pa. July 22, 2022) ............................................31

*Bissett v. Verizon Wireless*,
401 F. Supp. 3d 487 (M.D. Pa. 2019) ..........................................................................31

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ........................................................................................................11

*Boring v. Google, Inc.*,
362 Fed. App'x 273 (3d Cir. 2010) ........................................................................ 39, 40

*Buradus v. Gen. Cement Prods. Co.*,
52 A.2d 205 (Pa. 1947) ..................................................................................................36

*Byrne v. Cleveland Clinic*,
684 F. Supp. 2d 641 (E.D. Pa. 2010) ............................................................................17

*C.B.C. Distrib. & Mktg., Inc. v. MLB Advanced Media, L.P.*
505 F.3d 818 (8th Cir. 2007) ................................................................................*passim*

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
   95 F.3d 959 (10th Cir. 1996)..........................................................................25, 27, 30

*Carson v. Here's Johnny Portable Toilets, Inc.*,
   698 F.2d 831 (6th Cir. 1983)....................................................................................39

*CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*,
   259 F.R.D. 398 (D. Minn. 2009) .......................................................................25, 26, 30

*Chuy v. Phila. Eagles Football Club*,
   595 F.2d 1265 (3d Cir. 1979)...................................................................................35

*In re Coll. Athlete NIL Litig.*,
   No. 20-cv-03919, 2023 WL 8372787 (N.D. Cal. Nov. 3, 2023)...............................35

*Cornette v. Graver*,
   473 F. Supp. 3d 437 (W.D. Pa. 2020) ..........................................................19, 22, 23

*Cornette v. Graver*,
   No. 3:19-cv-219, 2020 WL 1643370 (W.D. Pa. Apr. 2, 2020) ............................ 10, 24, 26, 28

*Crash Proof Ret., LLC v. Price*,
   533 F. Supp. 3d 227 (E.D. Pa. 2021)...................................................................... 11, 28

*Daniels v. FanDuel, Inc.*
   No. 1:16-cv-01230, 2017 WL 4340329 (S.D. Ind. Sept. 29, 2017), *aff'd*, 909
   F.3d 876 (7th Cir. 2018) .......................................................................12, 13, 26

*Dietrich & Assocs., Inc. v. Oct. Three LLC*,
   No. 20-5002, 2021 WL 1614399 (E.D. Pa. Apr. 26, 2021) .....................................16

*Doe v. Princeton Univ.*,
   30 F.4th 335 (3d Cir. 2022).........................................................................................8

*Dryer v. National Football League*
   55 F. Supp. 3d 1181 (D. Minn. 2014) .....................................................................26

*ETW Corp. v. Jireh Publ'g, Inc.*,
   332 F.3d 915 (6th Cir. 2003).....................................................................................26

*Facenda v. N.F.L. Films, Inc.*,
   488 F. Supp. 2d 491 (E.D. Pa. 2007), *aff'd* 542 F.3d 1007 (3d Cir. 2008) .................21, 30, 37

*Fanelle v. LoJack Corp*,
   No. 99-4292, 2000 WL 1801270 (E.D. Pa. Dec. 7, 2000) ..................................... 16, 28

*Fike v. Glob. Pharma Healthcare Priv., Ltd.*,
   No. 5:23-cv-2981, 2024 WL 3460114 (E.D. Pa. July 18, 2024)...............................31

*FCC v. AT&T*,
   562 U.S. 397 (2011)..................................................................................................32

*Gionfriddo v. MLB*,
    94 Cal. App. 4th 400 (2001) ..............................................................13, 14, 26

*Grande v. Starbucks Corp.*,
    No. 18-04036, 2020 WL 4937105 (E.D. Pa. Aug. 24, 2020) ...................................36

*Gridiron.com, Inc. v. Nat'l Football League, Player's Ass'n, Inc.*,
    106 F. Supp. 2d 1309 (S.D. Fla. 2000)...........................................................26

*Hamilton v. Speight*,
    827 Fed. App'x 238 (3d Cir. 2020) ..............................................................24, 28

*Harrell v. Kellogg Co.*,
    892 F. Supp. 2d 716, 719 (E.D. Pa. 2012) ........................................................8

*Hart v. Elec. Arts, Inc.*,
    717 F.3d 141 (3d Cir. 2013) ....................................................................*passim*

*Hecht v. Malvern Preparatory Sch.*,
    716 F. Supp. 2d 395 (E.D. Pa. 2010)...........................................................40

*High Off Life, LLC v. Freebandz Prods., LLC*,
    No. 20-1556, 2022 WL 952861 (W.D. Pa. Mar. 30, 2022) ...................................28

*Ierardi v. Mylan Labs., Inc.*,
    230 F.3d 594 (3d Cir. 2000) .......................................................................6

*Kelly v. Peerstar LLC*,
    No.3:18-cv-126, 2020 WL 5077940 (W.D. Pa. Aug. 26, 2020)................................37

*Kenney v. Am. Bd. of Internal Med.*,
    847 Fed. App'x 137 (3d Cir. 2021) ..............................................................38, 40

*Lewis v. Marriott Int'l, Inc.*,
    527 F. Supp. 2d 422 (E.D. Pa. 2007)......................................................10, 11, 34, 37

*Lundberg v. One Three Five, Inc.*,
    No. 2:19-cv-00692, 2022 WL 2669136 (W.D. Pa. Jan. 14, 2022) ...........................36

*M3 USA Corp. v. Hart*,
    516 F. Supp. 3d 476 (E.D. Pa. 2021)...........................................................40

*Mills v. Ethicon, Inc.*,
    406 F. Supp. 3d 363 (D.N.J. 2019) ..............................................................31

*Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790 (1995).........................14

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    724 F.3d 1268 (9th Cir. 2013)...................................................................27

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   594 U.S. 69 (2021) ................................................................................................35

*Nat'l Football League v. Alley, Inc.*,
   624 F. Supp. 6 (S.D. Fla. 1983) ....................................................................... 14, 15

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   802 F.3d 1049 (9th Cir. 2015)..............................................................................30

*Pellegrino v. Epic Games, Inc.*,
   451 F. Supp. 3d 373 (E.D. Pa. 2020)................................................................ 39, 40

*Peters v. Del. River Port Auth.*,
   16 F.3d 1346 (3d Cir. 1994) ...................................................................................6

*Rose v. Triple Crown Nutrition, Inc.*,
   No. 4:07-cv-0056, 2007 WL 707348 (E.D. Pa. Mar. 2, 2007) ...................................10

*SEDA-COG Joint Rail Auth. v. Carload Express, Inc.*,
   238 A.3d 1225 (Pa. 2020)......................................................................................36

*Silverstein v. Globus Med., Inc.*,
   No. 15-5386, 2016 WL 4478826 (E.D. Pa. Aug. 25, 2016)........................................4

*Styer v. Hugo*,
   619 A.2d 347 (Pa. Super. Ct. 1993), *aff'd*, 637 A.2d 276 (Pa. 1994) ................. 38, 40

*Taha v. Bucks Cnty.*,
   9 F. Supp. 3d 490 (E.D. Pa. 2014)..........................................................................36

*Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*,
   641 F. Supp. 1179 (S.D.N.Y. 1986) .......................................................................20

*Torchia v. Torchia*,
   499 A.2d 581 (Pa. Super. Ct. 1985) .......................................................................40

*U.S. v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*,
   822 F.3d 136 (3d Cir. 2016) ..................................................................................15

*Vanderklok v. U.S.*,
   868 F.3d 189 (3d Cir. 2017) ...................................................................................4

*Wurth Baer Supply Co. v. Strouse*,
   627 F. Supp. 3d 422 (M.D. Pa. 2022) .....................................................................36

*Zacchini v. Scripps-Howard Broadcasting Co.*,
   433 U.S. 562 (1977)........................................................................................ 22, 39

*ZS Assocs., Inc. v. Synygy, Inc.*,
   No. 10-4274, 2011 WL 2038513 (E.D. Pa. May 23, 2011) ......................................11

## Statutes

5 U.S.C. § 552(b)(7)(C) ................................................................................................32

42 Pa. Const. Stat. § 8316 ........................................................................................*passim*

58 Pa. Code § 501a.1 ....................................................................................................18

Cal. Civ. Code § 3344(d) ..............................................................................................13

Fla. Stat. § 540.08(4)(a) ................................................................................................14

Ind. Code § 32-36-1-1(c)(1)(B) ....................................................................................12

## Other Authorities

*Advertisement*, Black's Law Dictionary (11th ed. 2019) ..............................................19

J. Thomas McCarthy, 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
§ 28:7 (5th ed.) ........................................................................................................27

MLBPlayers.com, *MLB Players Inc., FanDuel and OneTeam Sign Licensing
Agreement* (Nov. 26, 2024), https://www.mlbplayers.com/post/mlb-players-
inc-fanduel-and-oneteam-sign-licensing-agreement ......................................... 6, 30

MLBPlayers.com, *MLB Players Inc.*, https://www.mlbplayers.com/mlbpi ....................5

*News*, Oxford Dictionary (2024) ..................................................................................20

Nielsen, *Top of 2023: Sports* (Dec. 2023),
https://www.nielsen.com/insights/2023/tops-of-2023-sports/ ...................................17

Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) ..........................38

Restatement (Third) of Unfair Competition § 46, cmt. g ................................................33

Richard T. Karcher, *The Use of Players' Identities in Fantasy Sports Leagues:
Developing Workable Standards for Right of Publicity Claims*, 111 Penn St.
L. Rev. 557 (2007) ...................................................................................................20

Securities and Exchange Commission, Quarterly Report of DraftKings, Inc. for
Quarterly Period ended Sept. 30, 2024 (Form 10-Q) (Nov. 8, 2024),
https://draftkings.gcs-web.com/node/15276/html ......................................................4

Sports Business Journal, *Fanatics Sportsbook, MLBPA Ink Licensing Deal* (Oct.
9, 2024), https://www.sportsbusinessjournal.com/Articles/2024/10/09/fanatics-
sportsbook-mlbpa ............................................................................................... 6, 30

U.S. Dep't. of Labor, Form LM-2 Labor Organization Annual Report, MLBPA
(Apr. 1, 2024),
https://olmsapps.dol.gov/query/orgReport.do?rptId=890772&rptForm=LM2F
orm ...........................................................................................................3, 6, 20, 35

## INTRODUCTION

For all of the many arguments advanced in Defendants DraftKings, Inc.'s ("DraftKings") and bet365 Group Limited's ("bet365") respective motions to dismiss, their briefs are most striking for what they do not address. Defendants never confront the actual text of Pennsylvania's right of publicity statute (the "Statute"), instead advocating for a "newsworthy" exception to right of publicity claims that appears in other states' statutes but not Pennsylvania's. Defendants ignore the Third Circuit's governing standard for balancing the competing interests between the right to protect one's identity from unauthorized commercial use against the rights afforded by the First Amendment, instead relying on out-of-circuit cases decided under inapplicable standards that do not help Defendants anyway. Defendants never acknowledge that *all* of the out-of-circuit fantasy sports cases they rely so heavily upon were decided after discovery on summary judgment, not on the pleadings. And Defendants disregard the Complaint that Plaintiff Major League Baseball Players Inc. ("MLBPI") actually filed, instead re-casting MLBPI's allegations in inaccurate and often unrecognizable ways.

There is no dispute that DraftKings and bet365 each exploit the identities of hundreds of Major League Baseball ("MLB") players to enhance the commercial appeal of, and to advertise, their online sportsbooks. Nor is there any dispute that—unlike other sportsbooks—Defendants seized those valuable rights without authorization from MLBPI, the *exclusive*, *group* licensing representative of all MLB players. These are the paradigmatic facts of a right of publicity case. Defendants' legal rejoinders are wrong, and their "factual" contentions are contrary to the Complaint and not susceptible of resolution on the pleadings. Both motions should be denied.

*First*, Defendants' conduct is neither "newsworthy" nor exempt under the Pennsylvania Statute. The Court must save for another day deciding Defendants' farcical claim that DraftKings' +500 odds for Paul Skenes to win the Cy Young (Compl. ¶ 35) or bet365's +190 odds for the

Yankees to win more than 100 games (*id.* ¶ 36) is "newsworthy" information justifying using Paul Skenes' and Aaron Judge's likenesses. That is a disputed question of fact. It's also the wrong question of fact. Contrary to Defendants' framing, the Pennsylvania Statute limits its exemption to "news *report[s]*" and "news *presentation[s]*"; the broader "newsworthy" exception that Defendants argue for was specifically *rejected* in the Statute's legislative history. And the Complaint plausibly alleges facts showing that betting lines and social media ads are not "news reports"; they are promotions of the products (bets) that Defendants (sportsbooks—not news outlets) sell. A stark example of just how wrong Defendants are under the law and under the Complaint is their argument that the cited Instagram posts featuring Messrs. Skenes and Judge are merely informational, not promotional. As the Court will see for itself, both posts feature *gambling disclaimer* language that Pennsylvania regulations mandate only for *gambling **advertisements**—* not news reports. Compl. ¶¶ 35, 36. These two advertisements alone doom Defendants' motion.

*Second*, Defendants' assertion that First Amendment protections outweigh the rights of publicity at issue is replete with misdirection and errors. In *Hart v. Electronic Arts, Inc.*, the Third Circuit "set out a definitive methodology for balancing the tension between the First Amendment and the right of publicity." 717 F.3d 141, 151–52 (3d Cir. 2013). But neither Defendant cites *Hart* even once. That's because their uses of MLB players' identities cannot satisfy the "Transformative Use Test" that *Hart* established for the Third Circuit. To the contrary, Defendants again resort to out-of-circuit cases, involving different tests and different uses of professional athletes' personas in different products. On top of the legal and factual distinctions, each case was decided post-discovery on an *evidentiary record*—not disputed facts at the pleading stage.

*Third*, Defendants' challenges to MLBPI's "standing" to sue to enforce the rights of publicity that MLB players have assigned to it, and to MLBPI not listing the names of hundreds

of MLB players in its Complaint, are meritless. The Pennsylvania statute is *explicit* that organizations like MLBPI may bring right of publicity claims on behalf of individuals who have assigned those rights. bet365 has to distort both the statutory text and Restatement of Unfair Competition with misleading ellipses to contend otherwise. Plus, the Complaint alleges that the identity of "nearly every active MLB player" has been used; explains in detail how (*e.g.*, Compl. ¶¶ 30–32 (Defendants use entire team rosters)); there is no mystery about who is or isn't an MLB player; and *Defendants* are the ones who promoted the identities. Defendants thus have ample notice of the rights at issue while offering no authority for the pleading standard they advocate.

*Finally*, MLBPI has sufficiently pleaded that the collection of MLB players' personas used by Defendants—the best baseball players on the planet—has commercial value. Defendants' sole focus on each player's *individual* licensing value ignores the Complaint's assertion of *group* licensing value for exploiting MLB players. Using hundreds of MLB players' identities—as Defendants do—requires a *group* license from MLBPI, the *exclusive* group licensing agent of MLB players. For example, when MLBPI licenses a trading card company the right to manufacture cards for all MLB players, that is done through a single group license on behalf of all MLB players. The Complaint avers that is what Defendants were required to do here. And the ubiquity of "group licensing agreements authorizing use of MLB players' rights in a range of commercial products and services" (*id.* ¶ 27) demonstrates the indisputable commercial value of MLB players' names, images, and likenesses ("NILs"). Indeed, even Gregory Soto—the purportedly lesser-known former Phillies player referenced by defense counsel at the Pre-Trial Conference as a claimed illustration of a player with no commercial value—is paid by MLBPI for the use of his NIL in group licenses.[1] Like all other MLB players, his NIL adds commercial value to the whole. *Id.*

---

[1] *See* U.S. Dep't of Labor, Form LM-2 Labor Organization Annual Report, MLBPA (Apr. 1, 2024), https://olmsapps.dol.gov/query/orgReport.do?rptId=890772&rptForm=LM2Form (hereinafter, "2023 LM-

## FACTUAL BACKGROUND

**A.     Sports Betting in the United States and the Rise of Online Sports Betting**

In May 2018, the Supreme Court's decision in *Murphy v. National Collegiate Athletic Association* legalized sports betting at the federal level. Compl. ¶ 18. One year later, Pennsylvania legalized all types of sportsbook bets. *Id.* ¶ 19. DraftKings expanded its sportsbook platform into Pennsylvania in November 2019. *Id.* ¶ 23. bet365 did the same in July 2024. *Id.* While DraftKings had been using MLB players' *names and statistics* on its sportsbook for several years, neither Defendant featured *images* of MLB players on their platforms until 2024. *Id.* ¶ 5.

Through their sportsbook betting platforms—DraftKings Sportsbook and the bet365 app and website—Defendants offer bets on the outcomes of multiple professional sports, including MLB, based on betting odds set by Defendants. *Id.* ¶ 21. They also offer "prop bets" based on the occurrence of a specific event or the performance of a specific athlete (like hitting a home run or striking out). *Id.* Particular betting odds and particular promotions (*e.g.*, "risk-free" bets) may vary from sportsbook to sportsbook.

As alleged in the Complaint (*id.* ¶ 1), and as Defendants describe themselves—DraftKings in investor disclosures, and bet365 in its brief—they are gambling companies, not news outlets. DraftKings' own "Description of Business" from its most recent Securities Exchange Commission ("SEC") filing explains that DraftKings is a business that "provide[s] users with online sports betting [], online casino [] and daily fantasy sports [] product offerings, as well as retail sportsbook, media, digital lottery and other consumer product offerings."[2] Providing news is mentioned

---

2") (reflecting $54,289 in licensing revenue distributions for Gregory Soto). The Court may take judicial notice of this form, filed with the U.S. Department of Labor. *See, e.g., Vanderklok v. U.S.*, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (taking judicial notice of "information [] publicly available on government websites").

[2] Securities and Exchange Commission, Quarterly Report of DraftKings, Inc. for Quarterly Period ended Sept. 30, 2024 (Form 10-Q) at 7 (Nov. 8, 2024), https://draftkings.gcs-web.com/node/15276/html. *See Silverstein v. Globus Med., Inc.*, No. 15-5386, 2016 WL 4478826, at *3 n.2 (E.D. Pa. Aug. 25, 2016) ("The Court may take judicial notice of SEC filings on a motion to dismiss.").

nowhere. *Id.*; *see also* DraftKings Mot. at 1 ("DraftKings [is] an industry leader in both online sports betting [] and daily fantasy sports"). The same is true for bet365. *See, e.g.*, bet365 Mot. at 13 ("[bet365's] business is providing gaming entertainment services.").

### B.    MLBPI's Group Licensing Structure

As the world's preeminent baseball players who have dedicated their lives to becoming MLB players for teams and in a league that is followed by millions of fans, MLB players have an inherently valuable persona and identity. *See* Compl. ¶¶ 24–25. As discussed herein, Pennsylvania law affords these players the right to control the use of their identities, often through control of the use of their NILs. "Rights of publicity" ensure that persons have the right to profit off of their identities as *they* choose—not as an unauthorized third party decides for itself.

MLBPI represents MLB players for the purpose of commercializing their publicity rights on a group basis. MLBPI is the corporate subsidiary of the labor union for MLB players (the "MLBPA") and the exclusive group licensing agent for all active MLB players. *Id.* ¶¶ 11, 26. Specifically, each player assigns to MLBPA, and then MLBPA in turn assigns to MLBPI, the exclusive, worldwide right to use, license, and sublicense MLB players' NILs for any commercial marketing, promotional activity, product, or service in which three or more MLB players are identified over the course of a calendar year. *Id.* ¶ 26. Any use of the aforementioned protected attributes of three or more players in connection with commercial activities must be licensed through and authorized by MLBPI. *Id.*

MLBPI currently has more than 100 licensing partners worldwide—for use in products including trading cards, apparel, video games and online sportsbooks.[3] Licensees can and do

---

[3] *See* MLBPlayers.com, *MLB Players Inc.*, https://www.mlbplayers.com/mlbpi; *infra* notes 4 & 5. The Court "may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be

frequently secure the right to use *all* MLB players' identities. The last player in the lineup may be lesser known than the leadoff hitter, but his identity is still needed to simulate the whole roster in a video game, or to complete a trading card set, or to promote prop bets for every player on the team. *See* Compl. ¶ 30. A core tenet of MLBPI's business is that there is value in not just the individual NILs of MLB players, but also their collective NILs—as evidenced by the hundreds of millions of dollars group licensing generates yearly.[4] Recent examples of such group licenses are those that FanDuel and Fanatics Sportsbook acquired from MLBPI to use MLB players' identities on their online gambling apps (*i.e.*, the very thing that DraftKings and bet365 refuse to pay for).[5]

MLBPI uses the funds generated by group licensing to subsidize the MLBPA's services for members, and regularly distributes some of the revenues from group licensing deals that feature all MLB players to each of those players based on the number of days they were on a roster in a particular year—not based on their quality of play or notoriety. Thus, for example, MLBPI's public filing with the Department of Labor shows that in 2023, Gregory Soto—the MLB player mentioned during the parties' Pre-Trial Conference as supposedly having no commercial value— received more than $50,000 in payments from MLBPI.[6] That is the same payment that Phillies superstar Bryce Harper received from MLBPI that year. *Id.* (reflecting same for Bryce Harper).

---

reasonably questioned," including private websites. *See, e.g.*, *Ierardi v. Mylan Lab'ys, Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000) (taking judicial notice of *New York Times* article reporting stock prices and settlement figures); *Peters v. Del. River Port Auth.*, 16 F.3d 1346, 1356–57 (3d Cir. 1994) (taking judicial notice of substantive facts in newspaper articles); *see also, e.g.*, *Acuña-Atalaya v. Newmont Mining Corp.*, 612 F. Supp. 3d 384, 394 n.5 (D. Del. 2020) (McHugh, J.) (citing *Ierardi* to take judicial notice of "the reporting published in various newspapers but not exhibited by either party" in deciding motion to dismiss); DraftKings Mot. at 4 n.2 & 5 n.4 (judicial notice for similar); bet365 Mot. at 2 n.4 & 3 n.6 (same).

[4] *See, e.g.*, 2023 LM-2, *supra* note 1 (reflecting 2023 "Licensing Revenue" of nearly $50 million from trading card company Topps; $44 million from apparel and collectibles company Fanatics; and $10 million from trading card company Panini).

[5] *See* MLBPlayers.com, *MLB Players Inc., FanDuel and OneTeam Sign Licensing Agreement* (Nov. 26, 2024), https://www.mlbplayers.com/post/mlb-players-inc-fanduel-and-oneteam-sign-licensing-agreement (FanDuel); Sports Business Journal, *Fanatics Sportsbook, MLBPA Ink Licensing Deal* (Oct. 9, 2024), https://www.sportsbusinessjournal.com/Articles/2024/10/09/fanatics-sportsbook-mlba (Fanatics).

[6] *See* 2023 LM-2, *supra* note 1 (reflecting $54,289 in Licensing Revenue Distributions for Gregory Soto).

C.    **Defendants' Unauthorized Uses of MLB Player Images on Their Sportsbooks and Related Advertising**

The DraftKings Sportsbook and bet365 apps and websites feature the image of nearly every current MLB player—famous, lesser-known, and everyone in between. Compl. ¶ 28. On both platforms, these images are displayed next to betting lines for each player and are often paired with the player's team logo and team colors. *Id.* DraftKings Sportsbook also features multiple additional uses of MLB player images. For one, the app and website maintain individual pages for current MLB players that feature a large image of the players, their statistics, their playing records, and an aggregation of all available bets pertaining to the players. *Id.* ¶ 29. DraftKings Sportsbook also displays throughout its app stylized tiles of player images combined with the players' team logo, team color, and the MLB logo, as well as "rosters" for each MLB team, which feature tiles for each member of the team. *Id.* ¶¶ 30–32. And the DraftKings Sportsbook website advertises that clicking on a player image will take the user to a page of prop bets pertaining to the player. *Id.*

These player images are not necessary for sportsbook betting to function. *Id.* ¶ 33. All a bettor needs in order to wager is the player's name, and MLBPI does not challenge Defendants' display of baseball statistics. *Id.* Defendants know that images are not necessary for sportsbook betting, because they do not use player images of National Football League ("NFL") players, the most popular sport to bet on in America. *Id.* ¶ 34.

In addition, both DraftKings and bet365 feature MLB player names and images on their social media accounts, in posts promoting their sportsbook betting products. *Id.* ¶ 35. These posts often begin with a slide featuring a player's image and end with an advertisement that expressly encourages consumers to place a bet on the company's sportsbook platform. *Id.* ¶ 36. These posts are not news reports—which is why they often feature gambling disclaimers and betting odds. *Id.* ¶¶ 35–36. These ads capitalize on the featured MLB players' personas and identities and use them

to drive business into Defendants' platforms. By advertising betting lines in conjunction with an MLB player's image, Defendants use these images (without authorization) for their own commercial advantage. *Id.* ¶¶ 51, 58.

Because Defendants are using hundreds upon hundreds of MLB players' identities—*i.e.*, well more than three—authorization for such use may only be obtained through MLBPI, not through individual MLB players.

### D.    MLBPI's Claims Against Defendants

On September 16, 2024, MLBPI filed the instant Complaint for: (1) a violation of Pennsylvania's right of publicity Statute, 42 Pa. Const. Stat. § 8316; (2) a violation of the common law misappropriation of publicity; (3) a violation of the common law misappropriation of identity; and (4) unjust enrichment. *Id.* ¶¶ 41–60. MLBPI has the right and license to use the group licensing rights described herein, as well as the right to prosecute claims and suits in its own name to protect those rights. *Id.* ¶ 43. As such, MLBPI has standing to bring this claim on behalf of the MLB players who expressly assigned their rights to MLBPA and, in turn, to MLBPI. *Id.*

### LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In deciding a motion to dismiss, "a court must 'accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.'" *Harrell v. Kellogg Co.*, 892 F. Supp. 2d 716, 719 (E.D. Pa. 2012). To the extent the party moving to dismiss presents factual disputes, the "proper place to resolve [those] factual disputes is not on a motion to dismiss." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022).

## ARGUMENT

I. **Defendants' Uses of MLB Player Images on Their Sportsbook Platforms and Names and Images on Their Social Media Advertising Are Not Exempted from Right of Publicity Claims Under Pennsylvania Law**

Defendants urge this Court to decide—categorically, as a matter of law, and contrary to the Complaint—that their unauthorized uses of MLB player images on their sportsbook platforms and associated advertising are "newsworthy" and therefore not subject to right of publicity claims in Pennsylvania.[7] DraftKings Mot. at 8–17; bet365 Mot. at 19–22. This argument, which relies on inapposite, out-of-circuit cases analyzing other states' right of publicity statutes, is both incorrect and riddled with factual issues that cannot be decided on a motion to dismiss. The Pennsylvania Statute does not even include the word "newsworthy." Crediting MLBPI's allegations (as opposed to Defendants' mischaracterizations and disputed facts), Defendants are not news sources, but gambling operators. And sportsbook bets and associated social media posts are not news reports; they are the products that Defendants sell and promotions of those products. The Court should reject Defendants' argument that their use of MLB player images falls within the narrow "news report or news presentation" exception of the Pennsylvania Statute.

A. **The Right of Publicity Under Pennsylvania Law**

"[T]he basic and underlying theory" for the right of publicity "is that a person has the right to enjoy the fruits of his own industry free from unjustified interference. It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments merely because the owner's accomplishments have been highly publicized." *Hart*, 717 F.3d at 148 (citation omitted). Consistent with this right, Pennsylvania enacted its right of publicity Statute in 2002 that provides:

---

[7] *See, e.g.*, DraftKings Mot. at Argument § I ("DraftKings' Use of Player Images Is *Newsworthy* and Is Not Subject to Right of Publicity Claims"); bet365 Mot. at 19 ("bet365's use of MLB player attributes in *newsworthy* and informative ways falls squarely within the [S]tatut[e's] exceptions.") (emphases added).

> Any natural person whose name or likeness has commercial value and is used for ***any commercial <u>or</u> advertising purpose without the written consent*** of such natural person or the written consent ***of any of the parties authorized in subsection (b) may bring an action to enjoin such unauthorized use and to recover damages*** for any loss or injury sustained by such use.

42 Pa. Const. Stat. § 8316(a) (emphases added).[8]

To plead a claim under the Statute, a plaintiff must assert: (i) that a natural person's name or likeness has "commercial value"; (ii) that the defendant made an unauthorized use of that name or likeness[9]; and (iii) that the use was for "commercial or advertising purposes." *Id.*; *see Cornette v. Graver*, No. 3:19-cv-219, 2020 WL 1643370, *12 (W.D. Pa. Apr. 2, 2020). Pennsylvania's common law causes of action for misappropriation of (a) publicity and (b) identity contain similar pleading requirements as those under the Statute. *See Lewis v. Marriott Int'l, Inc.*, 527 F. Supp. 2d 422, 428–29 (E.D. Pa. 2007) (misappropriation of publicity occurs when a defendant "appropriate[es] [an individual's] valuable name or likeness, without authorization, and us[es] it to defendant's commercial advantage"); *Rose v. Triple Crown Nutrition, Inc.*, No. 4:07-cv-0056, 2007 WL 707348, at *3 (E.D. Pa. Mar. 2, 2007) (misappropriation of identity occurs under the same circumstances as misappropriation of publicity but notably "does not require the appropriation to be done commercially").[10]

---

[8] As detailed further *infra* (at p. 29), "subsection (b)" of the Statute explains that an action "may be brought by" "***any . . . firm or corporation authorized in writing by such natural person to license the commercial or advertising purposes of the person's name or likeness***." *Id.* § 8316(b)(4) (emphasis added). MLBPI is, as alleged, a "firm or corporation authorized in writing" by MLB players to license their identities on a group basis. *See id.*; Compl. ¶ 43.

[9] The Statute defines "'Name' or 'likeness'" to include identifiable features such as an individual's "photograph" or "image." *Id.* § 8316(e).

[10] bet365 contends that the common law causes of action have been abrogated by the Statute (*see* bet365 Mot. at 22–23) while DraftKings contends that "whether the Statute has abrogated the common law" "is an open question" (DraftKings Mot. at 9 n.7). As set forth *infra* (at pp. 36–38), both Defendants are incorrect.

Under the Statute, "commercial value" is defined as a "[v]aluable interest" in a person's NIL that "is developed through the investment of time, effort, and money." 42 Pa. Const. Stat. § 8316(e). Further, a "commercial or advertising purpose" includes "the public use or holding out of a natural person's name or likeness: (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, services; [or] (ii) for the purpose of advertising or promoting products, merchandise, goods or services of a business." *Id.* § 8316(e)(1)(ii).[11]

The Statute also provides for a narrow exception that "commercial or advertising purpose" does *not* include the use of an individual's NIL that "is associated with a ***news report or news presentation*** having public interest." *Id.* § 8316(e)(2)(ii) (emphasis added). Although courts have not specifically addressed what constitutes a "news report or news presentation" under the Statute or common law, the Statute's legislative history indicates that it does ***not*** refer simply to "material that has political or newsworthy value," as that exact language was considered and abandoned before the Statute was enacted. *Compare* H.B. 235, 2001 Gen. Assemb., P.N. 222 (as referred to Judiciary Comm.) (Pa. Jan. 25, 2001) (proposing an exemption for "material that has political or newsworthy value"), *with* H.B. 235, 2001 Gen. Assemb., P.N. 4645 (as amended on third consideration) (Pa. Nov. 19, 2002) (removing the "political or newsworthy value" exemption and replacing it with an exemption for uses associated with "news report or news presentation"), *and* 42 Pa. Const. Stat. § 8316(e)(2)(ii) (codifying the "news report or news presentation" exemption); *see also Lewis*, 527 F. Supp. 2d at 429 (looking to legislative history in interpreting the Statute).

---

[11] The Statute's definition of "commercial or advertising purpose" is consistent with the three factors that the Third Circuit assesses in determining whether speech is commercial: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *Crash Proof Ret., LLC v. Price*, 533 F. Supp. 3d 227, 230 (E.D. Pa. 2021) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68 (1983)) (explaining that no single factor is dispositive, and that the inquiry focuses on "making a commonsense distinction between speech proposing a commercial transaction . . . and other varieties of speech"); *see also ZS Assocs., Inc. v. Synygy, Inc.*, No. 10-4274, 2011 WL 2038513, at *7 (E.D. Pa. May 23, 2011) (explaining that "courts find statements to be commercial speech even where promulgated outside the traditional advertising campaign").

## B.    Defendants' Uses of MLB Player NIL Are Not Exempted Under the Statute

### 1.    Defendants' Out-of-Circuit Cases Analyzing Other States' Statutes Are Not Instructive

Defendants direct the Court to inapplicable out-of-circuit cases interpreting different states' statutes to argue that their uses of MLB player NIL are "newsworthy," and thus protected under the Statute. *See* DraftKings Mot. at Argument §§ I.B, C ("Players Headshots on DK Sportsbook Are *Newsworthy*"), ("Player Images on DraftKings' Social Media is *Newsworthy*"); bet365 Mot. at 19 ("bet365's use of MLB player attributes in *newsworthy* and informative ways falls squarely within the [S]tatut[e's] exceptions") (emphases added). This argument fails several times over. Most fundamentally, whether work is "newsworthy" is simply not the test under Pennsylvania law. Rather, the narrow exception applies only to uses associated with a "news ***report or news presentation***." 42 Pa. Const. Stat. § 8316(e)(2)(ii) (emphasis added).

For instance, Defendants rely heavily on decisions in *Daniels v. FanDuel, Inc. et al.*—a case from the Southern District of Indiana (and later, the Seventh Circuit) interpreting *Indiana's* right of publicity statute—for the proposition that the use of player NIL is "newsworthy" and thus not actionable. *See* DraftKings Mot. at 2 n.1, 10–15; bet365 Mot. at 20–21. This reliance is wholly misplaced. The exception in Indiana's statute provides that it "does not apply to . . . [t]he use of a personality's [NIL in] . . . material that has ***political or newsworthy value***." Ind. Code § 32-36-1-1(c)(1)(B) (emphasis added). As the *Daniels* court recognized, "the [Indiana] statute does not explicitly require that the user of a personality's name or likeness be engaged in 'reporting,' or be a news or media outlet. Absent a specific reference to such a requirement, the Court will not read one in." No. 1:16-cv-01230, 2017 WL 4340329, at *6 (S.D. Ind. Sept. 29, 2017), *aff'd*, 909 F.3d 876 (7th Cir. 2018) (citing Ind. Code § 32-36-1-1(c)(1)(B)). Here, however, the Statute *does* explicitly require that the use be "news report[ing]" (or "presentation") in order to be exempt. 42

Pa. Const. Stat. § 8316(e)(2)(ii). *Daniels* is thus inapplicable for this reason alone. But *even if* Indiana's "newsworthy" standard applied in this case, *Daniels* is also distinguishable based on MLBPI's factual allegations that the use of publicity rights at issue therein—fantasy sports, which require the use of game statistics—is profoundly different than Defendants' use of publicity rights to promote a betting product. *See* Compl. ¶ 2 ("Fantasy sports are generally considered to be games of skill that are not regulated as sports betting.").

Defendants' cases interpreting *California's* right of publicity statute are similarly uninstructive. *See* DraftKings Mot. at 11–12 (citing *Gionfriddo v. MLB*, 94 Cal. App. 4th 400 (2001)); bet365 Mot. at 21 (citing same). Under the California right of publicity statute, exempted uses include those made "in connection with **_any news_**, **_public affairs, or sports broadcast or account_**"—language far broader than that in the Pennsylvania Statute. Cal. Civ. Code § 3344(d) (emphasis added). As Defendants' own cases highlight, the inclusion of the term "***public affairs***" in addition to the word "news" indicates that California law was intended to also exempt "something less important than news." *Gionfriddo*, 94 Cal. App. 4th at 416. In fact, the *Gionfriddo* court concluded that the uses at issue therein "c[a]me within the 'public affairs' exemption to consent"—*not* the "news" exemption. *Id.* at 415. Here, on the other hand, there is no exemption for "public affairs." *See generally* 42 Pa. Const. Stat. § 8316.

Further, as with *Daniels*, *Gionfriddo* is still inapplicable for numerous additional reasons. In *Gionfriddo*, the California Court of Appeal affirmed the lower court's *summary judgment* finding that defendants' uses of MLB player NILs "were included as minor historical references to plaintiffs" that were "readily distinct from uses that do no more than propose a commercial transaction." 94 Cal. 4th at 412. The court notably distinguished the case there from one decided by the Ninth Circuit—*Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir.

1996)—in which a car company compared Kareem Abdul-Jabbar's NCAA basketball awards with its own "Best Buy" awards. *Gionfriddo*, 94 Cal. App. 4th at 412 (citing *Abdul-Jabbar*, 85 F.3d at 415–16). As *Gionfriddo* observed, the Ninth Circuit held that **although Abdul-Jabbar's "record may be said to be 'newsworthy,' its use is not automatically privileged.** [The defendant] used the information in the context of an automobile advertisement, not in a news or sports account." *Id.* at 413 (quoting *Abdul-Jabbar*, 85 F.3d at 416) (emphasis added). The *Gionfriddo* court further distinguished *Abdul-Jabbar* based on the fact that the *Gionfriddo* "plaintiffs never contend[ed] that their statistics and depictions appeared in the context of an advertisement." *Id.* Here, MLBPI expressly *does* claim that the use is promotional. *See, e.g.*, Compl. ¶¶ 5–6. Thus, even if Defendants' California cases had any relevance to this Court, they still would not support dismissal. *See also* DraftKings Mot. at 12 (citing *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790 (1995) (affirming *summary judgment* dismissal of California claim confirming newspaper's "right to republish its [own] front page sports stories")).

Defendants' invocation of Florida's right of publicity statute is more of the same. *See* DraftKings Mot. at 12 (citing *Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6 (S.D. Fla. 1983)); bet365 Mot. at 21 (citing same). While Defendants are correct that the Florida statute contains an exemption for "any bona fide news report or presentation having a current and legitimate public interest" (Fla. Stat. § 540.08(4)(a)), they omit that the reason "[c]ourts have . . . interpreted th[e Florida] statute broadly" (DraftKings Mot. at 12; *see also* bet365 Mot. at 21) has nothing to do with the "news report" portion of the exception. The lone Florida case upon which Defendants rely exempted the disputed use based on the statute's (broader) exemption for a "presentation having a current or legitimate public interest," with no mention of the "news report" portion of the exemption or analysis of whether the presentation constituted "news." *See Alley*, 624 F. Supp. at

14

10. Further, while the court held that the uses at issue therein "ha[d] not been shown to be an advertising use," it did so only *after a bench trial*. *Id.* at 7. *Alley* does not support Defendants' request to dismiss MLBPI's claims on the pleadings.

Ultimately, Defendants' cases fail to support their motion, but also underscore that the particular words codified in the Statute matter. Just because something is news*worthy* does not make it *news*, much less a "news report" or "news presentation." A finding to the contrary would mean that the Pennsylvania Statute carves out any and all advertisements that reference or include a photograph of someone who is "newsworthy"—*e.g.*, all celebrities and professional athletes—a result that would have the exception swallow the Statute's purpose. *See U.S. v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 140 (3d Cir. 2016) (declining to adopt a statutory interpretation that would allow the "exception [to] thereby swallow the rule"). It also would run headlong into the Statute's legislative history. *See supra* at p. 11. In short, Defendants have come forward with literally no support for the position they advocate—*i.e.*, dismissing a Pennsylvania right of publicity claim on the pleadings based on the "news report or news presentation" exemption.[12]

### 2. Defendants' Uses Do Not Fall Within Pennsylvania's "News Report or News Presentation" Exception

MLBPI's Complaint alleges in spades that Defendants' uses of MLB player NIL are both advertising and promotional, designed to drive users to, and place bets on, their respective sportsbooks. *See, e.g.*, Compl. ¶¶ 6, 30, 34, 38, 40. These alleged uses are associated with neither

---

[12] Even one of Defendants' other out-of-circuit cases—*C.B.C. Distrib. & Mktg., Inc. v. MLB Advanced Media, L.P.*—found that the claims at issue there were *not* exempted under that state's right of publicity law. 505 F.3d 818, 822–23 (8th Cir. 2007) ("Because we think that it is clear that CBC uses baseball players' identities in its fantasy baseball products for purposes of profit, *we believe that their identities are being used for commercial advantage and that the players therefore offered sufficient evidence to make out a cause of action for violation of their rights of publicity under Missouri law.*") (emphasis added).

"news reports" nor "news presentations." *Cf.* 42 Pa. Const. Stat. § 8316(e)(2)(ii). Notwithstanding the facts as pleaded in the Complaint, Defendants inappropriately (and irrelevantly under the Statute) ask this Court to find that all of their uses of MLB players' NILs are "newsworthy" without any discovery or factual inquiry. *See, e.g.*, DraftKings Mot. at 8; bet365 Mot. at 18. Defendants' counterfactual arguments supply no basis for dismissal on the pleadings. *See Dietrich & Assocs., Inc. v. Oct. Three LLC*, No. 20-5002, 2021 WL 1614399, at *4 (E.D. Pa. Apr. 26, 2021).

Stating the obvious, DraftKings and bet365 are gambling companies, not news outlets. *See* Compl. ¶¶ 12–13, 21–23. Defendants do not contend otherwise, as reflected in DraftKings' own SEC filings and both Defendants' instant motions. *See supra* pp. 4–5. In other words, Defendants "may enjoy the press attention [they] receive[], but [they are] not the press." *Cf. Fanelle v. LoJack Corp.*, No. 99-4292, 2000 WL 1801270, *6 (E.D. Pa. Dec. 7, 2000) (explaining that a device manufacturer's publications are not the same as the *Philadelphia Inquirer*'s).

Further, as alleged in the Complaint, Defendants' uses of MLB player NIL on their sportsbook platforms and social media posts are hardly "news reports" or "news presentations"— they are promotional and commercial. *See* Compl. ¶¶ 5–7. The uses are designed "to increase the consumer appeal of the[ir] apps and draw users to make bets on th[eir] platforms." *Id.* ¶ 6. As for the use of MLB player images on their sportsbook platforms, DraftKings and bet365 claim that the uses are merely "for the informational purpose of player identification" (bet365 Mot. at 12) and that the presentation of such images "serves th[e] purpose" of providing users with "informati[on]" and "context[]" about matters of public interest (DraftKings Mot. at 14). But these self-serving characterizations are disputes of fact, not law. MLBPI alleges—and will demonstrate following discovery—that Defendants include these images for the purpose of, for example, "entic[ing] users of the platform" to ultimately place bets. Compl. ¶ 30; *see also id.* ¶ 28 (alleging

16

that the images are "specifically used in connection with the promotion of prop bets"). MLBPI further alleges that most "bettors focus only on data in determining what bets to place" and that they "do not consider a player's picture when making their bets," such that the inclusion of those pictures "does not impact their decision-making process in any way." *Id*. ¶ 33.

The fact that Defendants' platforms do not feature player images for other sports like the NFL—which, like MLB, is a sport that generates public interest[13]—further undercuts Defendants' purported justification that player images are necessary for identification purposes. *See* Compl. ¶¶ 28–29, 34. Both Defendants tellingly ignore MLBPI's allegation that neither one utilizes NFL player images on their respective sportsbooks. MLBPI's allegations about the disparate uses of MLB and NFL player images—which must be accepted as true at this stage (*see Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 649 (E.D. Pa. 2010))—support MLBPI's contention that the use of MLB player images are neither necessary nor informational.[14] The same is true regarding MLBPI's allegation that Defendants have not always used images of MLB players on their sportsbooks— rather they only began including the images in 2024. Compl. ¶ 5.

As for Defendants' use of MLB player names and images in their social media advertisements, bet365 claims its use "does not constitute commercial speech" and that "MLBPI mischaracterizes such use as 'advertisements.'" *See* bet365 Mot. at 12. bet365 points to its Instagram post of Aaron Judge reproduced in the Complaint and contends that Judge's image is used "to illustrate newsworthy content, asking readers to consider whether any team would win

---

[13] *See, e.g.*, Nielsen, *Top of 2023: Sports* (Dec. 2023), https://www.nielsen.com/insights/2023/tops-of-2023-sports/ (providing that the NFL had an average viewership of 9.2 million people per game in 2023, almost thirteen times greater than the professional sports league with the next highest viewership, the NBA).

[14] bet365 counters that "MLBPI refuses to acknowledge" that the images "help disabled bettors (visual impairments, dyslexia) identify players" (Mot. at 4)—yet another factual contention that MLBPI is entitled to test through discovery.

100 games that season" and is thus non-commercial because it does not "contain[] a 'call to action' encouraging wagering." *Id* at 12–13. DraftKings explicitly asserts that the example Instagram post reproduced in the Complaint "is not an advertisement" and is instead "newsworthy both because of its content and because it serves as a forum for news commentators and individuals to discuss a topic of public interest." DraftKings Mot. at 15. Defendants' contentions are wrong on their face and in any event presented at the wrong stage of this case.

Under Pennsylvania's gambling laws, "advertisements" are defined as: "Gaming related marketing materials including a notice or communication by a [gambling company] to the public through signs, billboards, broadcasts, publications, mail, e-mail, text message, tweet or other means of dissemination." 58 Pa. Code § 501a.1. All such gambling "advertisements" must contain a state-mandated disclaimer:

> ***Advertisements must contain a gambling assistance message that includes the telephone number established by the Department of Drug and Alcohol Programs or its successor agency to provide persons with information on assistance for compulsive or problem gambling***.

*Id.* § 501a.7(d) (emphasis added); *see also id.* § 501a.7(e)(4)(i) (requiring, "[f]or web sites, ***including social media sites***: The gambling assistance message must be posted . . . on a gaming related advertisement") (emphasis added).

Against this legal backdrop, MLBPI highlights the gambling disclaimers in the merely illustrative bet365 and DraftKings social medial posts included in the Complaint (¶¶ 35, 36) featuring pictures of MLB players. These posts are thus definitionally *advertisements* under Pennsylvania law, and MLBPI will present many more similar uses after discovery:



As advertisements, Defendants' posts are also necessarily commercial forms of speech. *See Cornette v. Graver*, 473 F. Supp. 3d 437, 460 (W.D. Pa. 2020). Courts in this circuit have recognized that an "advertisement" is, by definition, a ***"commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers." Id.*** ("assessing whether particular expression constitutes commercial speech" and looking to Black's Law Dictionary (11th ed. 2019) definition of "Advertisement" to "guide its analysis") (emphasis added). These determinations plausibly support MLBPI's allegations that Defendants' social media posts are advertisements designed to drive traffic to and betting on Defendants' sportsbooks.

Defendants nonetheless offer counterfactual characterizations that their uses of MLB player NIL "'tell[] the story' of the games in which these [players] performed" (bet365 Mot. at 17) and that their content "is no different than information available from other sports news and media outlets" (DraftKings Mot. at 4). The determination of those descriptions and comparisons— including those based on DraftKings' submission of four hand-selected screen-grabs from other companies' websites (*see id.*)—are fact issues MLBPI is entitled to test through discovery. That

discovery will clarify the factual distinction between, for example, (i) the information that ESPN provides the public when highlighting important sports events from the day on SportsCenter or its mobile news application and (ii) the content Defendants utilize on their sportsbooks and associated advertisements. Looking back again at Defendants' advertisements excerpted above, the most prominent content is betting lines—*i.e.*, the product that Defendants sell—not news.

"News" is "the report or account of recent [] events or occurrences." *News*, Oxford Dictionary (2024). The betting odds on Defendants' platforms, however, are not reports of such historical events; they are values that Defendants set and change based on myriad dynamic factors. Compl. ¶ 21. But *even if* Defendants' content disseminated only factual and historical information about players, they *still* would not be news. Trading cards, for example, also disseminate factual and historical information about players, including their pictures and performance statistics. Yet consumers do not buy a pack of trading cards because they want to know how many home runs Bryce Harper hit in 2023, but because the cards are collectible products.[15] Here, Plaintiff plausibly alleges that consumers do not access sportsbooks to find player statistics, but to place bets. Trading card companies must—and do—pay MLBPI for the right to use MLB players' NILs in their cards[16]; this lawsuit will establish that Defendants here must do the same.

Finally, even (improperly) accepting the accuracy of Defendants' counterfactual and counter-Complaint characterizations of their uses, the "mere discussion of important public issues

---

[15] If consumers instead desire to be informed about players and their performances, they look to sources that traditionally report sporting news. *See* Richard T. Karcher, *The Use of Players' Identities in Fantasy Sports Leagues: Developing Workable Standards for Right of Publicity Claims*, 111 Penn St. L. Rev. 557, 581–82 (2007).

[16] *See, e.g.*, 2023 LM-2, *supra* note 1 (showing Licensing Revenues from card companies Topps and Panini); *see also Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*, 641 F. Supp. 1179, 1187 (S.D.N.Y. 1986) (explaining that "Topps purchases the rights from the players [through the union] and uses them in producing and marketing its [trading card] products").

in [their] advertisements does not render them non-commercial." *Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 862 (3d Cir. 1984) (internal citation omitted). Rather, the determination considers whether the speech "as a whole relates solely to the economic interest of the speaker and its audience." *Ad World, Inc. v. Doylestown Tp.*, 672 F.2d 1136, 1139 (3d Cir. 1982) ("The line between commercial and noncommercial speech for first amendment purposes cannot be drawn by some magic ratio of editorial to advertising content."). Given Defendants' businesses as sportsbook operators, their economic interests of luring potential bettors to their platforms cannot be disputed. At the earliest, determination of their form of speech would occur at summary judgment following the opportunity for discovery. *See, e.g.*, *Facenda v. N.F.L. Films, Inc.*, 488 F. Supp. 2d 491, 496–500 (E.D. Pa. 2007), *aff'd* 542 F.3d 1007 (3d Cir. 2008) (finding, on *summary judgment*, that defendant's video was "commercial in nature" based on examination of the full record, including internal documents and deposition testimony).

The Court should reject Defendants' arguments—contrary to the plain language of the Statute, and contrary to the allegations of the Complaint—for applying the "news report or news presentation" exception to MLBPI's well-pleaded factual averments.[17]

## II.    The Court Should Reject Defendants' Argument That Their First Amendment Concerns Trump MLB Players' Weighty Right of Publicity Interests

Defendants argue that, even if MLBPI has asserted actionable right of publicity claims, all of Defendants' uses of MLB player NIL are protected by the First Amendment. DraftKings Mot. at 17–21; bet365 Mot. at 10–17. But, as even Defendants concede, the First Amendment does not provide blanket protections for using celebrities' or athletes' NILs—factual inquiries are required.

---

[17] bet365 half-heartedly argues in a footnote that "[e]ven if the Court finds bet365's publications do not fall directly within the [S]tatute's news report or presentation exception, they are 'associate[d] with [an] announcement for a commercial or advertising purpose'" under the Statute. *See* bet365 Mot. at 22 n.12 (citing 42 Pa. Const. Stat. § 8316(e)(2)(v)). This argument has no merit, as reflected by the fact that bet365 has not attempted to support it with any case law and DraftKings did not even attempt to advance it.

Yet rather than acknowledge this circuit's controlling, fact-based "Transformative Use Test" balancing framework, Defendants ignore it, and then again resort to out-of-circuit cases that do not support dismissal anyway.

### A.    The Third Circuit's "Transformative Use" Balancing Test Governs This Case

In 2013, the Third Circuit was "presented with a case of first impression" inviting it to "set out a definitive methodology for balancing the tension between the First Amendment and the right of publicity." *Hart*, 717 F.3d at 151–52. In *Hart*, a college football player brought a putative class action lawsuit against videogame developer Electronic Arts ("EA") for violating his right of publicity and by using his likeness in EA's *NCAA Football* series of videogames. *Id.* at 147. At issue was whether EA had "sufficiently transformed" Hart's identity through its *NCAA Football* digital avatar—like a protected painting of a famous person—such that the First Amendment barred Hart's right of publicity claim. *Id.* at 165.

The court observed that the Supreme Court's only "case addressing the First Amendment in a right of publicity context" "called for a balancing test to weigh the interest underlying the First Amendment against those underpinning the right of publicity." *Hart*, 717 F.3d at 152 (citing *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 574–75 (1977)). The court then considered the different frameworks that courts across the country have use to conduct this balancing, ultimately "adopt[ing] the Transformative Use Test as being the most appropriate balancing test." *Id.* at 153, 163. Since *Hart*, courts in the Third Circuit apply the Transformative Use Test "[i]n balancing the right of free expression against the right of publicity." *See, e.g.*, *Cornette*, 473 F. Supp. 3d at 474 (citing *Hart*, 717 F.3d at 165).

Under the Transformative Use Test, the balance between the right of publicity and the First Amendment turns on:

> Whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, *whether the product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness.*

*Hart*, 717 F.3d at 160 (citation omitted) (emphasis in original).

As *Hart* explains, a new work is "transformative" only if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id*. at 159 (citation and internal quotations omitted). In such circumstances—*i.e.*, "[w]hen a new work is transformative of the old"—the new work is "less likely to interfere with the economic interests the right of publicity protects." *Cornette*, 473 F. Supp. 3d at 474 (citing *Hart*, 717 F.3d at 160). Accordingly, the Transformative Use Test "focus[es] on the specific aspects of a work that speak to whether it was merely created to exploit a celebrity's likeness" and "recognizes that if First Amendment protections are to mean anything in right of publicity claims, courts must *begin* by considering the extent to which a work is the creator's own expression." *Hart*, 717 F.3d at 163 (emphasis in original).

In light of the Third Circuit's pronouncement in *Hart* that it was "set[ting] out a definitive methodology for balancing the tension between the First Amendment and the right of publicity," *Hart* is the starting point—not a point to be ignored—in right of publicity cases where a party asserts a First Amendment defense. *Id.* at 151.[18]

---

[18] DraftKings noted in the parties' Joint Rule 26(f) Report that *Hart* is "inapposite" because "DraftKings does not argue that its use of copyrighted photographs that it duly licensed is a transformative use." ECF No. 40 at 7 n.3. That pronouncement is nonsensical given that the entire point of *Hart* was setting forth a test under which the courts (not defendants) decide whether or not a use is "transformative."

**B.    Whether Defendants' Interests in Using MLB Player NIL Without a License Trumps MLB Players' Right of Publicity Requires a Fact-Intensive Inquiry**

Balancing First Amendment and right of publicity interests "usually requires a fully developed factual record before analyzing the balance, making a motion for summary judgment, rather than a motion to dismiss, the proper stage in the litigation in which to rule on the defense." *Cornette*, 2020 WL 1643370, at *12 (citing *Hart*, 717 F.3d at 165–70). Based on the facts set forth in MLBPI's Complaint, however, it is clear that Defendants' uses are the furthest thing from transformative (which is likely why both Defendants ignore *Hart*). Indeed, Defendants have added *nothing* "new" to the images they use on their sportsbook and social media platforms (*e.g.*, Compl. ¶¶ 28–32, 35–37) and have not meaningfully "alter[ed] the [original] with new expression, meaning, or message." *Cf. Hart*, 717 F.3d at 159. Rather, Defendants simply reproduce the names and images of MLB players and put them next to betting odds, betting promotions and various advertisements to drive traffic to their sportsbook platforms. Compl. ¶¶ 34–38. Crediting MLBPI's allegations, Defendants' uses of MLB player NIL plainly do not "so transform[]" the players' likenesses such "that th[e works] ha[ve] become primarily the defendant's own expression rather than the [players'] likeness." *Cf. Hart*, 717 F.3d at 160. Defendants do not contend once in their briefs that the uses are transformative. *See generally* DraftKings Mot.; bet365 Mot. Nor could they.

A comparison to Third Circuit cases makes clear that Defendants' uses as alleged in the Complaint here do not come close to sufficiently transforming MLB players' NILs such that those uses are entitled to strong First Amendment protection and that, in any event, the inquiry entails a fact-intensive determination that requires discovery. *See, e.g.*, *Hamilton v. Speight*, 827 Fed. App'x 238, 240–41 (3d Cir. 2020) (affirming summary judgment for videogame creator and finding that although the creator used a celebrity as the "inspiration" for its fictional videogame character, there were "significant differences" in the character's portrayal that "so transformed" the celebrity's

likeness such "that it has become primarily the [creator]'s own expression"); *Hart*, 717 F.3d at 165–68 (reversing summary judgment in favor of EA and finding that EA's "digital avatar[s] of college football players were "not transformative" given that they did not "alter or transform [Hart's] identity in a significant way"). These cases underscore not only the purportedly transformative nature that Defendants must ultimately show—with evidence—to warrant sufficient protection under the Transformative Use Test, but also the fact-intensive nature of the inquiry. For these reasons, the Court should reject Defendants' argument that First Amendment concerns trump the weighty right of publicity interests at issue herein.

### C. Defendants Ignore This Circuit's Precedent and Instead Rely Entirely on Distinguishable, Non-Binding Out-of-Circuit Cases

Instead of grappling with binding Third Circuit precedent, Defendants instead grasp exclusively for a hodgepodge of non-binding, out-of-circuit cases involving fantasy sports products that are distinguishable both factually and procedurally.

Defendants claim that "[i]n other cases involving speech about professional sports, courts have concluded, as a matter of law, that the economic interests served by state publicity-right laws were outweighed by First Amendment interests." DraftKings Mot. at 18 (collecting cases); *see also* bet365 Mot. at 10–11 (collecting cases). However, Defendants neglect to mention that *every one of those cases* was determined only *after significant fact development*. *See C.B.C.*, 505 F.3d at 823–25 (affirming *summary judgment* finding that fantasy baseball company's use of MLB player names and statistics trumped the players' Missouri right of publicity claim); *CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 417–19 (D. Minn. 2009) (finding at *summary judgment* based on the "evidentiary record" and "pre-trial discovery," that use of player information in fantasy football game was protected by the First Amendment); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 976 (10th Cir. 1996) (affirming finding that

parody trading card producer's creation of cartoon baseball cards trumped players' Oklahoma right of publicity claim); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 928–38 (6th Cir. 2003) (affirming district court's *summary judgment* holding that artist's use of photos of Tiger Woods in a collage was protected by the First Amendment). If Defendants' out-of-circuit cases are instructive to this Court at all, it is to "demonstrate the need for the development of a factual record before conducting an in-depth First Amendment analysis." *Cornette*, 2020 WL 1643370, at *7 ("declin[ing] to consider [defendant's] First Amendment arguments" and its reliance on *ETW Corp.* and *Cardtoons* at the motion to dismiss stage).

Even the District Court of Minnesota in *Dryer v. National Football League*—which was bound by the Eighth Circuit precedents in *C.B.C.* and *CBS*—explicitly ***"declined to rely on C.B.C., CBS, [and] Gionfriddo" at the pleading stage*** "to determine as a matter of law that the [disputed uses] were protected speech under the First Amendment." 55 F. Supp. 3d 1181, 1195 (D. Minn. 2014) (emphasis added). Instead, the court dismissed the former NFL players' right of publicity claims only *after* the plaintiffs "had their chance to develop the record in th[e] case and [] failed to establish that the uses of which they complain[ed] are truly different from the uses found permissible in *C.B.C.*, *CBS*, and *Gionfriddo*." *Id.* (finding *at summary judgment* based on "[a]n evaluation of the full record" "that the balance between Plaintiffs' publicity rights and the constitutional protection due the uses involved" there "favor[ed]" defendant).[19]

---

[19] While the *Daniels* court relied on *C.B.C.* at the motion to dismiss stage, those two cases involved the same product (fantasy sports) (*see Daniels*, 2017 WL 4340329, at *1)—a product that MLBPI alleges is distinct from the recently-legalized and highly-regulated sportsbook gambling industry. *See* Compl. ¶ 2. Further, courts in other circuits have rejected the argument that fantasy sports providers have a First Amendment right to the unlicensed use of player images in connection with their fantasy sports games. *See, e.g.*, *Gridiron.com, Inc. v. Nat'l Football League, Player's Ass'n, Inc.*, 106 F. Supp. 2d 1309, 1315 (S.D. Fla. 2000) (finding First Amendment did not protect fantasy sports website and noting that the website's competition was "other Internet companies and merchandise sellers, not sports magazines").

Defendants' out-of-circuit cases do not support dismissal for additional reasons. For one, Defendants argue that MLB players' rights must give way to the First Amendment because "[p]layers earn handsome rewards for playing professional baseball, and they can earn additional 'large sums for endorsements and sponsorship arrangements.'" bet365 Mot. at 15 (citing *C.B.C.*, 505 F.3d at 824); *see also* DraftKings Mot. at 19–20 (similar) (citing same). But the Third Circuit already considered and "reject[ed]" this nonsensical argument in *Hart*. *See* 717 F.3d at 153 n.14 (quoting *C.B.C.*, 505 F.3d at 824 and citing *Cardtoons*, 95 F.3d at 974).[20] Whether a person with commercial value in her identity profits from it in certain contexts does not make the misappropriation of her identity in *other* contexts any less illegal. In any event, whether Defendants' conduct has caused harm depends on fact development. *See* J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 28:7 (5th ed.) (explaining that "plaintiff does not have to prove quantifiable commercial damage" to establish a prima facie violation of its right of publicity). Defendants also emphasize that their uses contain "no danger of consumers being misled" (bet365 Mot. at 15, citing *C.B.C.*) or "confus[ed]" (DraftKings Mot. at 21, citing same) into thinking that players endorse their products. But as *Hart* makes clear, "the right of publicity does not implicate the potential for consumer confusion." 717 F.3d at 158. Rather, "[t]he right of publicity protects the *celebrity*, not the *consumer*." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1281 (9th Cir. 2013) (emphasis in original).

Finally, to the extent Defendants have ignored this circuit's governing framework on the purported basis that their uses of MLB player images are not "expressive" and therefore not subject

---

[20] MLBPI further notes the internal inconsistency of Defendants' position, on the one hand, that MLB players' NILs do not necessarily have "commercial value" for purposes of pleading a claim under the Pennsylvania Statute, yet on the other hand, that MLB players have a categorical ability to earn "large sums" from off-field endorsements and sponsorships such that they should receive lesser rights of publicity.

to *Hart*, the entire question of what "test" applies depends on the nature of Defendants' use of player NILs, which is a question of fact. *Cornette*, 2020 WL 1643370, at *10 (whether work is "expressive" is a "fact-intensive inquiry"). As DraftKings acknowledges, it can present arguments about these facts at "summary judgment at the appropriate time." DraftKings Mot. at 4 n.3; *see also High Off Life, LLC v. Freebandz Prods., LLC*, No. 20-1556, 2022 WL 952861, at *4 (W.D. Pa. Mar. 30, 2022) ("find[ing] that the analysis of whether the First Amendment protects Defendants' actions is more appropriately conducted at [] summary judgment").[21] In the event the Court ultimately determines such uses constitute commercial speech, those uses will be subject to lesser First Amendment protection under any test. *See Crash Proof Ret.*, 533 F. Supp. 3d at 230 (explaining that "commercial speech occupies a subordinate position in the scale of First Amendment values") (citation and internal quotations omitted); *Fanelle*, 2000 WL 1801270, at *8 ("reject[ing]" "any attempt to clothe its commercial speech in the mantle of news reporting" and "conclud[ing] that the commercial speech at issue . . . receives only moderate . . . protection under the First Amendment"). In sum, even if the Court determines that the Transformative Use Test is inapplicable (it should not), any balancing that applies to this assessment would still depend on heavily disputed facts.

### III.    MLBPI's Right of Publicity Claims Are Adequately Pled

#### A.    MLBPI Has Standing to Bring Claims on Behalf of MLB Players

There is no merit to Defendants' arguments that MLBPI lacks "standing" to protect and enforce the rights of publicity of the MLB players who have exclusively assigned those rights to

---

[21] To the extent DraftKings has ignored the Transformative Use Test based on arguments purportedly related to "copyright law principles," the Third Circuit has already determined that such principles do not warrant non-application of the Transformative Use Test. *Hamilton*, 827 Fed. App'x at 241 n.5; *see also id.* (declining to consider argument "that the transformative-use test does not apply to commercial speech" where it was raised for the first time in a sur-reply brief).

MLBPI for group licensing. Styled as a "lack of standing" by bet365 (Mot. at 7–10) and a failure to identify "natural persons" whose rights have been violated by DraftKings (Mot. at 21–22), both arguments rest on mischaracterizations of the Complaint and the Statute and should be rejected.

The Statute expressly permits entities like MLBPI to bring right of publicity claims on behalf of others who have authorized it. The Statute defines the "[p]arties authorized to bring action" to include not only the "natural person whose name or likeness has commercial value," but also "[a]ny other person, firm or corporation authorized in writing by such natural person to license the commercial or advertising purposes of the person's name or likeness." 42 Pa. Const. Stat. § 8316(a), (b)(4). bet365's use of ellipses[22] does not change the statutory text, and authorization by MLB players is precisely what MLBPI has alleged. *See, e.g.*, Compl. ¶ 11 (MLBPI is the "assignee of the right to use the [NILs]" of MLB players); *id.* ¶ 26–27. That should end the inquiry.[23]

Defendants also argue that the Complaint must allege facts showing that "every MLB player has actionable publicity and privacy rights under Pennsylvania law." bet365 Mot. at 8; DraftKings Mot. at 21–22 ("MLBPI must provide adequate notice . . . of the identity of the 'natural person' or persons whose rights are being asserted . . ."). But the Complaint plausibly alleges that all MLB players have some commercial value; *measuring* the value of each individual player is

---

[22] bet365 reproduced Section 8316(a)'s operative text but omitted via ellipsis its express allowance that "any of the parties authorized in subsection (b)" are permitted to "bring an action." *Compare* bet365 Mot. at 8, *with* 42 Pa. Const. Stat. § 8316(a), (b)(4).

[23] bet365 also attempts to manufacture a pleading deficiency by arguing that the Complaint never states that the players' assignment of the NIL rights to MLBPI was "in writing." bet365 Mot. at 8–9. But MLBPI's allegations clearly reflect that the assignment necessarily was in writing. The Complaint details that MLBPI is the "assignee of the right to use the [NILs]" of MLB players; "the exclusive group licensing agent for all active MLB players"; and the organization that "negotiates and enters into group licensing agreements with companies throughout the world." Compl. ¶ 11; *see also id.* ¶¶ 24–27 (detailing MLBPI's group licensing structure, whereby "[e]ach active MLB player has assigned to MLBPA, *and in turn to MLBPI*, the exclusive, worldwide right to use, license, and sublicense, among other things, the players' [NIL]") (emphasis added).

not required because MLBPI filed a case over Defendants' misappropriation of MLB players' NILs without securing a *group* license from MLBPI (like other online sports betting companies have done). *See* Compl. ¶¶ 11, 26 (MLBPI is "the exclusive *group* licensing agent for *all* active MLB players") (emphases added).

As an example of what this case concerns, MLBPI recently executed group licensing deals with FanDuel and Fanatics Sportsbook, two of Defendants' online sportsbook competitors, to use MLB players' NILs.[24] Even Defendants' favorite out-of-circuit cases are replete with examples of corporate entities bringing actions to enforce *collectively* held rights. *See, e.g.*, *C.B.C.*, 443 F. Supp. 2d at 1082 (MLBPA intervened in suit and counterclaimed, asserting that "CBC violated the players' right of publicity"); *CBS*, 259 F.R.D. at 411 (either NFLPA or NFL Players Inc. was the appropriate entity to bring claims on behalf of the underlying players' rights); *Cardtoons*, 95 F.3d at 968 (discussing MLBPA's publicity rights under Oklahoma statute); *see also Facenda*, 488 F. Supp. 2d at 493 (estate suing under Pennsylvania Statute on behalf of natural person); *cf. O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1067 (9th Cir. 2015) (noting that "EA currently negotiates with the NFL and NBA players' unions for the right to use their members' NILs"). It would wholly frustrate the purpose of the Statute if corporate entities like MLBPI were barred from enforcing the players' collective rights they hold as assignee.

Defendants cite *nothing* that supports their position that MLBPI was required to allege, separately, the name of every active MLB player and facts showing that each separately "has actionable publicity and privacy rights." bet365 Mot. at 8. The only authorities proffered by bet365

---

[24] *See* MLBPlayers.com, *MLB Players Inc., FanDuel and OneTeam Sign Licensing Agreement* (Nov. 26, 2024), *supra* note 5; Sports Business Journal, *Fanatics Sportsbook, MLBPA Ink Licensing Deal* (Oct. 9, 2024), *supra* note 5.

relate to constitutional standing (*id.* at 7), which has no place in this analysis. And DraftKings cites four cases that have nothing to do with the Statute, not to mention rights of publicity at all.[25]

Nor is it any secret whose rights MLBPI alleges have been violated. *See* bet365 Mot. at 8 ("The Complaint is devoid of facts about any particular MLB player."). MLBPI alleges that "nearly every active MLB player's" identity has been used and provides numerous examples of Defendants' unauthorized uses. *See, e.g.*, Compl. ¶¶ 5, 28–32, 35–37. MLBPI further alleges that DraftKings' sportsbook platform also maintains individual MLB player pages that feature large images of the player alongside a list of all bets pertaining to that player. *See, e.g., id.* ¶¶ 28–32. It is unclear what practical purpose listing out hundreds more MLB players would have served. Defendants know who MLB players are—Defendants feature the players' identities on their platforms. Defendants have more than fair notice of the rights of publicity at issue.

Defendants' focus on individual MLB players makes even less sense when considering that no individual player could even grant either Defendant a license to use his NIL in the manner that has been alleged. Because Defendants are using "group" rights (*i.e.*, more than three MLB players—indeed, *far* more than three players), only MLBPI could grant such a license because it has been designated the *exclusive* group licensing agent of MLB players. Compl. ¶¶ 11, 26.

Defendants' argument that MLBPI lacks standing to bring its common law claims fares no better than their statutory-standing and notice-pleading ones. Defendants appear to argue that MLBPI does not have standing to bring a common law claim because (i) MLBPI's common law claim for a violation of the right of publicity "derive[s] from" the common law right of privacy;

---

[25] *See* DraftKings Mot. at 22 (citing *Bank v. Cmty. Coll. of Phila.*, No. 22-293, 2022 WL 2905243, at *3 (E.D. Pa. July 22, 2022) (defamation); *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 387 (D.N.J. 2019) (products liability); *Fike v. Glob. Pharma Healthcare Priv., Ltd.*, No. 5:23-cv-2981, 2024 WL 3460114, at *8 (E.D. Pa. July 18, 2024) (breach of express warranty); *Bissett v. Verizon Wireless*, 401 F. Supp. 3d 487, 500 (M.D. Pa. 2019) (breach of contract)).

(ii) "[t]he right to privacy is a personal right that may be enforced only by the individual injured by the misappropriation"; and, (iii) because MLBPI is a corporate entity, it may not press a right of publicity claim. *See* bet365 Mot. at 9–10; *cf.* DraftKings Mot. at 3 (suggesting "the Complaint fails to sufficiently plead the basic elements of [] common law right-of-publicity claims" because it "fails to . . . plead that MLBPI has standing to bring a claim on behalf of the players").

Defendants misapprehend MLBPI's common law right of publicity claim too. MLBPI does not allege that Defendants have violated *its* rights of publicity; rather, that Defendants' unauthorized use of MLB *players'* NILs violates the rights assigned to *it*. For that reason, bet365's reliance on the Supreme Court's ruling in *FCC v. AT&T* is completely off-the-mark. *See* bet365 Mot. at 10. There, the Supreme Court was tasked with interpreting a provision of the Freedom of Information Act ("FOIA"), which requires federal agencies to disclose law enforcement records, unless their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *See* 5 U.S.C. § 552(b)(7)(C). The Court concluded that corporations have no "personal privacy" for the purposes of this exemption. *See FCC v. AT&T*, 562 U.S. 397, 406 (2011); bet365 Mot. at 10 (quoting same). That conclusion has no possible relevance to this case. For one, it involved Congress's imputed understanding of the scope of "personal privacy" at the time of the drafting of a particular provision of FOIA, not the scope of any similar right in Pennsylvania at common law. More importantly, however, whether corporations have a right to "personal privacy" is inapplicable here. The rights that MLBPI alleges have been violated are certain publicity rights of MLB *players* now *held* by MLBPI, not any privacy right inherent to MLBPI. *See* Compl. ¶¶ 1, 7, 40, 45, 51, 55, 58; *see also id.* ¶ 43 (MLBPI's group licensing structure gives MLBPI "the right to prosecute claims and suits in its own name" "on behalf of the MLB players who assigned their rights to MLBPI").

And bet365's reliance on the Restatement (Third) of Unfair Competition affirmatively undermines its argument. Per bet365, "the personal interests protected under the right of privacy are not transferable." bet365 Mot. at 10 (quoting Restatement (Third) of Unfair Competition § 46, cmt. g). But as the Restatement's *full* comment (not another bet365 spliced quotation) makes clear, individuals are free to assign the "commercial value" of their identities to others, which is what MLBPI sues over here:

> [A]n assignment of the right of publicity transfers only the right to exploit the *commercial value of the assignor's identity*; the personal interests protected under the right of privacy are not transferable, and thus invasions of those rights by third persons remain actionable by the assignor.

Restatement (Third) of Unfair Competition § 46, cmt. g (emphasized text omitted by bet365). The comment further emphasizes that "[t]he interest in the commercial value of a person's identity is in the nature of a property right and is freely assignable to others. . . . ***An assignment of the right of publicity transfers ownership to the assignee, who has standing to assert the right against others***." *Id.* (emphasis added). Here again, MLBPI has sued not to protect MLB players' *personal* privacy interests, but rather the commercial value of their NIL rights.

Any fair reading of MLBPI's statutory and common law claims makes clear that MLBPI has more than sufficiently pleaded facts showing that it has the right to bring claims on behalf of the MLB players whose rights Defendants have infringed.

## B.  MLBPI Adequately Alleged That MLB Players' NILs Have "Commercial Value"

Defendants further argue that MLBPI has not adequately alleged that the NIL rights at issue have "commercial value" as required by the Statute. *See* bet365 Mot. at 18 (claiming MLBPI has failed "to allege facts showing that any single and identifiable player's name or likeness has commercial value"); DraftKings Mot. at 23 (similar). Not so.

To begin, whether the NILs of the MLB players assigned to MLBPI *in fact* have "commercial value" is a question inappropriate for resolution at the pleading stage. *See, e.g.*, *Lewis*, 527 F. Supp. 2d at 428 (denying motion to dismiss where plaintiff adequately pleaded "commercial value" under the Statute). It is also a question that discovery (including from *Defendants*) will answer: Why would Defendants use MLB players' NILs on their platforms and in their social media if not for a commercial advantage? Why would sportsbooks and other licensees pay for the NILs of all MLB players if not because they have commercial value?

Defendants complain that MLBPI "simply regurgitates the conclusory legal standard that MLB players' [NILs] have commercial value." DraftKings Mot. at 23 (quotations omitted); *see also* bet365 Mot. at 18 (similar). To support that argument, however, they point only to two paragraphs in the Complaint's prayer for relief (*see* DraftKings Mot. at 23 (citing Compl. ¶¶ 44, 55)), paragraphs that do not, as a matter of custom, include detailed factual allegations. In any case, other allegations in the Complaint more than adequately plead that MLB players' rights have "commercial value." The Statute defines "commercial value" as a "[v]aluable interest in a natural person's [NIL] that is developed through the investment of time, effort and money." 42 Pa. Const. Stat. § 8316(e). Numerous allegations explain how MLB players have done just that:

- **"Investment of time, effort, and money"**: "Professional baseball players spend their lives and careers developing the specialized skills necessary to succeed at the professional level." Compl. ¶ 24.

- **"Valuable interest"**: "MLB players benefit from approved uses of their public personas . . . for commercial benefit and for the benefit of their union (the MLBPA) through means such as licensing and promotional agreements negotiated by MLBPI on their behalf." *Id.*

- **"Valuable interest"**: "In its role as licensing agent, MLBPI regularly negotiates group licensing agreements authorizing use of MLB players' rights in a range of commercial products and services. These agreements ensure . . . that the commercial value of [players'] rights is neither tarnished nor diluted through misuse or overuse; and that the MLBPI and players receive fair compensation when the players' images are used[.]" *Id.* ¶ 27.

34

- **"Investment of time, effort, and money" and "valuable interest":** "For professional athletes, the ability to control the commercial use of their names, images, and likenesses . . . is a crucial return on their substantial career investment." *Id.* ¶ 25.

Defendants' suggestion that these allegations add up to the plausible conclusion that an MLB player—one of the greatest baseball players in the world—could have zero commercial value is a farce. That is especially true when they are licensed as a collective. Indeed, all MLB players—including Gregory Soto, the purportedly lesser-known former Phillies player referenced at the Pre-Trial Conference—receive compensation from MLBPI for the commercial value of their NIL by virtue of becoming MLB players. *See* 2023 LM-2, *supra* note 1.

Courts across the country have repeatedly reached the obvious conclusion that professional (and college) athletes' NILs have commercial value. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 110 (2021) ("[S]tudent athletes [] collectively generate billions of dollars in revenues for [their] colleges every year."); *In re Coll. Athlete NIL Litig.*, No. 20-cv-03919, 2023 WL 8372787, at *23 (N.D. Cal. Nov. 3, 2023) (noting even redshirted freshman college athletes "have NIL value based on the fact that they were recruited in high school, received full scholarships, and are going to play for their college team in later years"); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1280 (3d Cir. 1979) ("Professional athletes . . . generally assume a position of public prominence.").

Because Defendants cannot seriously argue that there is no "commercial value" in the identities and personas of MLB baseball players, they advocate for an impractical if not impossible pleading standard that finds no support in the law—*i.e.*, that MLBPI was required to allege, separately for every active MLB player, his individual commercial value. *See* DraftKings Mot. at 23 ("It is implausible that every one of the hundreds of unnamed MLB players have developed commercial value in their [NIL] through investment of time, effort, and money."). Once again, that

35

is not the suit MLBPI filed. MLBPI's claims are on behalf of all active MLB players whose *group* licensing rights MLBPI controls.[26] It is indisputable that all of these players' NILs have commercial value, as that is the only reason why so many group licensees, including several betting companies, have entered into group licenses with MLBPI.

### C.    MLBPI's Common Law Claims Were Not Abrogated by Statute

Nor is bet365 correct that MLBPI's common law claims have been abrogated by the passage of the Statute, an argument that DraftKings does not even make. *Compare* bet365 Mot. at 22–23, *with* DraftKings Mot. at 9 n.7 (stating that "whether the Statute has abrogated the common law" "is an open question"). It is a longstanding rule that a statute does not abrogate a common law right without an "express declaration" from the legislature or a ruling from the state's supreme court. *See, e.g.*, *Buradus v. Gen. Cement Prods. Co.*, 52 A.2d 205, 208 (Pa. 1947); *see also SEDA-COG Joint Rail Auth. v. Carload Express, Inc.*, 238 A.3d 1225, 1239 (Pa. 2020).

Neither has happened here. As bet365 concedes, "the Supreme Court of Pennsylvania has not yet made a pronouncement on this issue[.]" bet365 Mot. at 23 (citing *Lundberg v. One Three Five, Inc.*, No. 2:19-cv-00692, 2022 WL 2669136, *8 (W.D. Pa. Jan. 14, 2022)); *see also Wurth Baer Supply*, 627 F. Supp. 3d at 442 ("To date, the Pennsylvania Supreme Court has yet to clarify what effect Section 8316 has on the common law misappropriation cause of action."). More

---

[26] Defendants' reliance on *Taha v. Bucks Cnty.*, 9 F. Supp. 3d 490 (E.D. Pa. 2014), *Grande v. Starbucks Corp.*, No. 18-04036, 2020 WL 4937105 (E.D. Pa. Aug. 24, 2020), and *Wurth Baer Supply Co. v. Strouse*, 627 F. Supp. 3d 422 (M.D. Pa. 2022), is inapt. In all of those cases, the plaintiffs were not public-facing individuals whose NILs had *any* plausible commercial value. *See Taha*, 9 F. Supp. 3d at 491 (dismissing claim without prejudice by plaintiff who was arrested and challenged defendant website's publication of his mugshot after it sought to "extract a fee . . . in order to 'unpublish' th[e] information"); *Grande*, 2020 WL 4937105, at *1 (dismissing claim by pro se plaintiff with the last name "Grande" who claimed Starbucks misappropriated his name and likeness by advertising the size of their medium-sized drinks using his name); *Wurth Baer Supply Co. v. Strouse*, 627 F. Supp. 3d at 443 (dismissing claim against former employer by employee who "d[id] not allege that his name has any special reputation or prestige that mention of his name or use of his image . . . could confer an actionable benefits").

importantly, in *Lewis*, the only district court to meaningfully consider whether the Statute abrogated a common law right expressly concluded that it did not:

> As a matter of statutory construction, statutes are not presumed to make changes in the rules and principles of common law or prior existing law beyond what is expressly declared in their provisions. [Defendant] points to no indicia in the text of section 8316 or its legislative history suggesting that it was intended as an exclusive remedy to replace the common-law cause of action of invasion of privacy by misappropriation of identity, and the Court finds none. Absent any indicia of such legislative intent, the Court is hesitant to rule that a common-law cause of action that has been expressly recognized by the Pennsylvania Supreme Court has been impliedly subsumed.

527 F. Supp. 2d at 429 (internal citations omitted); *see also AFL Phila. LLC v. Krause*, 639 F. Supp. 2d 512, 530 n.6 (E.D. Pa. 2009) (citing *Lewis* and noting that "[t]his Court has found no caselaw to suggest the misappropriation of name tort has been subsumed in Pennsylvania").

The two district court cases relied upon by bet365—*Kelly v. Peerstar* and *Facenda v. N.F.L. Films*—neither control nor support a different result. For one, in both cases, the abrogation issue was not raised at the pleading stage, but later in the case. *See Kelly v. Peerstar LLC*, No. 3:18-cv-126, 2020 WL 5077940, at *1 (W.D. Pa. Aug. 26, 2020) (summary judgment); *Facenda*, 488 F. Supp. 2d at 493 (same). For another, unlike here, in *Facenda*, the plaintiff claiming violation of the Statute "abandoned" his common law claim prior to summary judgment, *see Facenda*, 542 F.3d 1007, 1013 n.2 (3d Cir. 2008), so the court's assessment of the issue was at best pure dicta. Finally, neither the *Kelly* court nor the *Facenda* court engaged in any detailed analysis of Section 8316's statutory scheme or whether Pennsylvania's General Assembly intended the passage of the Statute to displace a long-recognized common law right of publicity.

In the absence of any express abrogation language in the Statute or its legislative history, the Statute is presumed not to displace the common law, and Defendants would need to provide a cogent analysis to overcome that presumption. They have not. Nor have they cited any authority that has performed such an analysis and come to that conclusion. There is neither any basis nor

any need for this federal court to consider whether the Statute abrogated longstanding Pennsylvania common law.

## IV.    MLBPI's Unjust Enrichment Claim Should Not Be Dismissed

Finally, there is no merit to Defendants' contention that MLBPI has failed to properly plead its unjust enrichment claim because MLBPI purportedly does not allege a "relationship between the parties" through which MLBPI "directly conferred" a benefit on that Defendant. *See* DraftKings Mot. at 25; bet365 Mot. at 24.

While Defendants are correct that *one* way for a plaintiff to prevail on an unjust enrichment claim is to demonstrate that it directly conferred a benefit on the defendant that would be inequitable to retain without payment (*see* bet365 Mot. at 24; DraftKings Mot. at 25), that is not the *only* way to succeed on unjust enrichment. Decades of Pennsylvania law reject Defendants' contrary interpretation. Just last year, the Third Circuit reaffirmed that the core question in a Pennsylvania unjust enrichment analysis is whether "the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." *Allied World Ins. Co. v. Keating*, No. 22-1996, 2023 WL 1463391, at *3 (3d Cir. Feb. 2, 2023); *see also id.* ("[E]ven a passive and innocent party is unjustly enriched where she furnished no consideration for the receipt of the benefit."). Accordingly, the focus of the unjust enrichment analysis is not, as Defendant DraftKings insists, "on plaintiff's actions." *See* DraftKings Mot. at 25 (alterations omitted). Instead, the analysis "'depends on the unique factual circumstances of each case,' and the Court does not focus 'on the intention of the parties, but rather on whether the defendant has been unjustly enriched.'" *Kenney v. Am. Bd. of Internal Med.*, 847 Fed. App'x 137, 148 (3d Cir. 2021) (quoting *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993), *aff'd*, 637 A.2d 276 (Pa. 1994)); *see also, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) (noting that "[f]ormulas of this kind are not helpful, and they can lead to serious errors").

MLBPI's unjust enrichment claim clearly passes muster on the pleadings when the standard is correctly formulated. Misappropriating and then profiting from MLB players' valuable NILs without due compensation is a quintessential example of unjust enrichment. *See, e.g.*, *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 837 (6th Cir. 1983) ("Carson's achievement has made him a celebrity which means that his identity has a pecuniary value which the right of publicity should vindicate. . . . Vindication of the right will also tend to prevent unjust enrichment by persons . . . who seek commercially to exploit the identity of celebrities without their consent."). As the Supreme Court has explained, "[t]he rationale [for protecting the right of publicity] is the straightforward one of *preventing unjust enrichment* by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *See Zacchini*, 433 U.S. at 576 (emphasis added). Defendants unjustly enriching themselves by using publicity rights assigned exclusively to MLBPI is *exactly* what the Complaint alleges.

Defendants' reliance on an unpublished decision of the Third Circuit and a single decision of the district court is unavailing. *See* DraftKings Mot. at 25 & bet365 Mot. at 24–25 (citing *Boring v. Google, Inc.*, 362 Fed. App'x 273 (3d Cir. 2010), and *Pellegrino v. Epic Games, Inc.*, 451 F. Supp. 3d 373 (E.D. Pa. 2020)). In *Boring*, the plaintiffs alleged that Google tortiously took photographs of their property without their consent. 362 F. App'x at 282. The district court dismissed plaintiffs' unjust enrichment claim, and the Third Circuit affirmed, reasoning that "[t]he complaint [did] not allege [] that [plaintiffs] gave or that [defendant] took anything that would enrich [defendant] at [plaintiffs'] expense." *Id.* Here, MLBPI alleges that Defendants took and used intellectual property interests held by MLBPI to enrich themselves at MLBPI's expense. *See* Compl. ¶¶ 26, 28–40.

Similarly, in *Pellegrino*, an internet-based musician claimed that avatars within the popular video game "Fortnite" misappropriated his "Signature Move," a dance move he would display in concert. 451 F. Supp. 3d at 378. But as the district court recognized, the plaintiff in *Pellegrino* "d[id] not allege that the [] avatars equipped with the [Signature Move] share [plaintiff's] appearance or biographical information." *Id.* at 381. The ambiguity about Pellegrino's identity stands in stark contrast to Defendants' use of MLB players' names and images.[27]

In short, an unjust enrichment analysis "depends on the unique factual circumstances of each case," *Kenney*, 847 Fed. App'x at 148 (quoting *Styer*, 619 A.2d at 350), and Defendants' attempt to prevent MLBPI from pressing its well-pleaded claim should be rejected.

## CONCLUSION

For the reasons set forth herein, Defendants' motions to dismiss should be denied.

Dated: December 23, 2024       By:    */s/ Jeffrey L. Kessler*

           Jeffrey L. Kessler (*pro hac vice*)
           jkessler@winston.com
           David L. Greenspan (*pro hac vice*)
           dgreenspan@winston.com
           Robert S. Pannullo (*pro hac vice*)
           rpannullo@winston.com
           **WINSTON & STRAWN LLP**
           200 Park Avenue
           New York, NY 10166-4193
           Telephone: (212) 294-4700

---

[27] To the extent Defendants read *Pellegrino* to bar unjust enrichment claims for misappropriation of intellectual property rights, they are wrong. This is because *Pellegrino* misconstrues the Third Circuit's holding in *Boring* that a plaintiff may prosecute an unjust enrichment claim if it alleges that it either "gave" or that defendant "took" something of value, *Boring*, 362 F. App'x at 282, by inventing a requirement that the plaintiff must have "consent[ed]" to it. *Pellegrino*, 451 F. Supp. 3d at 382. The crux of an unjust enrichment analysis under Pennsylvania law is whether the defendants "wrongfully secured or passively received a benefit that it would be unconscionable for [them] to retain," not how the improper benefit was obtained—in other words, there is no "consent" requirement. *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985); *see also M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 505 (E.D. Pa. 2021) (same); *151 Advisors, LLC v. Brumer*, No. 21-3170, 2022 WL 18585882, at *1 n.2 (E.D. Pa. Sept. 21, 2022) (same); *Hecht v. Malvern Preparatory Sch.*, 716 F. Supp. 2d 395, 403 (E.D. Pa. 2010) (same).

Diana H. Leiden (*pro hac vice*)
dhleiden@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700

By:   */s/ Peter Leckman*

Peter Leckman (PA Id. 312076)
pleckman@langergrogan.com
Howard Langer (PA Id. 25403)
hlanger@langergrogan.com
Mary Catherine Roper (PA Id. 71107)
Mroper@langergrogan.com
Kevin Trainer (PA Id. 326064)
ktrainer@langergrogan.com
**LANGER GROGAN & DIVER P.C.**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Counsel for Plaintiff MLB Players Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2024, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system.

By:    */s/ Peter Leckman*

Peter Leckman (PA Id. 312076)
pleckman@langergrogan.com
Howard Langer (PA Id. 25403)
hlanger@langergrogan.com
Mary Catherine Roper (PA Id. 71107)
Mroper@langergrogan.com
Kevin Trainer (PA Id. 326064)
ktrainer@langergrogan.com
**LANGER GROGAN & DIVER P.C.**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Counsel for Plaintiff MLB Players Inc.*