**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **MLB PLAYERS INC.,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **No. 24-4884-KSM** |
| **DRAFTKINGS, INC.,** *f/k/a DK Crown Holdings Inc.*, et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                    **March 14, 2025**

Baseball may still be America's favorite pastime, but sports gambling has become a serious threat to baseball's crown.  Here, the two collide in a case where the law is as uncertain as a Phillies playoff run.  After a thorough consideration of the briefing and the arguments made by counsel at oral argument on February 18, 2025, the Court denies Defendants' motions to dismiss (Doc. Nos. 34, 36).

**I.      FACTUAL BACKGROUND**

Taking the allegations in the Complaint as true, the relevant facts are as follows.[1]

---

[1] DraftKings appends multiple exhibits to its motion (*see* Doc. Nos. 36-4 to 36-11), arguing that the Court can take judicial notice of screenshots from its own website, social media posts, and the websites of "[o]ther news sources, such as Yahoo! Sports, CBS Sports, Fox Sports, and NBC Sports" (*see* Doc. No. 36-1 at 10–11 & n.3).  The Court need not decide whether judicial notice can be taken, because either way, the Court finds it inappropriate to consider this extraneous material—which has been hand-selected by DraftKings—for purposes of this motion.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.").

A.    The Parties

Plaintiff MLB Players, Inc. ("MLBPI") is the corporate subsidiary of the MLB Players Association (the "Players Association"), the collective bargaining unit for MLB players.  (Doc. No. 1 at ¶ 11.)  Every MLB player has assigned his interest in his name, image, and likeness ("NIL") to the Players Association, which has in turn assigned the "group rights"—the right to use the NILs of "three or more MLB players in a calendar year"—to MLBPI.  (*Id.* at ¶¶ 11, 26.) MLBPI alleges that it is the "exclusive group licensing agent for all active MLB players, and it possesses the exclusive right to use, license, and sublicense those players' [NILs] for any commercial marketing, promotional activity, or product in which MLB players' group licensing rights are implicated."  (*Id.* at ¶ 11.)

Defendants DraftKings, Inc. and bet365 Group Limited are unrelated entities that operate in the sports entertainment and gambling space, providing online sports betting, online casino, daily fantasy sports, and other consumer products.  (*Id.* at ¶¶ 12–13.)  Through these platforms, users located in states which have legalized sports betting,[2] can bet on the outcome of sporting events as well as place "prop bets" on the performances of individual players.[3]  (*Id.* at ¶ 4.) MLBPI alleges that Defendants have reaped billions of dollars in revenue through the expansion of the online sportsbook betting marketplace.  (*Id.* at ¶ 23.)

---

[2] In 1992, Congress passed the Professional and Amateur Sports Protection Act ("PASPA"), which outlawed sports gambling in all states except Nevada.  In May 2018, the United States Supreme Court overturned PASPA, allowing each state to decide whether it would legalize sports betting.  *See Murphy v. Nat'l Collegiate Athletic Assoc.*, 584 U.S. 453, 486 (2018).  This ruling changed sports gambling in America, and in the years that followed, 38 states and the District of Columbia legalized sports betting.  (Doc. No. 1 at ¶ 19.)

[3] For example, a user can bet that Aaron Nola will throw five strikeouts or that Nick Castellanos will have two hits in a game.

B.     **Defendants' Sportsbook Betting Platforms**

In early 2024, DraftKings and bet365 began featuring MLB players' images throughout their online and mobile sportsbook platforms.  (*Id.* at ¶ 5; *see also id.* at ¶ 6 (alleging that "nearly every active MLB player's image is displayed on Defendants' websites and mobile apps").)  For example, on both Defendants' apps, a user looking to place a prop bet on home runs will find a headshot next to the name and team logo of each player hitting in each game and the odds that that player will hit a home run:

            

*DraftKings Sportsbook Mobile App*            *bet365 Mobile App*

(*Id.*)  In addition to prop bets, DraftKings also uses headshots on the individual page for each player on its app, under the team "rosters" tab on its app, under the "featured players" tab on its app, and under the "live batter props" tab on its website:

3

  



(*Id.* at ¶¶ 29–31.)  As these images show, sometimes the player's headshot appears next to his statistics.  Other times, however, the headshot appears next to the Defendant's current odds for a prop bet on that player's performance.

### C.    Defendants' Social Media Posts

In addition to using player images on their sportsbook platforms, Defendants also feature player NILs on social media, including in posts encouraging customers to place bets on the featured player.  (*Id.* at ¶ 5.)  For example, DraftKings frequently posts "action shots of MLB players mid-game, often in multi-slide posts that begin with what appears to be a piece of sports

reporting yet concludes with an advertisement encouraging viewers of the post to place a bet on the DraftKings Sportsbook platform":

 

(*Id.* at ¶ 35.)  bet365 similarly uses players' NILs in its social media posts, "making multi-slide posts that begin with a player image and end with an advertisement encouraging consumers to place a bet on the company's Sportsbook platform":

 

(*Id.* at ¶ 36.)

### D.    Procedural History

On September 16, 2024, MLBPI filed this action against Defendants asserting four causes of action:  (1) violations of 42 Pa. Cons. Stat. § 8316 (Count I), (2) misappropriation of publicity (Count II), (3) misappropriation of identity (Count III), and (4) unjust enrichment (Count IV).  (*See* Doc. No. 1 at 18–21.)  Defendants move under Federal Rule of Civil Procedure 12(b)(6)[4] to dismiss the Complaint in its entirety.  (Doc. Nos. 34, 36.)  They argue that MLBPI has failed to state claims for violations of § 8316 and Pennsylvania common law, and that even if it had, MLBPI cannot prevail on those claims as a matter of law.  (*See generally* Doc. Nos. 34, 36-1.)

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  "When there are well-

---

[4] bet365 also seeks dismissal under Rule 12(b)(1), arguing that MLBPI lacks standing because it "has not adequately alleged a cognizable injury-in-fact."  (Doc. No. 34 at 13.)  Although initially framed in constitutional terms, bet365 later refers to its argument as one challenging MLBPI's "statutory standing."  (*Id.* at 15.)  And in this portion of its briefing, bet365 contests whether MLBPI has the authority to bring claims on behalf of MLB players under § 8316 and common law.  (*See, e.g.*, *id.* at 14 (noting that § 8316 states "[a]ny *natural person* . . . may bring an action" and arguing that "MLBPI has failed to plead facts identifying any 'natural person' whose rights have been violated"); *id.* at 15 (noting that the common law claims are "personal rights [which] may be brought only by players in their individual capacity and are not assignable" such that "those claims may only be brought by the players themselves, and MLBPI lacks standing to assert such claims").)  "Unlike Article III standing, statutory standing is not jurisdictional."  *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015).  "As a result, a dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim, and a motion to dismiss on this ground is brought pursuant to Rule 12(b)(6), rather than Rule 12(b)(1)."  *Id.* (quotation marks omitted).  Accordingly, the Court analyzes bet365's "standing" arguments pursuant to Rule 12(b)(6), and not Rule 12(b)(1).

pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (quotation marks omitted and alterations accepted); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (explaining that at the motion to dismiss stage, the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations). The court may also "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quotation marks omitted).

## III.    DISCUSSION

In their motions to dismiss, Defendants raise a host of arguments that purportedly warrant the dismissal of MLBPI's complaint. At a high level, Defendants' arguments fall into two buckets: (1) that the pleadings are deficient and (2) that MLBPI's claims fail as a matter of law. In the first bucket, Defendants argue that MLBPI has failed to allege facts from which the Court can find that MLBPI is a proper plaintiff or that the elements of each claim are satisfied. (Doc. No. 34 at 13–16, 23–25, 30–31; Doc. No. 36-1 at 27–31.) In the second, Defendants argue that even if MLBPI has sufficiently pleaded any claim, its right of publicity claims in Counts I–III fail as a matter of law because Defendants' conduct falls into the news reporting exception to the statutory and common law right of publicity claims, the common law right of publicity claims were abrogated by § 8316, and all three counts are barred by the First Amendment. (Doc. No. 34

at 16–23, 25–30; Doc. No. 36-1 at 14–27.)  The Court begins with the alleged pleading

deficiencies before turning to Defendants' arguments that each claim fails as a matter of law.

### A.    Pleading Deficiencies

First, Defendants assert that MLBPI's allegations are insufficient because it has not

alleged facts from which the Court can find it is a proper plaintiff or that Defendants violated

§ 8316 or common law.  The Court addresses each argument in turn.

#### 1.    <u>Proper Plaintiff</u>

Defendants argue that MLBPI has failed to show it can bring claims for violations of

§ 8316 or common law claims for misappropriation of publicity and identity.  The Court tackles

the statutory standing issue before evaluating whether MLBPI can bring its common law claims.

##### a.    *Statutory Standing*

Section 8316 prohibits the unauthorized use of a natural person's valuable "name or

likeness" for "any commercial or advertising purpose."  42 Pa. Cons. Stat § 8316(a).  The statute

identifies four categories of "parties authorized [to] bring an action to enjoin such unauthorized

use and to recover damages for any loss or injury sustained by such use."  *Id.* § 8316(a), (b).  As

relevant here, one of those categories includes "[a]ny other person, firm, or corporation

authorized in writing by [the] natural person to license the commercial or advertising purposes of

the person's name or likeness."  *Id.* § 8316(b)(4).

Defendants argue that MLBPI "fails to allege facts showing that it has acquired the right

to bring an action on behalf of any natural person."  (Doc. No. 34 at 14–15; *see also* Doc. No.

36-1 at 13–14, 30–31.)  Although they concede that the Complaint alleges that "each player

assigned his rights to [the Players Association]," they argue that it fails to allege "that each MLB

player authorized *MLBPI* in writing to license the use of each player's name or likeness for

commercial or advertising purposes."  (Doc. No. 34 at 15 (emphasis added); *see also* Doc. No. 36-1 at 13–14, 30–31.)

Defendants swing, and it's a miss.  MLBPI alleges that "[e]ach active MLB player has assigned to [the Players' Association] . . . the exclusive, worldwide right to use, license, and sublicense . . . the players' [NILs] for purposes of any commercial marketing, promotional activity, product, or service in which three or more MLB players are identified over the course of a calendar year."  (Doc. No. 1 at ¶ 26.)  The Players Association has "in turn" assigned those rights to MLBPI.  (*Id.* ¶ 26; *see also id.* ¶¶ 11, 43, 48, 55.)  These allegations are sufficient at this early stage in the case.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").[5]

For similar reasons, the Court rejects bet365's argument that MLBPI's statutory claims fail because it has not "allege[d] any assignment was '*in writing*' as required by the statue [sic]." (Doc. No. 34 at 15 (emphasis added).)  At the motion to dismiss stage, the Court "draw[s] on its judicial experience and common sense."  *Ashcroft*, 556 U.S. at 679.  Common sense suggests that if, as MLBPI alleges, every player in the MLB assigned his NIL rights to the Players Association, which in turn assigned those rights to MLBPI, those assignments were made in writing.  It is certainly a reasonable inference at this stage.  *See Phillips*, 515 F.3d at 228 ("The court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations.").  Again, the nature and extent of those assignments can be probed in discovery.

---

[5] During oral argument, bet365 argued that even if the Players Association assigned the NIL rights to MLBPI, it is insufficient because MLBPI itself needs to have received authorization from each player. (Feb. 25, 2025 Hr'g. Tr. at 56:9–16, 57:8–13.)  The Court finds that the extent to which each player assigned his right of publicity and the nature of that assignment (including sublicensing rights) are best explored through discovery.

Thus, the Court rejects Defendants' contention that MLBPI is not a proper plaintiff for its statutory claims.

b.    *Common Law Rights of Publicity and Identity*

Next, bet365 argues that MLBPI lacks standing to bring claims for common law misappropriation of publicity and identity.  (Doc. No. 34 at 15.)  It asserts that both causes of action "derive[ ] from one's right to privacy," and a "right to privacy is a personal right that may be enforced only by the individual injured by the misappropriation."  (*Id.* at 15–16.)

In support of this argument, bet365 relies on cases and treatises holding that "nonhumans such as corporations, possess no right to privacy."  (*Id.* (quoting J. Thomas McCarthy, *The Rights of Publicity and Privacy*, § 4:43 (2d ed) and citing *FCC v. AT&T*, 562 U.S. 397, 406 (2011)).)  This is a wild pitch.  MLBPI does not contend that its own right to privacy has been violated (or that it, as a corporation, has a right to privacy at all); it alleges that Defendants violated MLB players' publicity rights, which were assigned in part to MLBPI.  (*See, e.g.*, Doc. No. 1 at ¶ 1 ("This action is brought by MLBPI against Defendant[s] . . . based on their knowing and deliberate misappropriation of *the images and likenesses of hundreds of Major League Baseball ('MLB') players . . . .*" (emphasis added).)

The next pitch is also outside the zone.  bet365 argues that although "an assignment of the right of publicity might transfer ownership to the assignee, that right only pertains to the ability to commercially exploit the assignor's identity—it does not extend to the personal interests of the assignor."  (Doc. No. 34 at 16 (citing Restatement (Third) of Unfair Competition § 46, cmt. g).)  bet365 then reasons that "[b]ecause MLBPI's common law claims are premised on MLB players' personal, and individual, rights of privacy, those claims may only be brought by the players themselves, and MLBPI lacks standing to assert such claims."  (*Id.*)  This argument conflates the various rights that fall under the broad banner of "a right to privacy," and

10

the extent to which each right may be assigned to and enforced by a third party. Because MLBPI brings a right of publicity claim that is distinct from a personal invasion of privacy claim, the Court finds that the right is assignable and may be enforced by MLBPI.

        i.        <u>The Right of Privacy and the Right of Publicity</u>

"The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by a common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff . . . 'to be let alone.'" William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383, 389 (1960); *see also Vogel v. W.T. Grant Co.*, 327 A.2d 133, 136 n.9 (Pa. 1974) ("Dean Prosser has accurately observed that the cause of action for invasion of privacy 'is not one tort, but a complex of four.'" (citing Restatement (Second) of Torts §§ 652B, 652C, 652D, 652E)); *Hogan v. A.S. Barnes & Co.*, No. 8645, 1957 WL 7316, at *3 (Pa. Ct. Comm. Pl. June 19, 1957) ("Right of privacy has frequently been employed as a generic term covering a great many diverse types of causes of action."). These rights are typically referred to as the rights to be free from: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life, and (4) publicity placing person in false light. *See Vogel*, 327 A.2d at 136 n.9 (citing Restatement (Second) of Torts §§ 652B, 652C, 652D, 652E); *Harris by Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984) ("An action for invasion of privacy is comprised of four distinct torts: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life and (4) publicity placing the person in a false light.").

Here, only the tort of appropriation of name or likeness is at issue. Pennsylvania courts have suggested that this particular right, covers two "distinct[ly] differen[t] . . . types of situations":

> On the one hand, where plaintiff is a person previously unknown to the general public, that is, one who has lived a life of relative obscurity insofar as publicity is concerned, the gist of his complaint is that, by reason of the publication of his picture in connection with the advertisement of a product, he has been unwillingly exposed to the glare of public scrutiny. In such a case, plaintiff's right of privacy has truly been invaded. On the other hand, where plaintiff is a person who may be termed a "public figure", such as an actor or an athlete, the gist of his complaint is entirely different. He does not complain that, by reason of the publication of his picture in connection with the advertisement of a product, his name and face have become a matter of public comment, but rather that the commercial value which has attached to his name because of the fact that he is a public figure has been exploited without his having shared in the profits therefrom.

*Hogan*, 1957 WL 7316, at *3. Although the latter situation is also often "decided under the heading of 'right of privacy,'" it is "more appropriately . . . considered . . . under the heading 'right of publicity.'" *Id.* at *10; *cf. Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953) ("This right might be called a 'right of publicity.'  For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways."); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 409 (Cal. Ct. App. 2001) (explaining that in *Haelan Laboratories*, "a court, for the first time, recognized a distinction between the personal right to be left alone and the economic right to exploit one's own fame").

In the years since *Hogan*, federal courts interpreting Pennsylvania law have similarly recognized that misappropriation of identity in violation of the right to privacy (the first situation described in *Hogan*) and misappropriation of publicity (the second situation described in *Hogan*) are "two different, though similar torts." *AFL Phila. LLC v. Krause*, 639 F. Supp. 2d 512, 530–32 (E.D. Pa. 2009); *see also Lundberg v. One Three Five, Inc.*, No. 2:19-CV-00692-RJC, 2022

WL 2669136, at *8 (W.D. Pa. Jan. 14, 2022) ("There are two distinct common law torts

regarding misappropriation of likeness, both of which have been recognized in Pennsylvania.");

*Eagle v. Morgan*, Civil Action No. 11–4303, 2013 WL 943350, at *8 (E.D. Pa. Mar. 12, 2013)

("Although similar, the right of publicity is not identical to invasion of privacy by appropriation

of name or likeness.  The right of publicity protects against commercial loss caused by

appropriation of a name or likeness.  In other words, the invasion of privacy by appropriation of

name or likeness is a personal right created to protect one's privacy, while the right of publicity

more closely resembles a property right created to protect commercial value." (quotation marks

omitted)); *Rose v. Triple Crown Nutrition, Inc.*, Civil Action No. 4:07–CV–00056, 2007 WL

707348, at *3 (M.D. Pa. Mar. 2, 2007) (same).

      Here, MLBPI appears at first glance to bring both types of claims, one for invasion of

privacy by appropriation of name or likeness (Count III) and one for misappropriation of

publicity (Count II).  (*See* Doc. No. 1 at 20.)  Despite asserting a claim for invasion of privacy, in

its opposition brief, MLBPI definitively states that it is not suing "to protect MLB players'

*personal* privacy interests, but rather *the commercial value* of their NIL rights."  (Doc. No. 42 at

40 (second emphasis added).)  And under both counts, MLBPI refers to a "common law right of

publicity," (*see id.* at ¶¶ 50, 54), argues that the MLB players' names and likenesses have

commercial value (*see id.* at ¶ 51 ("Defendants have used and appropriated the valuable

likenesses of three or more MLB players . . . ."); *id.* at ¶ 55 ("MLB players' names, images, and

likenesses have commercial value.")), and that the players' NILs were misappropriated for

Defendants' commercial advantage (*see id.* § 51 (alleging Defendants used the players' NILs

"for Defendants' commercial advantage"); *id.* § 55 (alleging Defendants used the players' NILs

"within Defendants' sportsbook betting platforms" and "in advertising meant to draw customers

to the platforms")).  (*See also* Feb. 18, 2025 Hr'g. Tr. at 82:1–5 (MLBPI's counsel confirming that "Counts 2 and 3 . . . are premised on the commercial lost [sic] caused by the appropriation of the players'" identities).)

In short, both Counts II and III allege not an intrusion on MLB players' personal privacy rights, but the unsanctioned commercial use of the players' NILs.  In this way, both counts allege a violation of the players' rights of publicity.  *See Rose*, 2007 WL 707348, at *3 (explaining that the right of publicity differs from the right to be free from an invasion of privacy by appropriation of name or likeness because "[i]nvasion of privacy by appropriation of name or likeness does not require the appropriation be done commercially"); *see also, e.g.*, *Hogan*, 1957 WL 7316, at *3; *AFL Phila. LLC*, 639 F. Supp. 2d at 530–32; *Eagle*, 2013 WL 943350, at *8. Because MLBPI's "misappropriation of identity" claim is duplicative of its misappropriation of publicity claim, the Court dismisses Count III.[6]

ii.    The Second Restatement of Torts and the Third Restatement of Unfair Competition

MLBPI's decision to bring two separate counts for violation of the right of publicity appears to stem not from the fact that Pennsylvania recognizes two variations on the right of publicity, but from the confusion in the case law as to the scope of the "right of publicity," its derivation from the related right of privacy, and whether in Pennsylvania the right of publicity is governed by § 652C of the Second Restatement of Torts or § 46 of the Third Restatement of Unfair Competition.

---

[6] To the extent MLBPI is, despite its assurances to the contrary, trying to assert claims for invasion of the players' personal privacy via a claim for misappropriation of identity, the Court agrees with bet365 that MLBPI is not able to bring such a claim for the reasons discussed below.

The text of the Second Restatement of Torts, § 652C shows that it broadly encompasses both a right of privacy claim and right of publicity claim: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." The comments to § 652C confirm that it encompasses both types of claims:

> The interest protected by the rule stated in this Section is the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others. Although the protection of his personal feelings against mental distress is an important factor leading to a recognition of the rule, the right created by it is in the nature of a property right, for the exercise of which an exclusive license may be given to a third person, which will entitle the licensee to maintain an action to protect it.

Restatement (Second) of Torts § 652C cmt. a; *see also* Restatement (Third) of Unfair Competition § 46 cmt. b (discussing § 652C and explaining that it "subsumes harm to both personal and commercial interests caused by an unauthorized exploitation of the plaintiff's identity").

Section 46 of the Third Restatement of Unfair Competition, by contrast, sets "forth the elements of a free-standing right of publicity claim, unconnected to the right of privacy torts." *Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 151 (3d Cir. 2013). In other words, § 46 outlines a standalone tort for misappropriation of publicity: "One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability . . . ." Restatement (Third) of Unfair Competition § 46. Like the comments to § 652C, the comments to § 46 recognize that an individual has both a personal and commercial interest in their identity, but unlike § 652C, § 46 is concerned with only the commercial aspects:

> This [t]opic addresses the common law and statutory rules that protect the commercial value of a person's identity. The appropriation of another's identity for purposes of trade can result

> in injury to both commercial and personal interests. This Restatement deals with rules affording relief against unfair methods of competition, and the rules stated in this [t]opic are therefore limited to the redress of commercial injuries. The interest protected by these rules is often described as the "right of publicity." Relief is also generally available under the law of torts for injuries to personal interests caused by the unauthorized commercial use of another's identity. The protection of these personal interests is often described as an aspect of the "right of privacy."

*Id.* cmt. a (citation omitted).  The comments to § 46 go on to explain that although some jurisdictions have parsed out the right of publicity from the right of privacy (similar to the manner proposed by § 46), in other jurisdictions, the two remain a single cause of action (similar to the manner presented in § 652C):

> Courts in a number of jurisdictions eventually came to distinguish claims for injury to personal feelings caused by an unauthorized use of the plaintiff's identity from claims seeking redress for an appropriation of the commercial value of the identity. The latter claim was sometimes denominated a "right of publicity" to distinguish it from the protection available to personal interests under the "right of privacy." Thus, in some jurisdictions separate causes of action now redress the commercial and personal injuries resulting from an unauthorized commercial exploitation of a person's identity. The distinction between the publicity and privacy actions, however, relates primarily to the nature of the harm suffered by the plaintiff; similar substantive rules govern the determination of liability. In other jurisdictions, relief for both personal and commercial harm is available through a single common law or statutory cause of action.

*Id.* cmt. b.  No appellate court in Pennsylvania has spoken to the scope of an individual's right of publicity, let alone whether that right is governed by § 652C of the Second Restatement of Torts or § 46 of the Third Restatement of Unfair Competition.

Nearly 30 years ago, a judge from this Court predicted that the Pennsylvania Supreme Court would "clarify the law concerning the right of publicity in Pennsylvania by adopting the Restatement (Third) of Unfair Competition."  *Seale v. Gramercy Pictures*, 964 F. Supp. 918, 929–30 (E.D. Pa. 1997).  But in the ensuing silence from the Commonwealth's higher courts, at

least one federal district court has diverged from *Seale*.  *See AFL Phila. LLC*, 639 F. Supp. 2d at

530 (declining to follow *Seale* and finding instead that "the Second Restatement appropriation

analysis applies"); *cf. Hart*, 717 F.3d at 151 & n.13 (declining to consider § 46 "because New

Jersey has yet to adopt the Restatement (Third)'s version of the tort [for misappropriation of

publicity] and the accompanying comments," and instead, applying § 652C).  Instead, the *AFL*

court found that § 652C governed the plaintiff's right of publicity claim, just as it governs a

common law claim for invasion of privacy by misappropriation of name or likeness.  *See AFL*

*Phila. LLC*, 639 F. Supp. 2d at 530; *see also The Choice is Yours, Inc. v. The Choice is Yours*,

No. 2:14-cv-01804, 2015 WL 5584302, at *5 (E.D. Pa. Sept. 22, 2015) (citing, without

discussion, the Second Restatement of Torts and *AFL Phila. LLC*); *Fanelle v. Lojack Corp.*, No.

CIV.A. 99–4292, 2000 WL 1801270, at *10–11 (E.D. Pa. 2000) (citing the Second Restatement

of Torts).

    After reviewing both lines of cases, this Court finds more persuasive *Seale* and those

opinions applying § 46 and joins their team.  Section 46 is consistent with the parameters of the

right of publicity as outlined by the Pennsylvania Court of Common Pleas in *Hogan*.  *See Hogan*,

1957 WL 7316, at *10 ("As we view the 'right of publicity' recognized in the *Haelan*

*Laboratories* case, it is *but another way of applying the doctrine of unfair competition*.  In

essence, it is calling the property right, which must be found to exist in an unfair competition

case, a 'right of publicity.'" (emphasis added)); *see also Buckley v. Universal Sewing Supply,*

*Inc.*, Civil No. 1:19-CV-794, 2020 WL 7240978, at *5 (M.D. Pa. Dec. 9, 2020) ("The

Pennsylvania Supreme Court has never formally recognized [a claim for misappropriation of the

right of publicity], but multiple federal district courts have cited a well-reasoned Pennsylvania

Court of Common Pleas decision [*Hogan*] as establishing Pennsylvania's recognition of the doctrine.").

Moreover, federal courts applying Pennsylvania law both before and after the release of the Third Restatement of Unfair Competition in 1995 framed the right of publicity in the same manner as § 46.  *Compare* Restatement (Third) of Unfair Competition § 46 ("One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability for [appropriate relief]."), *with, e.g.*, *World Wrestling Fed. Ent. Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp.2d 413, 443–44 (W.D. Pa. 2003) ("A defendant violates a plaintiff's right of publicity by 'appropriating its valuable name or likeness, without authorization, and using it to defendant's commercial advantage.'" (quoting *Phila. Orchestra Ass'n v. Walt Disney Co.*, 821 F. Supp. 341, 349 (E.D. Pa. 1993))), *and Eagle's Eye, Inc.*, 627 F. Supp. 856, 862 (E.D. Pa. 1985) ("The right protects against commercial loss caused by appropriation of an individual's personality for commercial exploitation.")), *and Eagle*, 2013 WL 943350, at *8 ("The right of publicity protects against commercial loss caused by appropriation of a name or likeness."), *and Rose*, 2007 WL 707348, at *2–3 (citing *World Wrestling*, *Eagle's Eye, Inc.*, and the Third Restatement of Unfair Competition § 46).  Accordingly, the Court finds the *Seale* line of cases more persuasive, and thus, follows their lead in looking to § 46's text and comments to outline the scope of a claim for misappropriation of the right of publicity.

### iii.    Assigning the Right of Publicity

With this clarification in mind, the Court turns to bet365's argument that MLBPI lacks standing to enforce the MLB players' publicity rights at common law.  This argument fails. Numerous courts have held that the right of publicity is transferable and once transferred, the transferee has standing to bring an action for violation of the right.  *See* Restatement (Third) of

18

Unfair Competition § 46, cmt. g ("An assignment of the right of publicity transfers ownership to the assignee, who has standing to assert the right against others." (emphasis added)); *see also Brockum Co. v. Blaylock*, 729 F. Supp. 438, 446 (E.D. Pa. 1990) ("The right of publicity may be legally and validly transferred from an entertainer or musical group to a corporate third-party licensee such as plaintiff Brockum." (emphasis added)); *Winterland Concessions Co. v. MacIntosh*, Civ. A. No. 89–8342, 1992 WL 170897, at *10 (E.D. Pa. July 14, 1992) ("The Right of Publicity may be and was validly transferred from the entertainers and musical groups listed above to plaintiff Winterland. Accordingly, Winterland has standing to bring this action for violation of the Right of Publicity transferred to it."); *Nice Man Merch., Inc. v. Logocraft Ltd.*, Civ. A. No. 91–7475, 1992 WL 59133, at *4 (E.D. Pa. Mar. 18, 1992) ("Courts have recognized that the right of publicity may be legally and validly transferred to a corporate third-party licensee, thus entitling the licensee to enjoin the use of the name or likeness of the licensor."); *see also Haelan Labs., Inc.*, 202 F.2d at 869 ("[P]laintiff, in its capacity as exclusive grantee of player's 'right of publicity,' has a valid claim against defendant if defendant used that player's photograph during the term of plaintiff's grant and with knowledge of it.").[7]

bet365, relying on comment g to § 46, acknowledges that the right of publicity is assignable, but it says that an assignee, like MLBPI, does not have standing to enforce the assignment in litigation. (Doc. No. 34 at 16.) This argument misses the plate. bet365's argument rests on a misreading of comment g, which states, in relevant part:

> The interest in the commercial value of a person's identity is in the nature of a property right and is freely assignable to others. . . . An

---

[7] Even if § 652C of the Restatement of Torts, and not § 46 of the Restatement of Unfair Competition, governed MLBPI's common law claims, the Court would still find the right of publicity transferrable and enforceable by the transferee: "[T]he right created by [this rule] is in the nature of a property right, for the exercise of which *an exclusive license may be given to a third person, which will entitle the licensee to maintain an action to protect it*." Restatement (Second) of Torts § 652C cmt. a (emphasis added).

> assignment of the right of publicity transfers ownership to the
> assignee, who has standing to assert the right against others.
> However, an assignment of the right of publicity transfers only the
> right to exploit the commercial value of the assignor's identity; the
> personal interests protected under the right of privacy are not
> transferable, and thus invasions of those rights by third persons
> remain actionable by the assignor.

Restatement (Third) of Unfair Competition § 46, cmt. g.  This comment distinguishes the right of publicity from the other rights that fall within the broader category of the "right of privacy," explaining that the right of publicity *is* assignable and the assignee "has standing to assert the right against others," while the other "privacy rights" (e.g., intrusion on seclusion) are "not transferrable, and thus invasions of those rights by third persons remain actionable by the assignor."  *Id.*  Indeed, comment g includes an illustration emphasizing this distinction:

> A, a famous actress, assigns to B the right to exploit the commercial
> value of A's identity. C, without the permission of either A or B,
> markets posters that feature A's picture in a pose that places A
> before the public in a false light. C is subject to liability to B, but not
> to A, for an appropriation of the commercial value of A's identity
> under the rule stated in this Section. C is subject to liability to A, but
> not to B, for placing A before the public in a false light . . . .

*Id*.

Because the common law right of publicity is assignable, and MLBPI has alleged that MLB players assigned their publicity rights to the Players Association, which, in turn, assigned those rights to MLBPI, the Court finds that MLBPI has standing to bring claims for violation of those rights.

*            *            *

In sum, the Court rejects Defendants' standing arguments and finds MLBPI is an appropriate plaintiff for both the statutory and common law claims it asserts.  The Court does, however, dismiss Count III as duplicative of Count II.

2.    **Failure to State a Claim**

Next, Defendants argue that even if MLBPI is a proper plaintiff for its statutory and common law claims, MLBPI's allegations do not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" as to any claim.  The Court addresses each count in turn.

a.    *Section 8316 (Count I)*

As noted above, § 8316 prohibits the unauthorized use of a natural person's valuable "name or likeness" for "any commercial or advertising purpose."  42 Pa. Cons. Stat § 8316(a).  "Based on the plain language of the statute, the only necessary elements in this claim are: (1) the plaintiff must be a natural person; (2) their name or likeness must have commercial value; (3) another person must have used their name or likeness for a commercial or advertising purpose; and (4) that other person must have lacked proper authorization to use the name or likeness in the manner it was used."  *Buckley*, 2020 WL 7240978, at *4.  Defendants argue that MLBPI has failed to:  identify any "natural person" whose rights have been violated (Doc. No. 34 at 14, 24; Doc. No. 36-1 at 27–28), allege the commercial value of the name or likeness of any natural person (Doc. No. 34 at 24; Doc. No. 36 at 28–29), and show that Defendants used player NILs for a commercial or advertising purpose (Doc. No. 34 at 24).

i.    Natural Person

First, Defendants argue that MLBPI has failed to "identify a specific natural person whose rights are violated."  (Doc. No. 34 at 24; Doc. No. 36-1 at 27–28.)  They assert that MLBPI's "vague" references to "all active MLB players" and "almost every current MLB player" are "insufficient under Rule 8 pleading requirements" because they fail to "provide adequate notice to [Defendants] of the identity of the 'natural person' or persons whose rights are being asserted and whose rights Defendant[s are] supposedly violating."  (Doc. No. 36-1 at 27–

28.)  The Court disagrees.  Rule 8 is meant only to provide notice, and the phrase "all active

MLB players" gives notice to Defendants of the "natural persons" whose rights MLBPI alleges

were violated.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002) (describing Rule

8 as a "simplified notice pleading standard," under which a plaintiff need only give "fair notice

of the basis for [plaintiff's] claims").  There is no meaningful difference between MLBPI

appending a list with the name of every active MLB player to the Complaint and it using the

catch-all phrase "all active MLB players."  The parties are capable of easily and clearly defining

which natural persons were "active MLB players" during the period identified in the Complaint,

and Defendants are certainly capable of identifying which players were featured on their

sportsbook platforms and social media accounts.

## ii.    Commercial Value

Second, Defendants argue that MLBPI has failed to allege that the MLB players' NILs

have commercial value.  (Doc. No. 34 at 24; Doc. No. 36-1 at 28–29.)  The statute defines

"commercial value" as a "[v]aluable interest in a natural person's name or likeness that is

developed through the investment of time, effort and money."  42 Pa. Cons. Stat. § 8316(e); *see

also Taha v. Bucks County*, 9 F. Supp. 3d 490, 493 (E.D. Pa. 2014) ("Typically, plaintiffs who

invoke § 8316 have invested resources in the development of a personal brand, and are suing to

redress the unauthorized exploitation of that brand.").

MLBPI alleges that all MLB players have spent "their lives and careers developing the

specialized skills necessary to succeed at the professional level."  (Doc. No. 1 at ¶ 24; *see also

id.* at ¶ 25 (referring to players' "substantial career investment").)  This effort has given rise to a

"valuable interest" in the players' NILs as reflected by the fact that the players "benefit from

approved uses of their public personas . . . through means such as licensing and promotional

agreements."  (*Id.* at ¶ 24.)  At this early stage, these allegations are sufficient to plausibly allege

that each player—even purportedly "lesser known" players like former-Phillies (now-Baltimore Orioles) relief pitcher, Gregory Soto[8]—has a valuable interest in his NIL.[9]

But even if these allegations were insufficient, it would not be fatal to MLBPI's claims, because MLBPI alleges that Defendants' uses violate MLBPI's *group* license (i.e., the right to use the NILs of three or more MLB players in a calendar year). (*See, e.g.*, Doc. No. 1 at ¶¶ 11, 24–27, 43.) In this context, courts have recognized an individual's likeness can have separate value if that individual is part of a group. *See Apple Corps. Ltd. v. Button Master, P.C.P., Inc.*, No. CIV. A. 96–5470, 1998 WL 126935, at *13 (E.D. Pa. Mar. 19, 1998) ("Musical groups as well as individual performers have protectable rights of publicity."); *Winterland Concessions Co.*, 1992 WL 170897, at *10 ("The evidence introduced by plaintiffs at trial supports their right to recover for the misappropriation of, or the violation of, the Right of Publicity of which plaintiff Winterland is licensee. In the context of this case, each licensor musical group has a

---

[8] The Court does not look to pass judgment on the notoriety of Gregory Soto. This merely addresses an argument made by counsel during the preliminary pretrial conference.

[9] As MLBPI notes (*see* Doc. No. 42 at 43 n.26), the cases on which Defendants rely are inapposite because the plaintiffs in those cases were not celebrities or professional athletes and had failed to allege any facts from which the court could infer their likeness held commercial value. *See, e.g.*, *Wurth Baer Supply Co. v. Strouse*, 627 F. Supp. 3d 422, 443 (M.D. Pa. 2022) ("First, Strouse's allegations do not establish that his name or likeness, as used in the videos on Wurth's website, has the requisite 'value'—commercial or otherwise. Although Strouse claims he 'suffered substantial damages' due to Wurth's supposed misappropriation, . . . [h]e does not allege that his name has any special reputation or prestige such that mention of his name or use of his image in a video on Wurth's website could confer an actionable benefit."); *Taha*, 9 F. Supp. 3d at 491–93 (noting that "[t]ypically, plaintiffs who invoke § 8316 have invested resources in their development of a personal brand," but in *Taha*, the plaintiff, who sued for the publication of his mugshot and arrest information on the defendant's website, had not alleged any facts from which the court could find his name or likeness had commercial value); *Grande v. Starbucks Corp.*, Civil Action No. 18-04036, 2020 WL 4937105, at *3 (E.D. Pa. Aug. 24, 2020) ("Even considering all of Mr. Grande's allegations of success in the light most favorable to him, he has failed to plausibly allege that his name or likeness have acquired the requisite commercial value to support his misappropriation claims. As an example, Mr. Grande has not shown how his ability to raise a company out of bankruptcy, after which he was made president of that company, confers commercial value to his name under the law. Nor does the Court find that his feature in magazines or the contention that he may own some patents, themselves, amount to factually pleading that his *name* and *likeness* have acquired value for purposes of his misappropriation claims.").

sole right to control the commercial exploitation of the name and/or likeness of the group, including their uses on T-shirts and jerseys."); *cf. Cardtoons, L.C. v. MLB Players Ass'n*, 95 F.3d 959, 963 (10th Cir. 1996) (analyzing right of publicity claims brought by the Players Association, which was "the exclusive collective bargaining agent for all active major league baseball players, and operate[d] a group licensing program"); *CBS Interactive Inc. v. NFL Player's Ass'n, Inc.*, 259 F.R.D. 398, 402–03, 414 (D. Minn. 2009) (explaining that individual MLB players had assigned their "Group Licensing Rights" to the defendant, which could assert defenses founded in players' rights of publicity).

Here, in addition to arguing that each individual player's NIL has a "valuable interest" developed over a lifetime of effort, MLBPI has plausibly alleged a valuable interest in MLB players' NILs when used as a group (i.e., three or more players appearing in the course of a calendar year):  "MLBPI regularly negotiates *group licensing agreements* authoring use of MLB players' rights in a range of commercial products and services."  (*Id.* at ¶ 27 (emphasis added).) This conclusion makes sense.  For example, it is reasonable to assume that there is value in Bryce Harper's headshot on its own, but that headshot holds independent value to the extent it appears as part of a group of headshots (say, with those of Trea Turner and Bryson Stott) or as part of the Philadelphia Phillies roster.

In sum, MLBPI has sufficiently alleged the commercial value of MLB players' NILs both individually and on a group basis.

### iii.    Commercial or Advertising Purpose

Third, bet365 argues that MLBPI has failed to allege that bet365 used player NILs for a commercial or advertising purpose.  (Doc. No. 34 at 24.)  The statute defines "commercial or advertising purpose" as the use of a natural person's name or likeness:

> (i)      on or in connection with the offering for sale or sale of a product, merchandise, goods, services, or businesses;
>
> (ii)     for the purpose of advertising or promoting products, merchandise, goods, or services of a business; or
>
> (iii)    for the purpose of fundraising.

42 Pa. Cons. Stat. § 8316(e)(i)–(iii).  Here, MLBPI has clearly alleged that bet365 uses player images "in connection with the offering for sale or sale of a product [and]. . . . services" and for "the purposes of advertising or promoting products [and] . . . services."  *Id.* § 8316(i), (ii). Specifically, MLBPI alleges that bet365 features MLB players' NILs on its sportsbook platform and in social media posts encouraging consumers to visit that sportsbook platform and/or to place a particular prop bet.  (*See, e.g.*, Doc. No. 1 at ¶ 5 ("MLB player names, images, and likenesses are also featured prominently in advertising . . . including in posts encouraging customers to place bets on the featured player."); *id.* at ¶ 28 ("[Defendants'] apps and websites feature the image of almost every current MLB player . . . in connection with the promotion of prop bets . . . ."); *id.* at ¶ 36 ("Bet365 utilizes MLB player names and images . . . in advertising, making multi-slide posts that begin with a player image and end with an advertisement encouraging consumers to place a bet on the company's Sportsbook platform.").

bet365 argues that its "use of MLB player attributes is for newsworthy reports and presentation of information and statistics, not commercial purposes."  (Doc. No. 34 at 24.)  It also argues that its use does not "constitute a commercial purpose, because consumers are unlikely to believe that any particular MLB players are affiliated with bet365 or sponsor or endorse its gaming products."  (*Id.* at 25.)  But both arguments are divorced from the broad language used in § 8316, which merely requires that the NILs be used "*in connection with* the offering for sale or sale of" bet365's gambling "products" and "services."  42 Pa. Cons. Stat. § 8316(e)(i) (emphasis added); *see also 3M Co. v. Continental Diamond Tool Corp.*, Cause No.

1:21-CV-274-HAB, 2022 WL 2355481, at *7 (N.D. Ind. June 30, 2022) (applying Pennsylvania law and concluding that "the weight of the authority interpreting § 8316 teaches . . . that, for a likeness to be used in a commercial or advertising purpose, there must be some public-facing commercial use of the likeness. That is, the likeness must be distributed to members of the public in a way calculated to bring in money"); *cf. Kelly v. Peerstar, LLC*, Case No. 3:18-cv-126, 2020 WL 5077940, at *10 (W.D. Pa. Aug. 26, 2020) (holding that "no reasonable jury could conclude that Kelly used Dr. Nulton and Dr. Kennedy's names for commercial or advertising purposes" because "Kelly never held their names out publicly"; did not "use the names in connection with the sale of a service because credentialing with Highmark is not a sale"; and did not use their names "for advertising because only Highmark employees saw the forms and the forms were not advertisements to Highmark"). Whether bet365's use falls into one of the enumerated statutory or common law exceptions to "commercial or advertising purpose" is addressed later in this Memorandum.

*    *    *

In sum, the Court finds that MLBPI has plausibly pleaded § 8316 claims against each Defendant.

### b.    Misappropriation of Publicity (Count II)

Next, DraftKings argues that MLBPI's common law claims for misappropriation of publicity fail because MLBPI has not alleged the commercial value of the name or likeness of any natural person. (Doc. No. 36-1 at 28–29.) As discussed above, the Court finds that MLBPI has sufficiently alleged the commercial value of each MLB player's NIL both on its own and to

26

the extent it appears as part of a group.[10]  Accordingly, the Court also finds that MLBPI has

stated a plausible claim for violation of the common law right of publicity.

### c.    Unjust Enrichment (Count IV)

Last, Defendants argue that MLBPI's unjust enrichment claim should be dismissed

because MLBPI has failed to allege that it conferred a benefit on either DraftKings or bet365.

(Doc. No. 34 at 30–31; Doc. No. 36-1 at 31.)  To state a claim for unjust enrichment, MLBPI

must allege facts tending to show:  (1) "benefits conferred on defendant by plaintiff;"

(2) "appreciation of such benefits by defendant;" (3) "acceptance and retention of such benefits

under such circumstances that it would be inequitable for defendant to retain the benefit without

payment of value."  *Meyer, Darragh, Buckler, Bebenek & Ek, P.L.L.C. v. Law Firm of Malone*

*Middleman, P.C.*, 179 A.3d 1093, 1102 (Pa. 2018) (quoting *Shafer Elec. & Const. v. Mantia*, 96

A.3d 989, 993 (2014)).

Defendants argue that MLBPI's unjust enrichment claim fails under the first element

because it has not alleged that MLBPI "directly conferred" a benefit on Defendants.  (Doc.

No. 34 at 30; *see also* Doc. No. 36-1 at 31.)  They assert that the focus of an unjust enrichment

action is "plaintiff's actions, and unjust enrichment does not apply simply because the defendant

may have benefited."  (Doc. No. 36-1 at 31.)  District courts in this Circuit are split as to whether

the unauthorized use of an individual's likeness can support a cause of action for unjust

enrichment.  *Compare Pellegrino v. Epic Games, Inc.*, 451 F. Supp. 3d 373, 382 (E.D. Pa. 2020)

---

[10] Moreover, some courts have found that as to common law claims, the commercial value of the individual's likeness can be inferred from the defendant's use of the likeness for its own commercial gain. *See Fanelle*, 2000 WL 1801270, at *11 ("Inherent in the act of a defendant using a person's name, identity, or persona in a commercially advantageous manner is the presumption that the identity has commercial value."); *cf. Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 624 (6th Cir. 2000) ("The defendant's act of misappropriating the plaintiff's identity . . . may be sufficient evidence of commercial value.").

("Here, the Complaint alleges that Epic 'misappropriated Pellegrino's likeness and the Signature Move' and that Pellegrino 'did not consent to or approve Epic's use of his likeness and the Signature Move for the Phone It In emote.'  Because Pellegrino alleges that Epic misappropriated his likeness without his permission, Pellegrino cannot have conferred anything on Epic." (citing New Jersey cases and *Boring v. Google, Inc.*, 598 F. Supp. 2d 695 (W.D. Pa. 2009), *aff'd in part, rev'd in part on other grounds by* 362 F. App'x 273 (3d Cir. 2010))), *with Lundberg*, 2022 WL 2669136, at *10 (finding the plaintiffs "adequately set forth the[ ] elements" of an unjust enrichment claim where they alleged that "Defendants benefitted financially from the unauthorized use of Plaintiffs' images and have not compensated Plaintiffs accordingly"). Here, Defendants argue that this Court should follow the *Pellegrino* line of cases.  This argument strikes out.

*Strike one*:  The Court doubts the viability of *Pellegrino*'s statement of the law, given that court's reliance on the district court opinion in *Boring*.  In *Boring*, the plaintiffs argued that the defendant, Google, violated their privacy rights and was unjustly enriched when it used unauthorized photos of the Borings' residence in the "Street View" feature on Google Maps. 362 F. App'x at 276.  The district court dismissed the unjust enrichment claim because the plaintiffs failed to allege that they "conferred anything of value upon Google."  *Boring*, 598 F. Supp. 2d at 703.  Instead, the "thrust of the Borings' allegations [wa]s that Google *took* something from the Borings without their consent, and should be held liable for having done so. There [wa]s, therefore, no basis for applying a quasi-contractual remedy."  *Id*.  On appeal, the Third Circuit affirmed the trial court's dismissal, but it did not adopt the district court's statement of the law.  *See Boring*, 362 F. App'x at 282.  Instead, the appellate court emphasized that missing from the complaint were any allegations that the plaintiffs "gave *or that Google took*

anything that would enrich Google at the Borings' expense." *Id.* (emphasis added). *Pellegrino* relies on the quoted language from the *Boring* district court without acknowledging that this very language is undermined by the Third Circuit's opinion on appeal. *See* 451 F. Supp. 3d at 382.

*Strike two*: There are cracks in *Pellegrino*'s reasoning. In *Pellegrino*, the plaintiff, a professional saxophone player, alleged that the defendant, a video game manufacturer, was unjustly enriched when it misappropriated his likeness and "signature move" for use in its video game. *Id.* at 377–78. The *Pellegrino* court, relying on the district court's opinion in *Boring*, found that the complaint failed to state a claim for unjust enrichment because the plaintiff failed to allege that he "directly conferred a benefit" on the defendant. *Id.* at 382. It reasoned that "[b]ecause [the plaintiff] allege[d] that [the video game developer] misappropriated his likeness without his permission, [the plaintiff could not] have conferred anything on [the developer]." *Id.*

This reasoning divorces the individual from their attributes and suggests there must be a prior relationship between the parties for a benefit to be "directly conferred" by the plaintiff to the defendant. Taking the reasoning in *Pellegrino* to its logical conclusion, there would be a distinction between: (1) a case where an MLB player authorizes defendant to use his name to advertise baseball bats, but the company also, and without permission, uses his name to promote its new line of cleats, and (2) a case where the defendant, without ever contacting the player or receiving authorization, uses his name to promote its baseball bats and cleats. In the first case, the player "directly conferred a benefit" on the defendant by providing his name for the company's use, albeit for a limited purpose. In the second, the player did not give the defendant anything. Indeed, the player may not have even spoken with the defendant or known that it exists. In both cases, however, the player, through his name, confers a benefit on the defendant in that the company receives the notoriety and commercial advantage of associating the player

with its products without having had to pay for that advantage. *Pellegrino*'s focus on form over substance would permit an unjust enrichment claim to proceed in the first case but not the second.

*Strike three*: *Pellegrino* is at odds with how Pennsylvania courts discuss unjust enrichment claims. Although the Pennsylvania appellate courts have not faced the precise issue before this Court, at least one state trial court has found that a plaintiff states a claim for unjust enrichment when he alleges that the defendant benefited from the unauthorized use of his name. *See Raskin, Liss & Franciosi, P.C. v. Franciosi*, No. 02364 DEC.TERM 2004, CONTROL 030363, 2005 WL 957711, at *2 (Pa. Ct. Comm. Pl. Apr. 6, 2005) ("In this case, the alleged benefit conferred on the Law Firm was the improper use of Mr. Franciosi's name. Although Mr. Franciosi may ultimately have difficulty proving the value of any such benefit to the Law Firm, the court will not dismiss the claim at this stage in the proceedings."). This ruling is consistent with the Pennsylvania Supreme Court's assertion that the "focus" of an unjust enrichment claim is not the intention of the parties, but "whether the defendant has been unjustly enriched." *Meyer, Darragh, Buckler, Bebenek & Ek, P.L.L.C.*, 179 A.3d at 1102 (quoting *Shafer Elec. & Const.*, 96 A.3d at 993); *see also Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993) ("[T]he most significant element of the doctrine is whether the enrichment of the defendant is *unjust*."); *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 569 (W.D. Pa. 2015) (acknowledging that "Plaintiffs actions are core to the cause of action" but that "[i]n determining if the doctrine applies, [the court] focus[es] not on the intention of the parties but rather on whether the defendant has been unjustly enriched" because "the 'unjust' element of an unjust enrichment claim is the 'most significant' one under Pennsylvania law" (quotation marks omitted) (citing *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. 1993))). It also tracks the Third Circuit's assertion that in

Pennsylvania, unjust enrichment occurs when a benefit is either "*wrongfully secured* or passively received" by the Defendant.  *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008) (emphasis added) (quoting *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. 1985)).  A defendant that misappropriates an individual's valuable name or likeness, without permission, for its own commercial gain, would certainly have "wrongfully secured" such gain.

        In sum, the Court rejects *Pellegrino*'s statement of the law.  The *Lundberg* line of cases has a stronger lineup, and this Court joins their dugout today.  MLBPI plausibly states a claim for unjust enrichment in that it alleges that Defendants used MLB players' NILs[11] without authorization and for their own commercial gain when Defendants used them to promote their gambling products and services.  *See Lundberg*, 2022 WL 2669136, at *10 (finding the plaintiffs "adequately set forth the[ ] elements" of an unjust enrichment claim where they alleged that "Defendants benefitted financially from the unauthorized use of Plaintiffs' images and have not compensated Plaintiffs accordingly"); *see also Vail v. Dermatology & Mohs Surgery Ctr., P.C.*, CIVIL ACTION No. 24-1535, 2024 WL 4507815, at *7 (E.D. Pa. Oct. 16, 2024) (holding that the plaintiff's unjust enrichment claim was "not legally deficient" where she alleged that "Defendants have been unjustly enriched . . . 'by creating the false impressions that Plaintiff is associated with AAD or retired from the profession entirely, thereby diverting past and potential consumers of [the plaintiff's] services to those of AAD's various practices'"); *Barnett v. Topps Co.*, No. CIV. A. 98–0462, 1998 WL 257859, at *1–2 (E.D. Pa. May 21, 1998) (denying motion

_____

[11] During oral argument, DraftKings argued that the unjust enrichment claim also fails because it was "the players' benefit to confer . . . . There is nothing that says that MLBPI can confer these rights." (Feb. 18, 2025 Hr'g. Tr. at 49:14–19.)  But MLBPI alleges that "these rights" were its benefit to confer because the players assigned their publicity rights to the Players Association, which, in turn, assigned those rights to MLBPI to the extent any player's NIL appears as part of a group of players.  DraftKings has not identified any cases that hold a licensee cannot bring a claim for unjust enrichment based on the infringement of its exclusive license to use a natural person's publicity rights.

to dismiss unjust enrichment claim where the plaintiffs, 13 MLB umpires, alleged that the defendant used "photographs, likenesses and personas" of the plaintiffs in connection with their baseball cards "without permission, authorization *or knowledge* of the Plaintiffs" (emphasis added)); *Dryer v. Nat'l Football League*, 689 F. Supp. 2d 1113, 1122–23 (D. Minn. 2010) (finding the plaintiffs "alleged enough to establish an unjust enrichment claim" when they alleged that the NFL "infringed plaintiffs right in their own identities" by using "Plaintiffs' names and images to promote the NFL").

*    *    *

For the reasons discussed above, the Court finds that MLBPI is a proper plaintiff for each cause of action raised in the Complaint and that MLBPI has sufficiently pleaded claims for violations of § 8316, misappropriation of publicity, and unjust enrichment.

**B.    Legal Failures**

Defendants contend that that even if MLBPI sufficiently states claims for violations of § 8316 and common law misappropriation of publicity, those claims fail as a matter of law because Defendants' conduct falls within the public interest exception to § 8316 and the common law; common law misappropriation of publicity was abrogated by § 8316; and the First Amendment forecloses both the statutory and common law claims. The Court considers each argument in turn.

**1.    The Public Interest Exception**

First, Defendants argue that MLBPI's statutory and common law misappropriation of publicity claims fail because their conduct is protected by a public interest exception. (Doc. No. 34 at 25–28; Doc. No. 36-1 at 15–23.) As mentioned above, § 8316 prohibits the unauthorized use of a natural person's valuable "name or likeness" for "any commercial or advertising purpose." 42 Pa. Cons. Stat § 8316(a). "Commercial or advertising purpose" is

defined as, among other things, the "public use or holding out of a natural person's name or likeness . . . on or in connection with the offering for sale or sale of a product . . . services or businesses." *Id.* § 8316(e)(1)(i).  It also includes the use of a "natural person's name or likeness . . . for the purpose of advertising or promoting products . . . goods or services of a business." *Id.* § 8316(e)(1)(ii).  The term does *not* include the use of a "natural person's name or likeness in a communications medium when . . . it is associated with a news report or news presentation having public interest." *Id.* § 8316(e)(2)(ii).

Like Pennsylvania's statutory public interest exception, the common law right of publicity, as described in § 46 of the Third Restatement of Unfair Competition, includes an exception for use of an individual's attributes in connection with "news reporting." *See* Restatement (Third) of Unfair Competition § 47 ("The name, likeness, and other indicia of a person's identity are used 'for purposes of trade' under the rule stated in § 46 if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user.  However, use 'for purposes of trade' does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses."); *id.* cmt. a ("[T]he use of a person's identity in news reporting . . . or works of fiction or nonfiction is not ordinarily an infringement of the right of publicity."); *id.* cmt. c ("[T]he use of a person's name or likeness in news reporting, whether in newspapers, magazines, or broadcast news, does not infringe the right of publicity. . . .  The fact that the publisher or other user seeks or is successful in obtaining a commercial advantage from an otherwise permitted use of another's identity does not render the appropriation actionable."); *Dryer*, 55 F. Supp.3d at 1198–99 (agreeing with the NFL that "given the Minnesota Supreme Court's reliance on the

Restatement [of Unfair Competition] . . . Minnesota is likely to apply the Restatement's rule that publicity-rights claims do not include 'using a person's identity in news reporting, commentary, or entertainment'").  Because the common law exception appears to encompass the same public interest exception that appears in § 8316, the Court discusses § 8316 and the common law claims together.

a.    The Two "News" Exceptions

The Court has found no state court opinions that discuss § 8316's public interest exception and only one federal district court opinion that does.  *See Taha*, 9 F. Supp. 3d at 493. *Taha*, however, is of no use in this case, because the court left "for a later opinion" the question of "whether [the defendant's] websites constitute 'news reports'" in the public interest.  *Id.* at 493.  Seeming to recognize the dearth of cases interpreting Pennsylvania's public interest exception, Defendants look to cases discussing analogous laws in other states.  (*See* Doc. No. 34 at 25–28 (Indiana, California, Florida); Doc. No. 36-1 at 15–19 (Minnesota, Indiana, New York, Ohio, Georgia, California, Florida).)  MLBPI opposes reliance on many of these out-of-state cases, arguing that they involved statutes with exceptions for "newsworthy" information, which are broader than § 8316's exception for a "news report or news presentation having public interest."  (Doc. No. 42 at 18–28.)

The Court bunts.  Pennsylvania is not the only state to pass legislation protecting the right of publicity, nor is it the first to include an exception for a "news report or news presentation having public interest."  This type of public interest exception is one of two common carve outs for speech involving "news."  The second is an exception for "newsworthy" information, under which the prohibition on misappropriation of publicity "does not apply" to the "use of a personality's, name, voice, [etc.]" in "[m]aterial that has political or newsworthy value."  Ind.

34

Code 32-36-1-1(c)(1)(B); *see also Myskina v. Conde Nast Publ'ns, Inc.*, 386 F. Supp. 2d 409,

417 (S.D.N.Y. 2005) (discussing New York's "newsworthiness" exception).

Defendants argue that the two exceptions are for all intents and purposes interchangeable,

and the Court may look to cases interpreting either "news" exception to determine the meaning

of "news report or news presentation in the public interest."  For three reasons, the Court

disagrees.

Beginning with the text of § 8316, neither Defendant can avoid the fact that the statute's

text refers to "news reports and news presentations," not more generally to information that is

"newsworthy."  *See Daniels*, Case No. 1:16-cv-01230-TWP-DKL, 2017 WL 4340329, at *7

(S.D. Ind. Sept. 29, 2017) (discussing both types of exceptions and emphasizing that a "key

difference between the two provisions is that the public interest exception includes the condition

that the use of a person's right of publicity be done 'in connection with the broadcast or reporting

of an event or a topic,' and the newsworthiness exception does not").  The distinction is

important because the terms "report" and "presentation" limit the scope of the exception based

on the nature of the use, i.e., "communications media" that involve discussion of facts, where the

primary purpose of the "report" is to convey "news."  *See* Report, Oxford English Dictionary

(2009) ("An account of a situation, event, etc., brought by one person to another, esp. as the

result of an investigation; a piece of information or intelligence provided by an emissary, official

investigator, etc.; a notification of something observed."); *see also Abdul-Jabbar v. Gen. Motors

Corp.*, 85 F.3d 407 (9th Cir. 1996) (discussing California's statutory exception for the use of

NILs "in connection with any news, public affairs, or sports broadcast or account," and finding it

did not apply because although the plaintiff's "basketball record may be said to be 'newsworthy,'

its use is not automatically privileged.  GMC used the information in the context of an

automobile advertisement, not in a news or sports account"); *Dryer*, 55 F. Supp. 3d at 1198 (finding the defendant's use of "video footage of [the plaintiffs] playing football" amounted to "publishing or reporting" because the "productions at issue are a means for obtaining information about real-world football games, and are therefore publishing or reporting factual data" (quotation marks omitted)).

Second, when there is ambiguity in a statute's text, the Pennsylvania legislature has suggested a preference for construing the Commonwealth's statutes consistent with statutes in other states. *See* 1 Pa. Cons. Stat. § 1927 ("Statutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."). Because some states, like Indiana, recognize both "news" exceptions, this suggests that the two exceptions are not coextensive. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative *or superfluous*, void or insignificant" and labeling this as the "most basic interpretive canons" (emphasis added)); *see also* Ind. Code 32-36-1-1(c)(1), (3); *cf. Daniels v. FanDuel, Inc.*, 109 N.E.3d 390, 394 (Ind. 2018) (analyzing the scope of the "newsworthy" exception to the Indiana statute but "declin[ing] to examine the 'public interest' exception").[12]

Last, the legislative history surrounding § 8316 weighs against Defendants' suggestion that the Court read a "newsworthiness" exception into the statute. *See* 1 Pa. Cons. Stat. § 1921(c) ("When the words of the statute are not explicit, the intention of the General Assembly

---

[12] The Court is unpersuaded by bet365's assertion that the "distinctions that MLBPI tries to draw between the Statute's language and analogous statutes around the country is a hair-splitting exercise that falls flat." (Doc. No. 44 at 6.) Notably, bet365 cites numerous cases discussing those very same "analogous statutes" without engaging in any consideration of how those statutes are similar (and importantly, dissimilar) to the Pennsylvania law the Court interprets in this case.

may be ascertained by considering, among other matters, . . . [t]he contemporaneous legislative history.").  As initially proposed, § 8316 included both types of exceptions—public interest and newsworthiness.  *See* H.B. 235, 185th Gen. Assemb., Reg. Sess. (Pa. 2001) ("The provisions of this section shall not apply to . . . (1) the publication [of the individual's aspect] in any newspaper . . . or publication as a part of any news report or news presentation having public interest where such name or likeness is not used for advertising purposes;" or (2) "material that has political or newsworthy value").  But the bill was amended, and the newsworthiness exception removed.  *Compare id.*, *with* H.B. 235, 186th Gen. Assemb., Reg. Sess. (Pa. 2002).  Of the two, only the public interest exception remains.  42 Pa. Cons. Stat. § 8316(e)(2)(ii).  Defendants take issue with the lack of congressional reports to explain this change (*see* Feb. 18, 2025 Hr'g. Tr. at 10:1–15), and the Court agrees that the lack of any guidance as to the intent behind the amendment restricts the usefulness of the legislative history.  Nevertheless, the amendment suggests the Pennsylvania legislature (1) considered including an exception for "newsworthy" information and (2) chose not to keep it.  That alone suggests the Court should not read the newsworthiness exception back into the statute's text.

For those reasons, the Court declines to read a newsworthiness exception into the statute or common law causes of action at this time,[13] and the Court finds persuasive those cases analyzing analogous public interest exceptions adopted in other jurisdictions.

---

[13] For the first time during oral argument, DraftKings suggested that even if § 8316 does not include an exception for newsworthiness, the Court should view the common law claim as including such an exception.  (Feb. 18, 2025 H'rg. Tr. at 20:19–22:10.)  However, DraftKings has not referenced any cases where the common law right of publicity is framed like Pennsylvania's common law right *and* the state recognized a newsworthiness exception to that right.  Without the benefit of briefing on this issue, the Court declines to find, at this time, that the common law also recognizes an exception for newsworthiness.  Instead, the Court limits its discussion to the nature of the public interest exception and whether MLBPI's allegations trigger that exception.  Defendants may argue the issue at summary judgment if appropriate.

b.      *Application to Defendants' Uses*

Turning to Defendants' alleged uses, the Court finds it premature to hold as a matter of law that they fall within the public interest exception.

i.      <u>Sportsbook Platforms</u>

First, Defendants argue that their use of MLB players' headshots on their sportsbook platforms is "exempt from a right-of-publicity" claim under the public interest exception.  (Doc. No. 36-1 at 16; *see also* Doc. No. 34 at 25 (arguing that "bet365's use of MLB players attributes in newsworthy and informative ways falls squarely within the statutory exceptions").)

The Southern District of Indiana's opinion in *Daniels v. FanDuel, Inc.* is instructive. 2017 WL 4340329, at *7.[14]  Indiana's public interest exception, similar to Pennsylvania's, excludes from liability the "use of a personality's [attribute(s)] in connection with the broadcasting or reporting of an event or a topic of general or public interest."  Ind. Code 32-36-1-1(c)(3).  In *Daniels*, former football players filed suit against two "companies that run fantasy sports websites and mobile apps," alleging that the companies used the plaintiffs' NILs "in operating and promoting online fantasy sports contests" in violation of the Indiana statute.  2017 WL 4340329, at *1.  On a motion to dismiss, the companies argued that the public interest exception foreclosed the players' statutory claims.  *Id.* at *7.  The court framed the "key issue" as "whether Defendants' conduct constitutes 'broadcasting or reporting' under the statute."  *Id.*

---

[14] Defendants reference two other opinions in the *Daniels* case, one from the Indiana Supreme Court and one from the Seventh Circuit.  (Doc. No. 34 at 26–27; Doc. No. 36-1 at 16–17.)  But those opinions discuss the Indiana statute's newsworthiness exception, not the public interest exception.  *See Daniels v. FanDuel, Inc.*, 109 N.E.3d 390, 394 (Ind. 2018) ("Keeping in mind our narrow approach to answering the certified question, and because we find that the use of players' names, pictures, and statistics by fantasy sports operators falls into the 'newsworthy value' exception, we decline to examine the 'public interest' exception."); *Daniels v. FanDuel, Inc.*, 909 F.3d 876, 877–78 (7th Cir. 2018) (relying on Indiana Supreme Court's holding as to the "newsworthy value" exception without any discussion of the public interest exception).  As discussed above, such cases are of only minimal persuasive value in this case.

And it found that although the defendants' "websites 'report' information about college sports" in that they "profile players on their websites, corral the week's news, notes and injury updates,' and disseminate performance information," that "is not all Defendants do with Plaintiffs' likenesses." *Id.* at *8. The companies also "provide an interactive medium through which players—identified by their names and statistical achievements—may be assembled onto fictitious teams to engage in competition with other fictitious teams." *Id.* The court was asked to determine "whether that particular use . . . removes Defendants' conduct from being properly understood as 'reporting.'" *Id.* Acknowledging that the question presented "a close call," the court sided with the companies and found the public interest exception applied. *Id.* at *9. In reaching that conclusion, the court emphasized that a broad interpretation of "report" to include the presentation of information for informational and non-informational purposes would avoid constitutional questions. *Id.* at *9.

Defendants ask this Court to follow *Daniels* and find that the use of players' headshots on their sportsbook platforms is a use "associated with a *news report or news presentation* having a public interest." (Doc. No. 36-1 at 18–19.)[15] But the Court cannot find at this stage that the Defendants' use of players' photos on their sportsbook platforms is, as a matter of law, a use "associated with a news report or news presentation." Viewing the allegations in the Complaint in the light most favorable to MLBPI, Defendants include headshots of each player in connection with, among other things, available prop bets on their respective sportsbook platforms:

---

[15] MLBPI does not dispute that the headshots carry a "public interest." *See Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 414 (Cal. 2001) (describing "significant public interest" in baseball); *Dryer v. Nat'l Football League*, 55 F. Supp.3d 1181, 1198 (D. Minn. 2014) ("[T]here is no dispute that both professional baseball and professional football are closely followed by a large segment of the public." (quoting *C.B.S.*, 259 F.R.D. at 419)).

 

The Court questions whether each Defendants' *unique* odds and prop bets—especially when unassociated with statistics or a discussion of historical or current events—constitute "news report[s]." The Court is certainly unwilling to categorically hold as much at the pleadings stage of this litigation. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d at 1282–83 (discussing California's common law and statutory exceptions, emphasizing that "both defenses protect only the act of publishing or reporting," and holding that the defendant video game producer "is not publishing or reporting factual data" in its video games because "[p]ut simply, EA's interactive game is not a publication of facts about college football; it is a game, not a reference source"); *cf. Jenkins v. Dell Pub. Co.*, 251 F.2d 447, 451 (3d Cir. 1958) ("For present purposes news need be defined as comprehending no more than relatively current events such as in common experience are likely to be of public interest.").

ii.    <u>Social Media Posts</u>

Defendants' social media posts present a closer call, but the result is the same. MLBPI alleges that Defendants "feature action shots of MLB players mid-game, often in multi-slide posts that begin with what appears to be a piece of sports reporting yet concludes with an

advertisement encouraging viewers to place a bet on" Defendants' sportsbook platforms.  As this allegation concedes, these "posts" look a lot like "sports reporting," a use which falls within Pennsylvania public interest exception.  Nevertheless, MLBPI argues, like the plaintiff in *Daniels*, that the inclusion of an advertisement on the last slide of each post "removes Defendants' conduct from being properly understood as 'reporting.'"  2017 WL 4340329, at *8. Here, as with the sportsbook platforms, the Court cannot say at this stage of the litigation that every use of a player's NIL on social media is one made "in association with a news report or news presentation," such that the public interest exception categorically applies.

For example, the Complaint alleges that bet365 made the following post, which featured an image of Aaron Judge next to bet365's odds that certain MLB teams would record more than 100 wins:



(Doc. No. 1 at ¶ 36.)[16]  The post does not mention Aaron Judge, his statistics, or the New York Yankees season to date.  Indeed, the only factual information "report[ed]" by the post, is the

---

[16] Defendants argue that MLBPI has only challenged three social media posts: this post, a bet365 post involving Chris Sale, and a similar post by DraftKings involving Paul Skenes.  (*See, e.g.*, Feb. 18, 2025 Hr'g. Tr. at 4–9 ("[W]e do need to remember that we are dealing with one social media post [by

odds at which bet365 places each MLB team to record more than 100 wins during the 2024 season, i.e., the relevant odds for a consumer wishing to use bet365's sportsbook to wager on this issue.[17]  Although Defendants argue that "odds are news," the Court is unwilling to hold as much at the pleadings stage of this litigation.

*      *      *

In sum, the Court cannot find as a matter of law that Defendants' uses of players' NILs fall within Pennsylvania's public interest exception to statutory and common law claims for misappropriation of publicity.

### 2.    Abrogation of Common Law Claim

Next, bet365 argues that MLBPI's common law claim for misappropriation of publicity was abrogated by § 8316.  (Doc. No. 34 at 28–29.)  DraftKings does not join this argument, but it does acknowledge that there "is an open question as to whether the Statute has abrogated the common law."  (Doc. No. 36-1 at 15 n.7.)

No Pennsylvania state court has spoken to whether § 8316 abrogates the common law cause of action for misappropriation of publicity.  And the few federal district courts to discuss

---

DraftKings] that is alleged . . . . They have alleged the use of one player on social media violates this right of publicity."); *id.* at 39:6–7 ("They have named one player and one post.").)  This misconstrues the allegations in the Complaint, which suggest that the three posts were meant to serve as *examples* of the type of posts (plural) being made by each Defendant.  (*See* Doc. No. 1 at ¶ 35 (referring to "DraftKings' social media *posts*" (emphasis added)); *id.* at ¶ 36 (referring to bet365's "multi-slide *posts*" (emphasis added)).)

[17] In this way, the Aaron Judge post is different than the DraftKings social media post referenced in the Complaint, which features Pittsburgh's all-star pitcher Paul Skenes.  The Paul Skenes post includes multiple photos of Skenes, provides a timeline of his rise to prominence in the MLB, and ends with DraftKings's odds for Skenes to win the National League rookie of the year and Cy Young awards.  (Doc. No. 1 at ¶ 35.)  The Court notes that this post looks more like a news report than the Aaron Judge post, but nevertheless, the Court declines to parse the Complaint at that level of specificity at the motion to dismiss stage.  Notably, both posts were included only as *examples*.  *See supra* n.16.  Viewing the allegations in the Complaint, including these examples, in the light most favorable to MLBPI, the Court cannot find as a matter of law that the use of players' NILs in social media posts categorically qualify as "news reports or news presentations."

the issue are split. *Compare Kelly, LLC*, 2020 WL 5077940, at *9 ("Section 8316 abrogated any

Pennsylvania common law claim for misappropriation of name or likeness."), *and Facenda v.*

*N.F.L. Films, Inc.*, 488 F. Supp. 4911, 513–14 (E.D. Pa. 2007), *aff'd in part*, *rev'd in part on*

*other grounds by* 542 F.3d 1007 (3d Cir. 2008) (discussing "cause of action for invasion of

privacy" and finding "[t]o the extent there was ever a common law cause of action for

misappropriation of identity, it is clearly subsumed now by 42 Pa.C.S.A. § 8316"), *with Lewis v.*

*Marriott Intern'l, Inc.*, 527 F. Supp. 2d 422, 429 (E.D. Pa. 2007) ("Marriott points to no indicia

in the text of section 8316 or its legislative history suggesting that it was intended as an exclusive

remedy to replace the common-law cause of action of invasion of privacy by misappropriation of

identity, and the Court finds none.  Absent any indicia of such legislative intent, the Court is

hesitant to rule that a common-law cause of action that has been expressly recognized by the

Pennsylvania Supreme Court has been impliedly subsumed."); *cf. Lundberg*, 2022 WL 2669136,

at *8 n.10 (recognizing that "[s]ome District Courts have ruled" that the common law invasion of

privacy claim "has been subsumed by Section 8316" but declining to reach the issue at the

motion to dismiss stage).  This Court now steps up to bat.

   The Pennsylvania Supreme Court has provided a framework for determining when a

statute abrogates prior common law principles.  *See Sternlicht v. Sternlicht*, 876 A.2d 904, 912

(Pa. 2005).  In *Sternlicht*, the court explained that a "common law doctrine may not, after a

statutory pronouncement on the same subject, continue to develop in a manner inconsistent with

the statute."  *Id.*; *see also In re Erie Golf Course*, 992 A.2d 75, 86 n.16 (Pa. 2010) ("To the

extent the Act modifies the public trust doctrine, the prior common-law principles are

superseded.").  In *Kelly v. Peerstar, LLC*, the district court, relying on *Sternlicht*, held that

"Section 8316 abrogated any Pennsylvania common law claim for misappropriation of name or

likeness." 2020 WL 5077940, at *9 (W.D. Pa. Aug. 26, 2020). The court reasoned that § 8316 and the common law misappropriation claim "involve the same subject matter–unauthorized use of a person's name or likeness"—and the common law claim is broader than the statutory claim in that it is not "limited to commercial appropriation." *Id.* (citing *AFL Phila. LLC*, 639 F. Supp. 2d at 531). Given this, the court concluded that "Section 8316 effectively modified the common law misappropriation scheme by narrowing it to only recognizing misappropriation that is done for a commercial or advertising purpose," and in doing so, the "Legislature abrogated" the inconsistent common law claim. *Id.*

bet365 emphasizes *Kelly*'s assertion that § 8316 "abrogated *any* Pennsylvania common law claim for misappropriation of name or likeness," interpreting this to mean "both the common law claim for misappropriation of publicity and the misappropriation of identity." (Doc. No. 34 at 29.) This Court is not convinced. Even assuming that *Kelly* is correct and § 8316 abrogates common law claims for invasion of privacy via a misappropriation of identity,[18] the *Kelly* court's reasoning does not apply to common law claims for misappropriation of publicity. As discussed at length of above, Pennsylvania recognizes two types of claims premised on a misappropriation of name or likeness: one based on an invasion of privacy, and a second based on an invasion of publicity. The elements for each claim differ. Although the invasion of privacy claim does not require proof of commercial appropriation, a misappropriation of publicity claim does. *See* Restatement (Third) of Unfair Competition § 46 ("One who appropriates *the commercial value* of a person's identity by using without consent the person's name, likeness, or other indicia of identity *for purposes of trade* is subject to liability for [appropriate relief]." (emphases added)),

---

[18] The Court need not decide this issue here because, as discussed above, MLBPI did not bring such a claim in this action.

*see also, e.g.*, *World Wrestling Fed. Entmt. Inc.*, 280 F. Supp.2d at 443–44 ("A defendant violates a plaintiff's right of publicity by 'appropriating its valuable name or likeness, without authorization, and using it to defendant's commercial advantage.'" (quoting *Phila. Orchestra Ass'n*, 821 F. Supp. at 349)); *Eagle's Eye, Inc.*, 627 F. Supp. at 862 ("The right protects against commercial loss caused by appropriation of an individual's personality for commercial exploitation."); *Eagle*, 2013 WL 943350, at *8 (same). Accordingly, *Kelly*'s reasoning that "Section 8316 effectively modified the common law misappropriation scheme by narrowing it to only recognize misappropriation that is done for a commercial or advertising purpose" is not applicable to misappropriation of publicity claims. And the Court rejects bet365's argument that "*Kelly*'s rationale is persuasive and should control this issue." (Doc. No. 34 at 29.)

Having held that a misappropriation of publicity claim—like § 8316—requires proof of commercial appropriation, the Court declines to follow *Kelly*. bet365 has not provided any other basis on which the Court can find that § 8316 abrogated the common law cause of action for misappropriation of publicity. Accordingly, this portion of the motion to dismiss is denied.

### 3.    First Amendment

Last, Defendants argue that their use of the players' NILs is protected by the First Amendment.[19] (Doc. No. 34 at 16–23; Doc. No. 36-1 at 24–27.) MLBPI argues that this issue is more appropriately addressed after discovery on a motion for summary judgment (Doc. No. 42 at 9, 28–29, 31, 34–35) and that if the Court does reach the issue now, we should find that

---

[19] The First Amendment applies in this controversy between private parties because "it involves application of a state statute that [Defendants] claim[ ] imposes restrictions on [their] right of free expression." *Cardtoons, L.C.*, 95 F.3d at 968; *see also C.B.C. Dist. & Mktg., Inc. v. Major League Baseball Adv. Media*, 505 F.3d 818, 823 (8th Cir. 2007) ("Though this dispute is between private parties, the state action necessary for first amendment protections exists because the right-of-publicity claim exists only insofar as the courts enforce state-created obligations that were never explicitly assumed by CBC." (quotation marks omitted)).

Defendants' uses constitute commercial speech that cannot satisfy the Third Circuit's transformative use test (*id.* at 29–42).

In *Zacchini v. Scripps-Howard Broadcasting Co.*, the United States Supreme Court considered the tension between the First Amendment and the right of publicity in a case where the defendant news broadcast company had reproduced the plaintiff's "human cannonball act" in its entirety. 433 U.S. 562, 563–64, 574–75 (1977). The Court weighed the interests underlying the plaintiff's right of publicity against the broadcaster's First Amendment interests and held that "[w]herever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Id.* at 574–75.

After *Zacchini*, numerous federal appellate courts, including the Third Circuit, held that a balancing test governs disputes between an individual's right of publicity and a defendant's rights under the First Amendment. *See Hart*, 717 F.3d at 148–49 (3d Cir.) ("To resolve the tension between the First Amendment and the right of publicity, we must balance the interests underlying the right to free expression against the interests in protecting the right of publicity."); *id.* at 150 ("Ultimately, we must determine whether the interest in safeguarding the right of publicity overpowers the interest in safeguarding free expression."); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d at 1271 (9th Cir.) ("In this case, we must balance the right of publicity of a former college football player against the asserted First Amendment right of a video game developer to use his likeness in its expressive works."); *C.B.C. Dist. & Mktg., Inc.*, 505 F.3d at 823 (8th Cir.) ("The Supreme Court has directed that state law rights of publicity must be balanced against First Amendment considerations."); *ETW Corp. v. Jireh*

*Publ'g, Inc.*, 332 F.3d 915, 938 (6th Cir. 2003) ("After balancing the societal and personal interests embodied in the First Amendment against Woods's property rights, we conclude that the effect of limiting Woods's right of publicity in this case is negligible and significantly outweighed by society's interest in freedom of artistic expression."); *Cardtoons, L.C.*, 95 F.3d at 972 (10th Cir.) ("This case instead requires us to directly balance the magnitude of the speech restriction against the asserted governmental interest in protecting the intellectual property right. We thus begin our analysis by examining the importance of Cardtoons' right to free expression and the consequences of limiting that right. We then weigh those consequences against the effect of infringing on MLBPA's right of publicity."). There is no real consensus, however, as to how courts weigh these interests in practice.

Some courts have crafted standardized tests. *See Hart*, 717 F.3d at 162 (discussing the "Predominant Use Test," the "*Rogers* Test," and the "Transformative Use Test" and noting that each "aims to balance the interests protected by the right of publicity against those interests preserved by the First Amendment"). Other courts have declined to adopt any uniform standard and instead, apply "a flexible case-by-case approach that takes into account the individual's interest in retaining his or her publicity and the public's interest in free expression." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d at 1282 (recognizing that this is the method adopted by the Tenth Circuit in *Cardtoons* and the Eighth Circuit in *C.B.C. Distribution*).

In *Hart*, the Third Circuit adopted the transformative use test. 717 F.3d at 165. There, a former college football star sued a videogame developer, alleging that it violated his right of publicity when it used his likeness and biographical information in its videogames. *Id.* at 145. The Third Circuit reversed the grant of summary judgment in favor of the developer. *Id.* The

court explained that three notable "systematized balancing tests" had arisen for resolving conflicts between the right of publicity and the First Amendment: "the commercial-interest-based Predominant Use Test, the trademark-based *Rogers* test, and the copyright-based Transformative Use Test." *Id.* at 153. After considering each test in turn, the court adopted the transformative use test first articulated by the Supreme Court of California in *Comedy III Productions, Inc. v. Gary Saderup, Inc.* and applied by the Sixth Circuit in *ETW Corp. v. Jireh Publishing, Inc. See Hart*, 717 F.3d at 158–65 (finding that the "Transformative Use Test is the proper analytical framework to apply to cases such as the one at bar"). Under that test, the court analyzes "whether the product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness" by considering whether the new work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 159–60 (quoting *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 809 (Cal. 2001)); *see also In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d at 1274 (outlining "five factors to consider in determining whether a work is sufficiently transformative to obtain First Amendment protection," including whether "the celebrity likeness is one of the raw materials from which an original work is synthesized," or "the very sum and substance of the work in question" (quoting *Comedy III*, 21 P.3d at 809)).

Defendants argue that *Hart*'s transformative use test is inapplicable here because "the Third Circuit's balancing test" was limited to expressive works and "has nothing to do with news reports." (Doc. No. 44 at 6; *id.* at 10 ("In *Hart*, the Third Circuit's adoption of the transformative use test was limited to *expressive* works, in that case, video games—it had nothing to do with news reports, factual accounts, or presentations."); *id.* at 11 (arguing that *Hart*

48

"tacitly acknowledge[ed] that a right of publicity claim should not be accepted in instances of news programming or reporting"); *id.* ("Because *Hart*'s transformative use test is so obviously inapplicable here, bet365 did not invoke the Third Circuit's transformative use test as a defense in bet365' opening brief"); *see also* Doc. No. 45 at 10 ("*Hart*'s adoption of the transformative use test was expressly limited to expressive works, in that case video games."); *id.* at 11 ("The transformative use test is not applicable here, as MLBPI does not argue that DK Sportsbook and DraftKings's social media page are expressive works like books, movies, plays, or video games.").)  MLBPI disagrees.  It argues that *Hart* broadly held that the transformative use test applies in every case where the First Amendment confronts the right of publicity.  (Doc. No. 42 at 30.)

As MLBPI notes, the court in *Hart* states that it is adopting a test of "uniform applicab[ility]" in cases where the right of publicity collides with the First Amendment.  717 F.3d at 162 ("Like the Predominant Use and *Rogers* tests, the Transformative Use Test aims to balance the interest protected by the right of publicity against those interests preserved by the First Amendment.  In our view, the Transformative Use Test appears to strike the best balance because it provides courts with a flexible—yet uniformly applicable—analytical framework."); *see also id.* at 151–52 (broadly describing the question before it as one of first impression "for balancing the tension between the First Amendment and the right of publicity").  But a closer look at the opinion shows that the court's holding was not as broad as MLBPI suggests.  For one, the court repeatedly stated that the transformative use test was the most appropriate test for "balanc[ing] the interests at issue in cases *such as the one at bar*," i.e., those involving expressive or creative works.  *Id.* at 153 (emphasis added); *see also*, *e.g.*, *id.* at 153 ("[W]e adopt

the Transformative Use Test as being the most appropriate balancing test *to be applied here*."
(emphasis added)).

Second, in its discussion, the court recognized that other tests and First Amendment
protections remained.  For example, in discussing—and ultimately rejecting—adoption of the
trademark-based *Rogers* test, the court limited its rejection to cases like the one before it:
"Ultimately, we find that the *Rogers* Test does not present the proper analytical approach *for
cases such as the one at bar.*"  *Id.* at 157 (emphasis added).  And the court noted that the *Rogers*
test could be applicable "in trademark-like right of publicity cases."  *Id.*  Similarly, in the portion
of the opinion adopting the transformative use test, the court noted that it was merely extending
pre-existing First Amendment protections to expressive works like video games:  "[A]dopting
the [Transformative Use] Test ensures that *already-existing First Amendment protections in right
of publicity cases* apply to video games with the same force as to 'biographies, documentaries,
docudramas, and other expressive works depicting reallife figures.'"  *Id.* at 165 (emphasis added)
(citation omitted).[20]

Accordingly, this Court rejects MLBPI's suggestion that *Hart*'s transformative use test
applies to every case where a right of publicity claim runs up against the First Amendment.
Instead, *Hart* is more appropriately read as standing for:  (1) recognition of the general balancing
inquiry first discussed in *Zacchini*, and (2) adoption of the transformative use test as the
appropriate method for balancing competing interests in the context of expressive, creative
works.  *See id.* at 171 (Ambro, J., dissenting) ("The Transformative Use Test gives First
Amendment immunity where, in an expressive work, an individual's likeness has been creatively

---

[20] MLBPI has not referenced, nor has this court found, any case that applied the transformative
use test when the use at issue did not involve expressive or creative content.

adapted in some way.  Correctly applied, this test strikes an appropriate balance between countervailing rights—the publicity interest in protecting an individual's right to benefit financially when others use his identifiable persona for their own commercial benefit versus the First Amendment interest in insulating from liability a creator's decision to interweave real-life figures into its expressive work."); *see also In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d at 1273 (framing the "transformative use test" as a "balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant *creative* elements so as to be transformed into something more than a mere celebrity likeness or imitation" (quotation marks omitted) (emphasis added)); *Comedy III*, 21 P.3d at 807 (developing transformative use test as a test to "distinguish between forms of *artistic expression* protected by the First Amendment and those that must give way to the right of publicity" (emphasis added)); *id.* at 808 ("When *artistic expression* takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist." (emphasis added)).

Here, none of the alleged uses involve expressive content like the uses seen in those cases applying the transformative use test.  *See, e.g.*, *Hart*, 717 F.3d at 145 (video games); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d at 1271 (video games); *ETW Corp.*, 332 F.3d at 936 (painting); *Comedy III*, 21 P.3d at 919 (lithographs and screen print t-shirt). Instead, Defendants use MLB players' NILs on their sportsbook platforms and in social media posts, without alteration.  Accordingly, the Court looks beyond *Hart* for guidance on addressing Defendants' First Amendment concerns.

Although no court has reached this exact issue, numerous courts have analyzed the use of professional athletes' attributes in similar scenarios. *See, e.g.*, *C.B.C. Dist. & Mktg., Inc.*, 505 F.3d at 820 ("[F]antasy baseball products incorporate the names along with performance and biographical data of actual major league baseball players."); *CBS Interactive Inc.*, 259 F.R.D. at 419 (same but football); *Gionfriddo*, 114 Cal. Rptr. 2d at 318 (inclusion of "plaintiffs' names and statistics with other former [baseball] players in assorted All–Star game and World Series programs, or on [Defendant's] baseball Web sites"). In each case, the court began by considering the "nature of the precise information conveyed and the context of the communication to determine the public interest in the expression." *Gionfriddo*, 114 Cal. Rptr. 2d at 314. Among other things, courts have considered whether the use constitutes "commercial speech, entitled to a reduced level of constitutional protection,"[21] whether the information conveyed consists of "mere factual data," and the extent to which the public has historically been interested in the information presented. *Id.* at 314–18. The public interest is then weighed "against the plaintiffs' economic interests." *Id.* Of note, courts consider whether the unauthorized use impairs the plaintiff's economic interests, *id.* at 318, and take into account the "[e]conomic interests that states seek to promote" when recognizing a right of publicity, "includ[ing] the right of an individual to reap the rewards of his or her endeavors," "an

---

[21] There is some confusion in the case law as to whether we need to analyze whether the speech at issue constitutes "commercial speech." *See generally Dryer*, 689 F. Supp. 2d at 1117 ("Not all courts engage in the three-part commercial speech analysis in determining whether the First Amendment bars claims such as those Plaintiffs bring here. The cases on which NFL most heavily relies, [including *C.B.C.* and *CBS Interactive, Inc.*] . . . merely examined the challenged uses and determined that the uses were protected by the First Amendment."); *see also generally*, *C.B.C. Dist. & Mktg., Inc.*, 505 F.3d 818 (lacking any commercial speech inquiry); *CBS Interactive Inc.*, 259 F.R.D. 398 (same). *But cf. Hart*, 717 F.3d at 148 (not discussing commercial versus noncommercial speech but nevertheless recognizing that "[video]games enjoy the full force of First Amendment protections"). The Court agrees with *Gionfriddo* that whether the use at issue is "commercial speech" is a relevant consideration when determining the nature and extent of the public interest.

individual's right to earn a living," and "the desire to provide incentives to encourage a person's productive activities and to protect consumers from misleading advertising," *C.B.C. Distrib. & Mktg., Inc.*, 505 F.3d at 824.[22]

MLBPI argues that the Court cannot analyze these factors until after discovery is complete. (Doc. No. 42 at 9, 28–29, 31, 34–35.) The Court agrees. Nearly every case to address the First Amendment question has done so at summary judgment. *See, e.g.*, *Hamilton v. Speight*, 827 F. App'x 238, 239 (3d Cir. 2020); *Hart*, 717 F.3d at 145; *C.B.C. Dist. & Mktg., Inc.*, 505 F.3d at 821; *ETW Corp.*, 332 F.3d at 919; *Dryer*, 55 F. Supp. 3d at 1185; *CBS Interactive Inc.*, 259 F.R.D. at 414; *cf. Gionfriddo*, 114 Cal. Rptr. 2d at 311. The district court in *Daniels* explicitly refused to consider the First Amendment question at the pleadings stage, concluding that "consideration of this defense requires an analysis of evidence that is not possible or appropriate at the motion to dismiss stage." *Daniels*, 2017 WL 4340329, at *11–12. Of note, the court found it could not "make the threshold determination as to whether the speech at issue should be properly characterized as commercial or non-commercial" at the motion to dismiss stage because it lacked a "proper factual and evidentiary basis to conduct such an analysis." *Id.* at *12.

---

[22] Some courts also consider the "[n]on-monetary interests that publicity rights are sometimes thought to advance." *C.B.C. Distrib. & Mktg., Inc.*, 505 F.3d at 824. These interests include "protecting natural rights, rewarding celebrity labors, and avoiding emotional harm." *Id.* That said, most courts have found that the right of publicity is intended to "promote only economic interests and that noneconomic interests are more directly served by so-called rights of privacy." *Id.* at 824 (citing *Cardtoons, L.C.*, 95 F.3d at 967; *Gionfriddo*, 114 Cal. Rptr. 2d 307). And even those cases that have provided substantive discussion on these issues have typically found that these "non-economic justifications for the right of publicity [a]re unpersuasive as compared with the interest in the freedom of expression." *C.B.C. Distrib. & Mktg., Inc.*, 505 F.3d at 824 (citing *Cardtoons, L.C.*, 95 F.3d at 967); *see also id.* ("We do not see that any of these interests are especially relevant here, where baseball players are rewarded separately for their labors, and where any emotional harm would most likely be caused by a player's actual performance, in which case media coverage would cause the same harm.").

Like the court in *Daniels*, this Court finds it is too early in the litigation to address the weighty issues necessary for First Amendment balancing. If appropriate, Defendants may raise their First Amendment defenses again at summary judgment.

## IV.    CONCLUSION

For the reasons discussed above, Defendants' motions to dismiss are granted as to Count III, which is dismissed as duplicative of Count II. The remainder of Defendants' motions are denied. An appropriate order follows.